PETER RUKIN (SBN 178336)
*prukin@rhdtlaw.com*
VALERIE BRENDER (SBN 298224)
*vbrender@rhdtlaw.com*
RUKIN HYLAND DORIA & TINDALL LLP
100 Pine Street, Suite 2150
San Francisco, CA 94111
Telephone:   (415) 421-1800
Facsimile:   (415) 421-1700

WILMER J. HARRIS (SBN: 150407)
*wharris@sdshhlaw.com*
SCHONBRUN DESIMONE SEPLOW HARRIS & HOFFMAN LLP
715 Fremont Avenue, Suite A
S. Pasadena, CA 91030
Telephone: (626) 441-4129
Facsimile: (626) 283-5770

(Additional counsel listed on the next page)

REDACTED VERSION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

RAYMOND ALFRED and MARVIN BARRISH, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

PEPPERIDGE FARM, INC., a Connecticut Corporation, and DOES 1-100, inclusive,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.: 2:14-cv-7086-JAK-RZx

Honorable John A. Kronstadt

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT AS CLASS COUNSEL**

**(FED. R. CIV. P. 23(A), (B)(3), (G))**

**Hearing Date:** December 14, 2015
**Time:** 8:30 a.m.
**Courtroom:** 750 – 7th Floor
**Judge:** Hon. John A. Kronstadt

THOMAS V. URMY, JR.
*turmy@shulaw.com*
IAN J. MCLOUGHLIN
*imcloughlin@shulaw.com*
SHAPIRO HABER & URMY LLP
Seaport East
Two Seaport Lane
Boston, MA 02210
Telephone: (617) 439-3939
Facsimile: (617) 439-0134

ADAM SHAFRAN
*ashafran@rflawyers.com*
RUDOLPH FRIEDMANN LLP
92 State Street
Boston, MA 02109
Telephone: (617) 723-7700
Facsimile: (617) 227-0313

Attorneys for Plaintiffs

Plaintiffs' Mem. Of Ps & As ISO of Motion                 Case No.: 2:14-cv-7086-JAK-RZx
**REDACTED VERSION**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF FACTS ................................................................... 2

    A.    Overview of PFI Distribution Operations ................................. 2

    B.    SDAs Operate Under Materially Common Consignment Agreements That Reserve For PFI Broad Rights to Control SDA Work Activities ........................................................................ 3

    C.    SDAs Are Paid Under a Common Commission Plan ............................ 4

    D.    PFI Retains Common Control Over SDA Hiring and Training .............. 4

    E.    PFI Retains Common Control Over the Work of SDAs ........................ 5

        1.    PFI Commonly Controls Sale and Distribution of Product in Chain Stores ................................................................ 5

        2.    PFI Monitors All SDAs' Work Via PFI's Handheld Computer System ................................................................ 7

        3.    PFI Establishes and Enforces Common Performance Metrics for SDAs ................................................................ 8

    F.    PFI Classifies All SDAs as Independent Contractors, Requires Them to Bear Certain Common Business Expenses, and Denies Them Other Statutory Employment Rights. .......................... 11

III.  ARGUMENT ................................................................................... 12

    A.    The Proposed Class Meets the Requirements of Rule 23(a) ................ 12

        1.    The Class is Sufficiently Numerous ............................................ 12

        2.    Significant Common Questions May Be Answered By Common Proof ................................................................ 12

        3.    The Named Plaintiffs' Claims Are Typical .................................. 13

        4.    The Named Plaintiffs are Adequate Representatives .................. 14

    B.    The Proposed Class Satisfies the Requirements of Rule 23(B)(3) ................................................................................ 14

        1.    Common Questions Predominate over Individual Questions ..... 14

            a.    Whether SDAs Are Employees or Independent Contractors Is A Common Question That Predominates Over Individual Issues ................................ 15

                i.    Whether PFI Has Retained the Right to Control the Manner and Means By Which SDAs Accomplish their Job Is Subject to Common

**REDACTED VERSION**

Proof ................................................................ 15

ii.    Secondary Factors Are Subject to Common
       Proof ........................................................ 17

       a.    Whether PFI Has the Right to Terminate
             SDAs At Will Is Subject to Common
             Proof ................................................ 18

       b.    Whether SDAs are engaged in a distinct
             occupation or business Is Subject to
             Common Proof ............................... 18

       c.    Whether the Job of SDA Requires
             Special Skill Is Subject to Common
             Proof ................................................ 19

       d.    Whether PFI or the SDAs supply the
             Instrumentalities and Place of Work Is
             Subject to Common Proof. ............ 19

       e.    The Length of Services Factor Is Subject
             to Common Proof .......................... 20

       f.    The Method of Payment Factor Is
             Subject to Common Proof ............. 20

       g.    Whether the Work Performed By SDAs
             Is Part of PFI's Regular Business Is
             Subject to Common Proof ............. 20

       h.    Parties' belief ................................. 20

b.    Common Questions Also Predominate
      with Respect to Plaintiffs' Underlying
      Wage and Hour Claims ............................... 21

      i.    Common Questions Predominate
            with Respect to Plaintiffs' Labor
            Code Section 2802 Claims ............ 21

      ii.   Common Questions Predominate
            with Respect to Plaintiffs' Meal
            and Rest Break Claims ................... 22

      iii.  Common Questions Predominate
            as to Whether PFI Is Liable For
            Unpaid Overtime Wages and
            Waiting Time Penalties ................. 23

      iv.   Common Questions Predominate
            with Respect to Plaintiffs' Wage
            Statement Penalty Claims ............. 24

      v.    Common Questions Predominate
            with Respect to Plaintiffs' Unfair
            Competition Law Claims .............. 24

- iv -

        2.     A Class Action is Superior to Multiple Individual Actions ........ 24

IV.    CONCLUSION ................................................................. 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs' Mem. Of Ps & As ISO of Motion       Case No.: 2:14-cv-7086-JAK-RZx

**REDACTED VERSION**

# TABLE OF AUTHORITIES

## CASES

*Alexander v. FedEx Ground Package Sys., Inc.*,
    765 F.3d 981 (9th Cir. 2014)..................................................................passim

*Amchem Products, Inc. v. Windsor*,
    117 S. Ct. 2231 (1997) ...................................................................................14

*Ayala v. Antelope Valley Newspapers, Inc.*

    59 Cal. 4th 522, 533 (2014).....................................................................15, 18

*Bowerman v. Field Asset Servs., Inc.*,
    No. 13-CV-00057-WHO, 2015 WL 1321883 (N.D. Cal. Mar. 24, 2015) 13, 16, 23

*Bradley v. Networkers Int'l, LLC*,
    211 Cal. App. 4th 1129 (2012)......................................................................23

*Brinker Rest. Corp. v. Superior Court*,
    53 Cal. 4th 1004 (2012).................................................................................22

*Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 639 (S.D. Cal. 2010) .........21, 22, 24

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011)..........................................................................14

*Estrada v. FedEx Ground Package Sys., Inc.*,
    154 Cal. App. 4th 1 (2007).....................................................................20, 21

*Faulkinbury v. Boyd & Associates, Inc.*,
    216 Cal. App. 4th 220 (2013)........................................................................23

*Guifu Li v. A Perfect Franchise, Inc.*,
    No. 5:10-CV-01189-LHK, 2011 WL 4635198 (N.D. Cal. Oct. 5, 2011)........24

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998).............................................................14, 15, 24

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992)....................................................................13, 14

*Hopkins v. Stryker Sales Corp.*,
    No. 5:11-CV-02786-LHK, 2012 WL 1715091 (N.D. Cal. May 14, 2012) .....21

*In re Cooper Companies Inc. Sec. Litig.*,
    254 F.R.D. 628 (C.D. Cal. 2009) ..................................................................12

*In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*,
    273 F.R.D. 424 (N.D. Ind. 2008) ..................................................................17

*In re Rubber Chemicals Antitrust Litig.*,
    232 F.R.D. 346 (N.D.Cal.2005)....................................................................12

Plaintiffs' Mem. Of Ps & As ISO of Motion                    Case No.: 2:14-cv-7086-JAK-RZx

**REDACTED VERSION**

*JKH Enterprises, Inc. v. Dep't of Indus. Relations*,
142 Cal. App. 4th 1046 (2006) ........................................................... 21

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) ............................................................. 15

*Lopez v. Ace Cash Express, Inc.*,
No. LA CV11-04611 JAK, 2012 WL 1655720 (C.D. Cal. May 4, 2012) ....... 24

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581(9th Cir. 2012) ............................................................. 13

*Medlock v. Host Int'l, Inc.*,
No. 1:12-CV-02024-JLT, 2013 WL 2278095 (E.D. Cal. May 22, 2013). ...... 22

*Nguyen v. Baxter Healthcare Corp.*,
275 F.R.D. 596 (C.D. Cal. 2011) ....................................................... 23

*Norris-Wilson v. Delta-T Grp., Inc.*,
270 F.R.D. 596 (S.D. Cal. 2010) .................................................. 18, 24

*Rehberg v. Flowers Baking Co. of Jamestown, LLC*,
No. 3:12-CV-00596-MOC, 2015 WL 1346125 (W.D.N.C. Mar. 24, 2015) ... 17

*Rodriguez v. Hayes*,
591 F.3d 1105 (9th Cir.2010) ............................................................ 13

*Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093 (9th Cir.) ............................. 17, 19, 20

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*
(1989) 48 Cal. 3d 341 ............................................................. 15, 17, 18

*Smith v. Cardinal Logistics Mgmt. Corp.*,
No. 07-2104 SC, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) ................. 13

*Villalpando v. Exel Direct Inc.*,
303 F.R.D. 588 (N.D. Cal. 2014) ................................................. passim

*Wal–Mart Stores, Inc. v. Dukes*,
131 S.Ct. 2541 (2011) ..................................................................... 13

**STATUTES**

Cal. Lab. Code § 2802 ...................................................................... 21

Cal. Labor Code § 202 ...................................................................... 23

Cal. Labor Code § 226(a) .................................................................. 24

Cal. Labor Code §§ 226.7 .................................................................. 22

Cal. Labor Code § 2802(a) ................................................................ 21

Cal. Labor Code § 510 ...................................................................... 23

**OTHER AUTHORITIES**

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778 (2d ed. 1986) ........................................................................ 15

IWC Wage Order 9–2001 ........................................................................... 22, 23

IWC Wage Order No. 9 ..................................................................................... 24

**RULES**

Fed. R. Civ. P. 23(a)(1) ..................................................................................... 12

Fed. R. Civ. P. 23(b)(3) ............................................................................... 14, 25

Plaintiffs' Mem. Of Ps & As ISO of Motion                    Case No.: 2:14-cv-7086-JAK-RZx

**REDACTED VERSION**

# I.       INTRODUCTION

Pepperidge Farm, Inc. ("PFI") produces and markets packaged snack foods throughout the United States, including California. To deliver its products to retail stores, the company operates a distribution system manned by Pepperidge Farm Sales Development Associates ("SDAs"). SDAs' primary duties consist of delivering Pepperidge Farm products to stores in their territory, ensuring that the shelves are stocked according to "planograms," and rotating out stale/out of code product. Plaintiffs allege that although PFI treated them and other SDAs as employees, PFI classified them as independent contractors and unlawfully denied them the statutory benefits of employment.

Plaintiffs now move for certification of a class composed of of all signatories to SDA Consignment Agreements in the State of California between August 7, 2010 and the present who personally delivered, stocked, and merchandised consigned product in retail stores in California. Certification of this class is appropriate because Plaintiffs satisfy all the requirements of Rule 23(a) and (b)(3). The class is sufficiently numerous, Plaintiffs are adequate class representatives, their claims are typical of the class, and Plaintiffs' claims turn on numerous and predominantly common questions. Indeed, the overarching question is this case—whether PFI misclassified its California SDAs as independent contractors—is subject to common proof. PFI's controls over the SDAs have been standardized in uniform consignment agreements, PFI's corporate compliance manual, and other company policies applicable to all SDAs. Whether these common controls are sufficient to render SDAs employees under the primary "right of control" test can be decided once and for all Class members at a class trial. The same is true of the secondary factors relevant to employee status, nearly all of which can be determined on a class-wide basis. Finally, the class claims are manageable and class treatment is a superior means of adjudicating these common claims.

-1-

**REDACTED VERSION**

## II.      STATEMENT OF FACTS

### A. Overview Of PFI Distribution Operations

PFI is in the business of producing, marketing, and distributing snack products throughout the United States.[1] The day-to-day work of delivering, stocking, and merchandising PFI's snack products to retail stores in California is performed by SDAs.[2] Using trucks and tools they are required to purchase and maintain, SDAs pick up PFI-owned product[3] from depots and deliver that product to PFI's retail customers, including major chain store operations like Kroger, Target, Ralphs, and Wal-Mart.[4]

SDAs are a "key part of PFI's business" and are PFI's "face in the marketplace."[5] Approximately 90 percent of SDAs are single truck "owner/operators."[6] PFI's expectation is that SDAs are personally delivering, stocking, and merchandising PFI's product in retail stores from early in the morning through mid-afternoon, and it communicates that expectation to SDAs beginning with the hiring process.[7] PFI's Interview Guide for SDAs instructs managers to inform candidates that they will be "a delivery person working on a truck" and contains numerous other refences to both the expectation that SDAs personally work their routes and the number of hours that they are expected to work.[8]

---

[1] Dkt. No. 12; Declaration of Peter Rukin In Support of Plaintiffs' Motion for Class Certification ("Rukin Decl."), *Exh. 23*, at PF-CA-ESI-012594.  All Exhibits to Rukin Decl. will hereafter be cited as "Exh. __".
[2] *Exh. 24*, at PF-CA-ESI052898-99.
[3] 30(b)(6) Deposition of John Lucas, Director of Retail Operations of Southern California and Las Vegas, ("PFI Dep.") at 77:16-78:6; 15:14-23.
[4] *See Exh. 25*, at PF-CA-ESI-016937
[5] PFI Dep. at 78:7-14; Deposition of Kyle Jordan, Vice President, Sales Execution and Distributor Engagement ("Jordan Dep."), 12:1-16; 115:9-15.
[6] *Exh. 25*, at PF-CA-ESI-016943; Jordan Dep., 189:9-15.
[7] *Exh. 26*, at PF-CA-ESI-059662; *Exh. 27*, at PF-CA-ESI-013471; *Exh. 28*, at PF-CA-ESI-062861-64; Deposition of Wil Werther, District Sales Manager ("Werther Dep."), at 11:21-12:8; 30:10-21.
[8] *Exh. 29*,at PF-CA-ESI-056442, Section 6; *see also* Jordan Dep., at 183:16-184:18; 187:18-188:19.

- 2 -

**B. SDAs Operate Under Materially Common Consignment Agreements That Reserve For PFI Broad Rights To Control SDA Work Activities**

All California SDAs operate under the terms of uniform "Consignment Agreements" which set forth PFI's ███████████████████ relating to the DSD system.[9] According to PFI, these Consignment Agreements ███████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████.

The common Consignment Agreements identify SDAs' primary responsibilities within PFI's DSD system: delivering PFI product to stores; stocking and arranging (also known as "merchandising") PFI's displays in retail stores according to PFI's space merchandising and promotions; rotating and removing out-of-code (stale) product from store shelves to ensure an adequate and fresh supply of PFI products; and maintaining proper service frequency.[11] Under the Consignment Agreements, SDAs are limited to distribution of PFI products to retail stores within their assigned geographic area or "route."[12] SDAs may not distribute non-PFI product if that product competes with PFI product or if its distribution would interfere with SDAs best efforts obligations.[13] Pepperidge Farm retains a number of other rights under the terms of the Consignment Agreement, including: rights relating to SDAs' equipment, dress, and helpers; and rights related to the insurance that SDAs must purchase.[14] PFI has the right to terminate its relationship with SDAs with or without cause.[15]

---

[9] ***Exh. 30***, at PF-CA-ESI-016119.
[10] *Id.*
[11] ***Exh. 31*** (sample Consignment Agreement), at PF-CA004726, ¶4.
[12] ***Exh.31***, ¶1, Schedule A.
[13] ***Exh. 31***, ¶4; PFI Dep. at 46:3-47:10.
[14] ***Exh.31***, ¶¶ 5, 13.
[15] ***Exh. 31***, ¶¶19, 20, 23.

Plaintiffs' Mem. Of Ps & As ISO of Motion                    Case No.: 2:14-cv-7086-JAK-RZx

**REDACTED VERSION**

### C. SDAs Are Paid Under A Common Commission Plan

All California SDAs are compensated under the same commission system, and earn their commissions upon completion of deliveries of PFI products to retail customers.[16] Commissions are paid weekly and memorialized on "settlement statements."[17]

### D. PFI Retains Common Control Over SDA Hiring And Training

PFI administers a system by which incoming SDAs purchase the right to distribute PFI products on PFI's routes.[18] PFI provides "████████████████████████████████████████████████████████████"[19] PFI launched its own website ("PFRoutes.com") advertising available routes ████████████ ████████████████████████ interested in becoming SDAs.[20] Some routes are sold by PFI directly, while others are transferred from an existing SDA to someone who wants to become an SDA.[21] Sometimes PFI allows existing SDAs to "split" off portions of their route, which are then run by a new SDA.[22] PFI plays a central role in the transfer process.[23] In every case, PFI retains the right to decide who may become an SDA.[24] Every prospective SDA must submit an application to PFI, and every prospective SDA is interviewed by PFI management.[25] PFI retains the right to reject any route transfer or split.[26] In most cases, the new SDA obtains financing for the route

---

[16] PFI Dep. at 70:15-25; *see also* ***Exh. 24***, at PF-CA-ESI-052899; ***Exh. 29***, at Section 6.
[17] ***Exh. 32***, at PF-CA-ESI-008276-86 (example SDA settlement statement).
[18] ***Exh. 29***, at Sections 6, 9; ***Exh. 33***, at PF-CA-ESI-055268.
[19] ***Exh. 34***, at PF-CA-031076-77.
[20] *Id.*
[21] ***Exh. 29***, at Sections 1, 2 (desire to sell agreements and instructions for company-owned distributorships).
[22] *Id.*
[23] *Id.*; ***Exh. 35***, at PF-CA-ESI-061009-062.
[24] ***Exh. 31***, ¶18 (stating that "The Distributorship may not be sold, conveyed or transferred by Consignee in whole or in part without the prior written approval of Bakery" and that any purchaser must "meet the requirements of Bakery as to character, ability, financial responsibility, business acumen, adequate facilities, and involvement in the business….").
[25] ***Exh. 29***, at Section 1 (Route Procedures for FSF & Road Map).
[26] ***Exh. 31***, ¶18.

Plaintiffs' Mem. Of Ps & As ISO of Motion                Case No.: 2:14-cv-7086-JAK-RZx
**REDACTED VERSION**

"purchase" through a bank financing program initiated by PFI itself.[27] PFI's route transaction process is systemized through the Route Transaction Manual.[28]

PFI also has a onboarding program for new SDAs, memorialized in a manual.[29] DSMs may train new SDAs on the "rules of the road" and how to run their route, including many of the tasks involved with the delivery and stocking of PFI product.[30]

**E. PFI Retains Common Control Over The Work Of SDAs**

The work performed by SDAs is comprehensively circumscribed by PFI both directly and as a function of the nature of the work that PFI has assigned them.

**1. PFI Commonly Controls Sale And Distribution Of Product In Chain Stores**

SDAs service two types of retail stores: chain accounts and cash accounts. The Consignment Agreement defines Chain accounts as any legal entity that "owns or operates three or more retail stores."[31] Over 99% of all sales revenue generated from the sale of PFI product in California comes from PFI's chain account customers.[32] Consequently, nearly all SDA commission earnings are from chain accounts.[33]

PFI commonly retains and exercises control over all aspects of the relationship with its chain accounts. PFI establishes the relationship with the chain accounts, negotiates the price at which PFI product is sold to chain accounts, directly bills chain accounts for all product, and handles all monetary transactions with these stores.[34] PFI and its chain account customers also decide which products will go on the shelves of

---

[27] PFI ███████████████████████████████████████
[28] ████████████████████████████████████████████
████████████████████████████████████████████
. *33*, at PF-CA-ESI-055241.
[30] *Id.*; PFI Dep. at 79:5-17, 85:8-23.
[31] *Exh. 31*, at PF-CA004726.
[32] *Exh. 20*, at 3; *Exh. 19.*, at 10.
[33] *See Exh. 1* (Alfred Decl.), ¶ 10; *Exh. 2* (Barrish Decl.), ¶ 10; *Exh. 3* (Taylor Decl.), ¶ 7; *Exh. 4* (Alves Decl.), ¶ 8; *Exh. 5* (Caputo Decl.), ¶ 9; *Exh. 6* (Dufault Decl.), ¶ 6; *Exh. 7* (Chinn Decl.), ¶ 6; *Exh. 8* (Epilone Decl.), ¶ 6; *Exh. 9* (Ouye Decl.), ¶ 6; *Exh. 10* (Kenny Decl.), ¶ 8; *Exh. 11* (Seeto Decl.), ¶ 6; *Exh. 12* (Coody Decl.), ¶ 11; *Exh. 13* (Moses Decl.), ¶ 6; *Exh. 14* (Johnson Decl.), ¶ 10.
[34] PFI Dep. at 94:9-95:5; *Exh. 19* at 8-10.

- 5 -

the stores, the amount of shelf space that PFI products will have, and how these products will be arranged on the shelf.[35] In order to implement these specifications stores develop detailed schematics or "planograms" with input from PFI.[36] In addition, PFI creates its own ██████████████████"[37] SDAs are directed to comply with all of these planograms, though they provide no input on these essential diagrams that determine much of their daily work and compensation.[38]

PFI corporate develops promotions for PFI products, and works with chain accounts to determine which promotions the stores will run.[39] All SDAs are expected to comply with promotions of PFI product.[40] PFI also employs a field sales force that engages with the chain accounts at the store level to try to secure additional space for PFI products above and beyond that which PFI corporate has negotiated.[41] PFI's field sales force (including its district sales managers, or "DSMs") are in chain stores frequently to promote product placement and engage in other selling (like asking store managers to leave displays up over holiday weekends).[42] There is no type of promotional or "selling activity" done by SDAs that cannot be performed by DSMs.[43]

PFI also uniformly retains all necessary control over the manner, timing,

---

[35] PFI Dep. at 209:8-213:10; *see also* ***Exh. 1*** (Alfred Decl.), ¶ 11; ***Exh. 2*** (Barrish Decl.), ¶ 9; ***Exh. 3*** (Taylor Decl.), ¶ 8; ***Exh. 4*** (Alves Decl.), ¶ 9; ***Exh. 5*** (Caputo Decl.), ¶¶ 10-11; ***Exh. 6*** (Dufault Decl.), ¶ 7; ***Exh. 7*** (Chinn Decl.), ¶ 7; ***Exh. 8*** (Epilone Decl.), ¶ 7; ***Exh. 9*** (Ouye Decl.), ¶ 7; ***Exh. 10*** (Kenny Decl.), ¶¶ 9-10; ***Exh. 11*** (Seeto Decl.), ¶ 6; ***Exh. 12*** (Coody Decl.), ¶¶ 12-13; ***Exh. 13*** (Moses Decl.), ¶¶ 7-8; ***Exh. 14*** (Johnson Decl.), ¶ 11.
[36] *Id.*; PFI Dep. at 92:4-93:13.
[37] ***Exh. 36***, at PF-CA-ESI-072743.
[38] *Id.* at 92:4-13, 270:10-17; *see also infra* Section III.E.3 (discipline for noncompliance with schematic). Schematics and Pepperidge Farm promotions largely determine the amount of product that SDAs order. *See* ***Exh. 1*** (Alfred Decl.), ¶ 12; ***Exh. 2*** (Barrish Decl.), ¶ 11; ***Exh. 3*** (Taylor Decl.), ¶ 9; ***Exh. 4*** (Alves Decl.), ¶ 10; ***Exh. 6*** (Dufault Decl.), ¶ 7; ***Exh. 7*** (Chinn Decl.), ¶ 7; ***Exh. 8*** (Epilone Decl.), ¶ 9; ***Exh. 9*** (Ouye Decl.), ¶ 7; ***Exh. 10*** (Kenny Decl.), ¶ 11; ***Exh. 11*** (Seeto Decl.), ¶ 7; ***Exh. 12*** (Coody Decl.), ¶ 10; ***Exh. 13*** (Moses Decl.), ¶ 10; ***Exh. 14*** (Johnson Decl.), ¶¶ 12-13.
[39] PFI Dep. at 107:22-108:11, 257:8-259:10.
[40] *Id.* at 102:20-103:10, 130:20-131:21.
[41] *Id.* at 215:17-217:11.
[42] *Id.* at 194:12-17, 195:9-19.
[43] *Id.* at 218:6-9.

Plaintiffs' Mem. Of Ps & As ISO of Motion                    Case No.: 2:14-cv-7086-JAK-RZx
**REDACTED VERSION**

volume, and frequency of product delivery to chain accounts. All or nearly all chain stores have narrow delivery windows or "receiving hours,"[44] which are ███████████ ████████,"[45] SDAs are required to deliver PFI product during these delivery windows, which can be as short as four hours.[46] These receiving hours control when SDAs work. According to PFI, a primary advantage of the DSD system is "███████ █████████,"[47] and PFI has promulgated recommended service frequency standards for its SDAs that set forth the number of times per week that SDAs should visit their stores.[48] These standards describe how SDAs should divide up their store visits by day of the week.[49] PFI retains the right to instruct and direct SDAs regarding its frequency expectations,[50] and PFI considers an SDA's failure to meet frequency standards as "non-performance" and a disciplinary offense.[51]

Finally, PFI retains additional control over the volume and type of products that SDAs distribute by reserving for itself the right to send SDAs product that they have not ordered. This practice, referred to as "plussing out" or sending product "on allocation," requires that SDAs find a way to place this product in the stores on their route or potentially suffer the economic consequences of stale product.[52]

### 2. PFI Monitors All SDAs' Work Via PFI's Handheld Computer System

All SDAs are required to purchase and operate their route with a handheld computer ("handheld") loaded with PFI's software that is "███████████████

---

[44] PFI Dep. at 80:15-19; *see also* SDA schedules set by receiving hours and Pepperidge Farm's expectations of SDAs. *See Exh. 1* (Alfred Decl.), ¶ 9; *Exh. 2* (Barrish Decl.), ¶ 8; *Exh. 3* (Taylor Decl.), ¶ 6; *Exh. 4* (Alves Decl.), ¶ 7; *Exh. 5* (Caputo Decl.), ¶ 8; *Exh. 6* (Dufault Decl.), ¶ 5; *Exh. 8* (Epilone Decl.), ¶ 5; *Exh. 9* (Ouye Decl.), ¶ 5; *Exh. 10* (Kenny Decl.), ¶ 7; *Exh. 11* (Seeto Decl.), ¶ 5; *Exh. 12* (Coody Decl.), ¶ 9; *Exh. 13* (Moses Decl.), ¶ 5; *Exh. 14* (Johnson Decl.), ¶ 8.
[45] *Exh. 29*, at Section 6.
[46] *See Exh. 4* (Alves Decl.), ¶ 7.
[47] *Exh. 37*, at PF-CA-030493.
[48] *Exh. 38*, at PF-CA-030234 (Recommended Snacks Service Frequency Standards and Recommended Snacks Delivery Tickets By Day Of Week Standards).
[49] *Id.*
[50] *Exh. 38*, at PF-CA-030232; PF-CA-030234.
[51] *Exh. 39*, at PF-CA-ESI04447; *see also infra* Section III.E.3.
[52] PFI Dep. at 104:2-105:6; *see e.g. Exh. 1* (Alfred Decl.), ¶ 18; *Exh. 2* (Barrish Decl.), ¶ 17; *Exh. 3* (Taylor Decl.), ¶ 15; *Exh. 4* (Alves Decl.), ¶ 16.

- 7 -

██████████████████████████████████████[53] The handheld allows PFI to monitor the activity on an SDA's route and contains detailed information about an SDA's daily work.[54] PFI requires SDAs to use their handheld for all accounts.[55] SDAs are required to send to PFI the information that the handheld has stored about their daily activity.[56] The information in the handheld is used to generate historical data about service frequency and stale that assists PFI in the monitoring, evaluation, and discipline of SDAs.[57] Starting in February 2016, the handheld will also have a GPS function which may provide data to PFI regarding an SDA's location during the day.[58]

### 3. PFI Establishes And Enforces Common Performance Metrics For SDAs

PFI evaluates SDA performance by applying "████████████████████████████████ ████████████████."[59] The common key performance indicators that PFI considers in evaluating SDA performance include: the volume of delivered product and sales-to-objective; the amount of stale/out-of-date product; service frequency;[60] "service to best practices" (compliance with day-of-week standards for delivery tickets);[61] distribution of new items within set time periods; meeting attendance and communciation; store manager feedback; deportment; compliance with customers' planogram programs; proper shelf inventory management (*i.e.,* keeping out-of-date product off the shelf and rotating product); the maintenance of merchandising

---

[53] PFI Dep. at 81:8-19, 83:12-19; *see also **Exh. 24**,* at PF-CA-ESI-052900; ***Exh. 40**,* at PF-CA-030794.

[54] *See **Exh. 20**,* Defendant's Responses in Lieu of Deposition Testimony, at 3-7.

[55] ***Exh. 41**,* at PF-CA-030427; *see also* PFI Dep. at 120:17-121:24.

[56] ***Exh. 33**,* at PF-CA-ESI-055263; *see e.g., **Exh. 1*** (Alfred Decl.), ¶¶ 9,14; ***Exh. 2*** (Barrish Decl.), ¶ 14; ***Exh. 5*** (Caputo Decl.), ¶ 17; ***Exh. 8*** (Epilone Decl.), ¶ 11.

[57] *See id.; see also infra* Section III.E.3.

[58] ***Exh. 42**,* at PF-CA-030315.

[59] ***Exh. 43**,* at PF-CA-ESI-056390.

[60] ***Exh. 44**,* at PF-CA-ESI-070601-604 (describing performance metrics, BDS, and store evaluations); *see also **Exh. 45**,*at PF-CA-ESI-071907-09. (BDS warning letter for sales volume, out of codes, and service frequency and days of week).

[61] *Id.,* at PF-CA-ESI-070575.

- 8 -

standards and promotional performance;[62] and the redistribution of product from warehouse-delivered pallets to ensure complete sell-off.[63]

DSMs are ███████████████████████████

███ ,"[64] DSMs review "scorecard" assessments of SDA performance daily, DROs review them weekly, and PFI has generated summaries ranking SDAs from best to worst on the overall score.[65] In addition, PFI expects each DSM to conduct at least ten store audits/evaluations per week.[66] During those evaluations, the DSMs review planogram compliance, display compliance, whether product is out of code, product rotation, service frequency, and discuss SDA performance with store personnel.[67] PFI also expects DSMs to conduct route rides, during which DSMs ride with or trail an SDA.[68] During the route ride, the DSM evaluates the SDA's service (including service frequency and appropriate days of week), distribution (including out of codes and proper ordering for displays and promotions), space, and merchandising (compliance with the stale policy, planograms, and whether the SDA is using a helper).[69] After the route ride, the DSM provides performance feedback to the SDA.[70]

Any SDA with "performance issues" may be subjected to a disciplinary system known as the "Business Development System" or "BDS".[71] BDS is "█████████████

---

[62] *Id.*, at PF-CA-ESI-070575, PF-CA-ESI-070601-604 (evaluating SDAs on whether they communicated promotional activity to stores and whether they executed on promotions)
[63] PFI Dep. at 129:12-131:21, 133:6-134:4; ***Exh. 46***, at PF-CA-ESI-015675.
[64] PFI Dep.at 167:23-25.
[65] *Id.* at 156:12-58:9; *see also* ***Exh. 47,*** at PF-CA-ESI-060763, PF-CA-ESI-060786.
[66] PFI Dep. at 191:10-15; *see, e.g.,* ***Exh. 48***, at PF-CA-ESI-000095; Werther Dep., at 92:7-12; Deposition of Gary Bess, District Sales Manager ("Bess Dep."), at 11:21-12:2; 57:3-5.
[67] *See, e.g.,* ***Exh. 49***, at PF-CA-ESI-019200; *see also* Werther Dep., at 94:18-102:20; Bess Dep., at 168:6-25; 173:12-178:8.
[68] PFI Dep., at 191:2-15; *see also* ***Exh. 48***, at PF-CA-ESI-000095; Werther Dep., at 138:15-25; Bess Dep., at 186:11-187:8.
[69] *See, e.g.,* ***Exh. 50*** (Completed Route Ride)), at PF-CA-ESI-009201-9206); *see, e.g.,* Werther Dep., at 141:22-148:25; Bess Dep., at 191:23-192:22; 193:19-196:21; 203:16-205:15.
[70] *Id.*; *see also* Werther Dep., at 159:15-20.
[71] PFI Dep., at 163:6-25; *see also* ***Exh. 30***, at PF-CA-ESI-016125.



1     ████████████,"[72] and ██████████████████

2 ██████████████████"[73] The BDS system includes template warning letters (also

3 known as "five day letters") that can be sent to under-performing SDAs instructing

4 them on "██████████████████████

5 ████████████████████████████

6 ██████████████████████████████████

7 ████████████████████████████████

8 ██████████ The purpose of the warning letters is "about the SDA satisfying the

9 customer."[75] PFI also requires the under-performing SDA to participate in sit-down

10 sessions with his or her DSM and DRO.[76] An SDA who fails to improve his or her

11 performance after these warning and corrective measures may be subject to

12 termination at PFI's discretion.[77]

13      PFI also manages SDA performance against the above key metrics through its

14 "Stale Policy."[78] The Stale Policy, which applies to all SDAs in California,[79] allows

15 SDAs to return out-of-code or damaged ("stale") snack products to PFI for a credit.[80]

16 SDAs who, in PFI's discretion, do not satisfy certain performance metrics may have

17 their Stale Policy "privileges" revoked.[81] PFI uses stale privileges as an additional tool

---

[72] PFI Dep. at 183:16-18; *see also **Exh. 30***, at PF-CA-ESI-016125.

[73] PFI Dep. at 176:8-14; *see also **Exh. 30***, at PF-CA-ESI-016125 ("The BDS process is most commonly used to address chronic under-performance"); *see also **Exh. 52***, at PF-CA-ESI-015726 (listing as potential areas of improvement: sales volume, service frequency, communications, days of service, schematic compliance, out of stock conditions, among many other potential issues).

[74] ***Exh. 30***, at PF-CA-ESI-016126 (listing various letter types); *see also **Exh. 51***, at PF-CA-ESI-012826 (collecting letter templates).

[75] PFI Dep. at 184:10-19.

[76] ***Exh. 30***, at PF-CA-ESI-016125-26 (describing sequencing of meetings and letters); ***Exh. 52***, at PF-CA-ESI-015726 (same).

[77] ***Exh. 30***, at PF-CA-ESI-016126.

[78] ***Exh. 38***, at PF-CA-030232 (stating that SDAs must maintain Pepperidge Farm's service frequency and tickets by day of the week standards and compliance with planograms and display programs, among other requirements, in order to maintain their stale privileges).

[79] PFI Dep. at 268:10-12, 268:21-269:1.

[80] *id*.

[81] ***Exh. 53***, at PF-CA-ESI-014903 (Business Development System: Guidelines for SDAs with Revoked Stale Privileges) (describing the procedure for revoking stale

to manage SDA performance.[82] PFI also provides direction to SDAs by email, telephonically, through the SDAs' handheld, or through in-person meeetings regarding a host of work and performance issues.[83]

### F. PFI Classifies All SDAs As Independent Contractors, Requires Them To Bear Certain Common Business Expenses, And Denies Them Other Statutory Employment Rights.

PFI classifies all California SDAs as independent contractors.[84] SDAs are required to bear certain common business expenses, including fuel, vehicle maintenance, insurance, pallet fees,[85] warehouse expenses, stale chargebacks, and the cost of the handheld and printer.[86] Other costs related to SDA distribution of PFI product—including warehousing expenses at PFI-leased depots,[87] the installation of graphics on SDAs trucks, and advertising and promotional activities and related items—are commonly borne by PFI.[88] As a matter of policy, PFI does not pay SDAs overtime wages for overtime hours worked, has no policy providing SDAs with meal and rest breaks, and does not provide SDAs with itemized wage statements.[89]

---

privileges).

[82] *Exh. 38*, at PF-CA-030232-234; *Exh. 44*, at PF-CA-ESI-070566; PF-CA-ESI-070570.

[83] *See e.g., Exh. 1* (Alfred Decl.), ¶ 15; *Exh. 2* (Barrish Decl.), ¶ 13; *Exh. 3* (Taylor Decl.), ¶ 12; *Exh. 4* (Alves Decl.), ¶ 12; *Exh. 5* (Caputo Decl.), ¶ 18; *Exh. 8* (Epilone Decl.), ¶ 7; *Exh. 9* (Ouye Decl.), ¶ 9; *Exh. 11* (Seeto Decl.), ¶ 9; *Exh. 12* (Coody Decl.), ¶ 17; *Exh. 13* (Moses Decl.), ¶ 13; *Exh. 14* (Johnson Decl.), ¶ 16; *Exh. 54*, at PF-CA-ESI-009164 (direction to appear before 7:00 a.m. for display compliance).

[84] *Exh. 30*, at PF-CA-ESI-016131; *Exh. 19*, at 8.

[85] Pallet fees are fees that SDAs pay for the direct shipment of Pepperidge Farm product to stores on their route. *See* PFI Dep., at 98:3-99:24.

[86] PFI Dep. at 279:13-281:10; *see also Exh. 24*, at PF-CA-ESI-052899-052900 (describing distributorship costs); *Exh. 55*, at PF-CA-ESI-012775 (same).

[87] *Exh. 57*, at PF-CA-030440-46. Some SDAs pick up product from PFI-leased depots. In those instances where an SDA does not utilize a PFI-leased depot, PFI provides the SDA with a "depot allowance" payment to help offset any costs the SDA bears in renting or leasing his own depot space.  PFI Dep., at 52:24-53:84; *Exh. 58*, at PF-CA-030222-030224.

[88] *See* PFI Dep., at 51:22-53:8, 280:18-281:10; *Exh. 56*, at PF-CA-ESI-012458-59 (describing SDA support); *Exh. 59* (high-performing SDAs receive perks to help offset their fuel expenses); *Exh. 60*, at PF-CA-ESI030428 (same); *Exh. 25*, at PF-CA-ESI-016946 (describing PFI effort to reduce SDA business expenses).

[89] PFI Dep., at 72:2-4, 297:14-299:16 (no meal or rest break policy and no way of recording missed meal or rest breaks); *Exh. 20*, at 8-9 (no meal break policy); *Exh. 32*, at PF-CA008276-86 (sample SDA settlement statement, which does not include hours worked, hourly rates, or missed meal and rest breaks).

- 11 -

# III.   ARGUMENT

## A. The Proposed Class Meets The Requirements Of Rule 23(a)

### 1.  The Class Is Sufficiently Numerous

Numerosity is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The party seeking certification "do[es] not need to state the exact number of potential class members, nor is a specific number of class members required for numerosity." *In re Rubber Chemicals Antitrust Litig.,* 232 F.R.D. 346, 350 (N.D.Cal.2005). However, numerosity is presumed where the plaintiff class contains forty or more members. *In re Cooper Companies Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009) (citing to *Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995)).

Here, Plaintiffs seek to certify a class composed of all signatories to SDA Consignment Agreements in the State of California between August 7, 2010 and the present who personally delivered, stocked, and merchandised consigned product in retail stores in California. According to Defendant, at least 291 SDAs operated in California during the liability period.[90]  PFI expected these SDAs to personally deliver, stock, and merchandise PFI product, and the evidence establishes that nearly all of these SDAs did so. *See supra* at Section II.A.[91]

### 2.  Significant Common Questions May Be Answered By Common Proof

---

[90] Dkt. No.1, at 17.

[91] The PFI California-based DSMs deposed to date have testified that nearly all SDAs personally deliver product and stock shelves, and they have been able to identify only three so-called "absentee SDAs" who are not on their trucks doing the day-to-day work. Werther Dep., at 32:8-37:17 (identifying two absentee SDAs over the last five years of the seventeen current and eight former SDAs in his district); Werther Dep., at 91:9-93:5 (absentee SDAs have someone else delivering the product); Bess Dep., at 24:23-26:4 (absentee SDA is "a distributor that is not physically on the truck"); Bess Dep., at 18:15-19:22 (of the 18 current and three former SDAs in Mr. Bess' territory, only one is an absentee SDA); *see also* ***Exh. 1*** (Alfred Decl.), ¶ 19; ***Exh. 2*** (Barrish Decl.), ¶ 19; ***Exh. 3*** (Taylor Decl.), ¶ 16; ***Exh. 4*** (Alves Decl.), ¶ 17; ***Exh. 5*** (Caputo Decl.), ¶ 22; ***Exh. 6*** (Dufault Decl.), ¶ 12; ***Exh. 7*** (Chinn Decl.), ¶ 12; ***Exh. 8*** (Epilone Decl.), ¶ 5; ***Exh. 9*** (Ouye Decl.), ¶ 14; ***Exh. 10*** (Kenny Decl.), ¶ 17; ***Exh. 11*** (Seeto Decl.), ¶ 14; ***Exh. 12*** (Coody Decl.), ¶ 22; ***Exh. 13*** (Moses Decl.), ¶ 17; ***Exh. 14*** (Johnson Decl.), ¶ 19.

Plaintiffs' Mem. Of Ps & As ISO of Motion                    Case No.: 2:14-cv-7086-JAK-RZx

**REDACTED VERSION**

Commonality is satisfied when there exists a common question "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011). One such common question in this case is whether Defendant misclassified SDAs as independent contractors under California law. Resolution of this common question using common proof (including common agreements and policies) will resolve an issue central to PFI's liability in this case. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) ("commonality only requires a single significant question of law or fact."); *Bowerman v. Field Asset Servs., Inc.*, No. 13-CV-00057-WHO, 2015 WL 1321883, at *14 (N.D. Cal. Mar. 24, 2015) ("whether putative class members were misclassified under California law as independent contractors" is common question capable of common resolution).

### 3.  The Named Plaintiffs' Claims Are Typical

"[T]he typicality requirement is permissive and requires only that the representative's claims are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Rodriguez v. Hayes,* 591 F.3d 1105, 1124 (9th Cir.2010) (internal citations omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citations omitted).

Here, Plaintiffs allege the same wrong as other Class Members: misclassification as independent contractors. *Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-2104 SC, 2008 WL 4156364, at *5 (N.D. Cal. Sept. 5, 2008) (typicality satisfied where Plaintiffs "presented evidence that [Defendant] had a corporate practice of classifying delivery drivers as independent contractors and that this practice was common to the overwhelming majority of [Defendant's] delivery

1  drivers."). Plaintiffs' claims against PFI are thus typical. *Hanon,* 976 F.2d at 508.

### 4. The Named Plaintiffs Are Adequate Representatives

To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (citing to *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

Plaintiffs have satisfied the adequacy prong of Rule 23(a). Plaintiffs do not have any conflicts of interest with other class members; they share common injuries with the class and seek monetary relief that will benefit the entire class.[92] Plaintiffs have actively participated in this case through responding to Defendant's discovery requests and attending depositions. Plaintiffs' counsel is experienced in complex class action wage and hour litigation and has prosecuted this case vigorously.[93]

### B. The Proposed Class Satisfies The Requirements of Rule 23(B)(3)

Plaintiffs satisfy the requirements of Rule 23(b)(3) because: (1) questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. *See* Fed. R. Civ. P. 23(b)(3).

### 1. Common Questions Predominate Over Individual Questions

Rule 23(b)(3) tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 117 S. Ct. 2231, 2249 (1997). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an

---

[92] ***Exh. 1*** (Alfred Decl.), ¶¶ 1-4; ***Exh. 2*** (Barrish Decl.), ¶¶ 1-4.
[93] Rukin Decl., ¶¶ 2-10; Declaration of Thomas V. Urmy, Jr. in Support of Plaintiffs' Motion for Class Certification, ¶¶ 4-6); Declaration of Adam Shafran in Support of Plaintiffs' Motion for Class Certification, ¶¶ 2-9.

- 14 -

individual basis." *Hanlon*, 150 F.3d at 1022 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778 (2d ed. 1986)). The presence of some individualized issues, such as damages, does not preclude a finding that common issues predominate. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) (individualized damages are insufficient to defeat class certification; "damages determinations are individual in nearly all wage-and-hour class actions.").

As discussed below, common issues predominate with respect to the central and foundational question of whether SDAs have been misclassified as independent contractors. Common questions also predominate with respect to each of Plaintiffs' substantive claims.  Accordingly, Plaintiffs have satisfied Rule 23(b)(3).

### a.  Whether SDAs Are Employees Or Independent Contractors Is A Common Question That Predominates Over Individual Issues

### i.  Whether PFI Has Retained The Right To Control The Manner And Means By Which SDAs Accomplish Their Job Is Subject To Common Proof

"The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired."  *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 988 (9th Cir. 2014) (citing to *S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations* (1989) 48 Cal. 3d 341, 350). "[W]hat matters under the common law is not how much control a hirer *exercises,* but how much control the hirer retains the *right* to exercise."*Ayala v. Antelope Valley Newspapers, Inc.* 59 Cal. 4th 522, 533 (2014) (emphasis in original); *see also Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 608 (N.D. Cal. 2014) ("[T]he Court must ask, 'Is [Defendant's] right of control over its [drivers], whether great or small, sufficiently uniform to permit classwide assessment?") (quoting *Ayala,* 59 Cal. 4th at 533).

Here, the extent to which PFI has reserved the right to control the manner and means of SDAs' work is subject to common proof. PFI has admittedly formalized, routinized and standardized the DSD system to ensure that the system's performance is predictable and responsive to PFI's business goals. The fact that SDAs perform

- 15 -

**REDACTED VERSION**

common tasks within a standardized system is evidenced in PFI's own documents, which commonly convey work expectations precisely and in great detail to the entire class of SDAs. *See supra* Section II.E.

The common proof begins with the Consignment Agreements. PFI has rolled out materially identical contracts in order to █████████████████████ ████████████████████████████████████████████████████████ ███████████████ *See supra* Section II.B and evidence cited therein. All SDAs have the same job responsibilities per the terms of their contracts, and PFI's rights with respect to chain accounts (which account for over 99% of PFI's revenue in California) are the same for all SDAs. *See supra* Section II.E.1 and evidence cited therein. These contracts permit PFI to remove stores from all SDA routes; to terminate SDAs for cause without remuneration for their routes; and to terminate SDAs without cause.[95] *See supra* Section II.B. The existence of such common contract terms supports certification. *See Villalpando*, 303 F.R.D. at 608 ("[U]niform contracts are a significant focus of the 'right to control' inquiry."); *Alexander*, 765 F.3d at 989 (focusing on FedEx's contracts, policies, and practices for route operators).

SDAs are also subject to a common onboarding process that PFI has standardized and controls. *Supra* Section II.D. SDAs are uniformly required to purchase and use a handheld loaded with PFI's software which extensively tracks SDA and store activity. *Supra* Section II.E.2. And PFI uniformly retains and exercises the right to evaluate and discipline SDAs for perceived performance deficiencies through a set of common tools, including Store Evaluations, Route Rides, Five Day Letters, and revocation of stale privileges. *Supra* Section II.E.3. All SDAs are subject to the performance standards set forth in PFI's stale policy and BDS process. *Id.*

Courts have found similar independent contractor arrangements susceptible to common proof and suitable for class treatment. *See Bowerman*, 2015 WL 1321883, at

---

[94] ***Exh. 30***, at PF-CA-ESI-016119.
[95] ***Exh. 31***, at PF-CA004727, ¶ 7.

*1 (certifying California wage and hour claims where Plaintiffs performed property preservation work as independent contractors for Defendant, operated under Defendant's common system, and claimed that they were misclassified); *Villalpando*, 303 F.R.D. at 610  (certifying a class of delivery who alleged they were misclassified as independent contractors); *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, No. 3:12-CV-00596-MOC, 2015 WL 1346125, at *1 (W.D.N.C. Mar. 24, 2015) (certifying a wage and hour case where Plaintiffs alleged that a commercial bakery misclassified its distributors as independent contractors and where the distributors were required to sign Distributor Agreements and deliver, stock, and merchandise the bakery's bread); *In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 273 F.R.D. 424, 458-59 (N.D. Ind. 2008) (certifying California wage and hour claims in an independent contractor misclassification case where FedEx operators/delivery drivers signed a standard operating agreement).

As a result of these standardized policies, work rules, and other common evidence, the Court may determine on a classwide basis whether the degree of PFI has retained sufficient control over SDAs to render them employees.

### ii.   Secondary Factors Are Subject To Common Proof

While "the right to control work details is the most important" consideration, secondary factors (which Plaintiffs can demonstrate using common proof) may also be relevant in determining whether an employment relationship exists. *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1100 (9th Cir.) *cert. denied,* 135 S. Ct. 877 (2014) (quoting  *Borello,* 48 Cal. 3d at 350) (internal quotations omitted). These additional factors include: (a) whether the putative employer has the right to terminate at will, without cause;[96] (b) "whether the one performing services is engaged in a distinct occupation or business;" (c) "the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist

---

[96] *Alexander*, 765 F.3d at 994 (recognizing that the right to discharge at will is "strong evidence in support of an employment relationship.")

- 17 -

without supervision;" (d) "the skill required in the particular occupation;" (e) "whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work;" (f) "the length of time for which the services are to be performed;" (g) "the method of payment, whether by the time or by the job;" (h) "whether or not the work is part of the regular business of the principal;" and (i) whether the parties "believe they are creating the relationship of employer-employee." *Alexander*, 765 F.3d at 988-89 (quoting *Borello,* 48 Cal. 3d at 783).

In evaluating the secondary factors at the class certification stage, the Court "must identify whether the factor will require individual inquiries or can be assessed on a classwide basis." *Villalpando,* 303 F.R.D. at 608 (quoting *Ayala,* 59 Cal. 4th at 538) (internal quotations omitted). The Supreme Court in *Ayala* noted that Courts must weigh these factors "with an eye to the reality that the considerations in the multi-factor test are not of uniform significance." *Ayala,* 59 Cal. 4th at 539 ("Some, such as the hirer's right to fire at will and the basic level of skill called for by the job, are often of inordinate importance.") "Accordingly, the impact of individual variations on certification will depend on the significance of the factor they affect." *Id.; see also Norris-Wilson v. Delta-T Grp., Inc.*, 270 F.R.D. 596, 608 (S.D. Cal. 2010) (finding that variation among class members were not "meaningful" where, "[a]t best, they touch on just three of the [] secondary factors articulated in *Borello and Sons....*").

Here, as described below, common proof exists with respect to all significant secondary factors.

### a. Whether PFI Has The Right To Terminate SDAs At Will Is Subject To Common Proof

The right to terminate at will is subject to common proof: all of the PFI form contracts contain common termination provisions for SDAs.  *See supra* Section II.B.

### b. Whether SDAs Are Engaged In A Distinct Occupation Or Business Is Subject To Common Proof

Whether SDAs are engaged in a distinct occupation or business is subject to common proof.  PFI operates a standardized DSD system in which SDAs play the

- 18 -

common role of delivering and merchandising PFI's product. *Supra* Section II.A. All Class Members are subject to the common requirement that they perform the work in their own name or through a corporation in which they have at least a 51 percent ownership interest, and must personally guarantee that the work will be done according to the contract.[97]  Proof on this prong is common. *Villalpando*, 303 F.R.D. at 609 ("to the extent the drivers are performing the same type of work, the 'distinct occupation or business' factor can be decided on a classwide basis").

### c. Whether The Job Of SDA Requires Special Skill And Whether Work Is Performed Under The Principal's Direction Are Subject To Common Proof

Whether or not the job of SDA requires special skill is subject to common proof. All SDAs all perform the same work, which PFI admits does not require any special license, training, or skill.[98]  Further, PFI admits that it applies uniform hiring criteria for SDAs, that all SDAs operate under the same management and supervision structure, and that all are subject to the same policies. *See supra* Section II. D-E. Common proof predominates with respect to these factors.  *Ruiz*, 754 F.3d at 1104 (considering under the skill factor that "[Defendant] did not require special driving licenses or even any work experience…"); *Alexander,* 765 F.3d at 995 (considering FedEx's supervision system when analyzing whether work was performed under the principal's direction).

### d. Whether PFI Or The SDAs Supply The Instrumentalities And Place Of Work Is Subject To Common Proof.

PFI has common policies regarding which costs are borne by PFI and which are borne by SDAs.  All SDAs must provide their own trucks and bear all fuel and maintenance expenses.  *Supra* Section II.F. PFI uniformly requires SDAs to purchase a handheld computer and printer and maintain liability insurance.  *Id.* Finally, PFI has

---

[97] *See **Exh. 61***, at PF-CA004685-PF-CA004690, PF-CA004693.
[98] Defendant's Response to Raymond Alfred's Special Interrogatories, Set One, ("Defendant's First ROG Responses"), at 11; PFI Dep. at 296:10-22.

Plaintiffs' Mem. Of Ps & As ISO of Motion          Case No.: 2:14-cv-7086-JAK-RZx
**REDACTED VERSION**

common and standardized policies regarding warehousing expenses. *Id*. Common proof predominates with respect to this factor. *See Alexander*, 765 F.3d at 995 (analyzing who provides the vehicles and other equipment, and who supplies the funds and recommends vendors).

### e.  The Length Of Services Factor Is Subject To Common Proof

All SDA contracts contain the same general terms for the duration of the contract, which is ongoing and indefinite.[99] *Supra* Section II.B. This factor is thus subject to common proof.

### f.  The Method Of Payment Factor Is Subject to Common Proof

All SDAs are paid on commission as a percentage of wholesale sales, which is spelled out in the contracts. *Supra* Section II.C. The effect of this payment scheme on employment status is subject to classwide resolution.

### g.  Whether The Work Performed By SDAs Is Part Of PFI's Regular Business Is Subject To Common Proof

PFI operates a common system of SDAs' delivering the company's products to market. *Supra* at Section II.A.  Whether this system is part of the regular business of PFI will be resolved in one stroke for all class members. *Dukes,* 131 S.Ct. at 2551; *see also Ruiz*, 754 F.3d at 1105 (agreeing with the district court's finding that Defendant's drivers "perform those very home delivery services that are the core of [Defendant's] regular business."); *Alexander*, 765 F.3d at 996 ("The work that the drivers perform, the pickup and delivery of packages, is 'essential to FedEx's core business.'") (quoting *Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 8 (2007)).

### h.  Parties' Belief

While there may or may not be differences in Class Members' beliefs regarding the creation of an independent contractor relationship, any such differences do not preclude class certification because "the parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship." *Ruiz*, 754 F.3d at

---

[99] ***Exh. 31***, at PF-CA004731, ¶ 26.

1105 ((quoting *Estrada*, 154 Cal. App. 4th at 11); *Alexander*, 765 F.3d at 997

("Ultimately, though, 'neither [FedEx]'s nor the drivers' own perception of their

relationship as one of independent contracting' is dispositive.") (quoting *JKH*

*Enterprises, Inc. v. Dep't of Indus. Relations*, 142 Cal. App. 4th 1046, 1065 (2006)).

Plaintiffs are aware of no decision in which class certification was denied because of

of variations in class members' beliefs regarding their independent contractor status.

### b. Common Questions Also Predominate With Respect To Plaintiffs' Underlying Wage And Hour Claims
### i. Common Questions Predominate With Respect To Plaintiffs' Labor Code Section 2802 Claims

California Labor Code Section 2802(a) states that "[a]n employer shall

indemnify his or her employee for all necessary expenditures or losses incurred by the

employee in direct consequence of the discharge of his or her duties…."  Here,

Plaintiffs seek reimbursement for SDAs' necessary and common expenses: the cost of

the their trucks; fuel; maintenance; registration; the cost of their handheld devices and

printers; insurance, and where applicable, warehousing fees.  *Supra* at II.F.  Defendant

admits that its policy was to not reimburse SDAs for these specific expenses.

Defendant's common policies on reimbursements make this claim susceptible to

common proof.  *Villalpando*, 303 F.R.D. at 609 (Section 2802 claim "len[t] itself to

class treatment to the extent that [defendant] ha[d] a uniform policy as what is

reimbursed and what is not"); *Hopkins v. Stryker Sales Corp.*, No.

5:11-CV-02786-LHK, 2012 WL 1715091, at *9 (N.D. Cal. May 14, 2012) (common

questions predominated "in the inquiry as to whether [Defendant's] business expense

reimbursement policy violated Cal. Lab. Code § 2802" and where Plaintiffs had

identified common categories of expenses that were not reimbursed); *Dilts v. Penske*

*Logistics, LLC*, 267 F.R.D. 625, 639 (S.D. Cal. 2010) (where "putative class members

were engaged in a common type of job and performed common tasks," common issues

**REDACTED VERSION**

predominated on Section 2802 claim).[100]

### ii.     Common Questions Predominate With Respect To Plaintiffs' Meal And Rest Break Claims

IWC Wage Order 9–2001 provides that "no employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes." *See also* Cal. Labor Code §§ 226.7 and 512.  Where an employer fails to maintain meal period records, there is a rebuttable presumption that the meal period was not provided. *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1053 (2012) (Werdeger, J., concurring); *Medlock v. Host Int'l, Inc.*, No. 1:12-CV-02024-JLT, 2013 WL 2278095, at *3 (E.D. Cal. May 22, 2013).  IWC Wage Order No. 9, § 12 further provides that employers "shall authorize and permit all employees to take rest periods." If an employer does not authorize and permit the amount of rest break time called for by the applicable wage order, then it has violated the wage order and is liable. *Brinker Rest. Corp*, 53 Cal. 4th at 1033.

Whether or not Defendant had a policy of practice of failing to provide Class Members with meal and rest breaks will be subject to common proof. PFI admits that it never promulgated a written meal or rest break policy and never otherwise had a policy of notifying class members that they were authorized or permitted to take meal and rest breaks. PFI also concedes that it has never made a premium payment for missed or late meal and rest periods. *Supra* Section II.F.  Further, there is common evidence regarding work demands created by receiving hours that are "prevalent on every route." *Supra* Section II.E.1. From this common evidence the trier of fact may determine whether PFI had a policy or practice of failing to provide meal and rest breaks to Class Members.  *Villalpando,* 303 F.R.D. at 609 (lack of a meal/rest break

---

[100] For the same reason, Plaintiffs' California Labor Code Section 221 claim is amenable to class resolution. Defendant does not dispute that it had a policy of deducting pallet fees, handheld computer maintenance fees, and the cost of stale product from SDA compensation. *Supra* Section II.F.  Whether these policies are lawful under Section 221 is subject to common proof.  *Dilts*, 267 F.R.D. at 635; *Villalpando*, 303 F.R.D. at 609.

- 22 -

policy and the uniform failure to authorize such breaks are matters of common proof.); *Nguyen v. Baxter Healthcare Corp.*, 275 F.R.D. 596, 600-01 (C.D. Cal. 2011) (common issues predominated where there were uniform policies regarding meal breaks and where Defendant never paid extra pay for missed or late meals during the class period); *Bradley v. Networkers Int'l, LLC*, 211 Cal. App. 4th 1129, 1151 (2012), *as modified on denial of reh'g* (Jan. 8, 2013) ("[W]hen an employer has not authorized and not provided legally-required meal and/or rest breaks, the employer has violated the law and the fact that an employee *may* have actually taken a break or was able to eat food during the work day does not show that individual issues will predominate in the litigation."); *Faulkinbury v. Boyd & Associates, Inc.*, 216 Cal. App. 4th 220, 235 (2013), *review denied* (July 24, 2013) (same).

### iii.   Common Questions Predominate As To Whether PFI Is Liable For Unpaid Overtime Wages And Waiting Time Penalties

California Labor Code Section 510 and IWC Wage Order 9–2001, § 3 requires overtime compensation for non-exempt employees.  Although Plaintiffs and class members routinely worked overtime hours,[101] PFI admits that it has no overtime policy and uniformly failed to pay overtime compensation.  *Supra* Section II.F. Whether Plaintiffs and SDA class members are owed overtime compensation can be resolved on a classwide basis once the underlying misclassification issue is resolved. *Villalpando*, 303 F.R.D. at 609 (minimum wage and overtime claims could be resolved classwide where class members were subject to common payment practices); *Bowerman*, 2015 WL 1321883, at *15 (certifying misclassification case including overtime claims). Additionally, an employer must provide an employee with all unpaid wages within a certain timeframe upon termination of employment. California Labor Code § 202. An employer who willfully fails to timely pay compensation is

---

[101] ***Exh. 1*** (Alfred Decl.), ¶ 9; ***Exh. 2*** (Barrish Decl.), ¶ 8; ***Exh. 3*** (Taylor Decl.), ¶ 6; ***Exh. 4*** (Alves Decl.), ¶ 7; ***Exh. 5*** (Caputo Decl.), ¶ 8; ***Exh. 7*** (Chinn Decl.), ¶ 5; ***Exh. 8*** (Epilone Decl.), ¶ 5; ***Exh. 9*** (Ouye Decl.), ¶ 5; ***Exh. 10*** (Kenny Decl.), ¶ 7; ***Exh. 12*** (Coody Decl.), ¶ 10; ***Exh. 13*** (Moses Decl.), ¶ 5.

Plaintiffs' Mem. Of Ps & As ISO of Motion                    Case No.: 2:14-cv-7086-JAK-RZx
**REDACTED VERSION**

liable for waiting time penalties equivalent to the employee's daily wage for a maximum of 30 days. *Id.* at § 203; *Norris-Wilson*, 270 F.R.D. at 611; *Dilts*, 267 F.R.D. at 640 (certifying waiting time penalty claims as derivative claims when other unpaid wage claims were certified).

### iv.   Common Questions Predominate With Respect To Plaintiffs' Wage Statement Penalty Claims

California Labor Code § 226(a) and IWC Wage Order No. 9 require that Defendant semimonthly, or at the time of each payment of wages, to furnish Plaintiffs and putative class members with accurate, itemized written statements containing all the information described in § 226 and Wage Order No. 9, § 7. Whether settlement statements comply with § 226(a) and Wage Order No. 9 can be resolved at once for the entire class. *Norris-Wilson*, 270 F.R.D. at 610 (certifying wage statement claim where overtime pay was uniformly not recorded).[102]

### v.   Common Questions Predominate With Respect To Plaintiffs' Unfair Competition Law Claims

Plaintiffs' UCL claims are predicated on the same underlying wage and hour violations.  To the extent that these wage and hour violations are certifiable under Rule 23, so too should the UCL violation. *Guifu Li v. A Perfect Franchise, Inc.,* No. 5:10-CV-01189-LHK, 2011 WL 4635198, at *15 (N.D. Cal. Oct. 5, 2011) (certifying UCL claim for same wage and hour violations certified under Rule 23).

### 2.  A Class Action Is Superior To Multiple Individual Actions

Class treatment is superior "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon*, 150 F.3d at 1022 (quotation omitted). In evaluating superiority, courts examine: (a) the class members' interests in individually controlling separate actions; (b) the extent and nature of any

---

[102] Plaintiffs' representative claims under PAGA have not been pled as class claims and need not be certified under Rule 23.  *Lopez v. Ace Cash Express,* Inc., No. LA CV11-04611 JAK, 2012 WL 1655720, at *2 (C.D. Cal. May 4, 2012) (Kronstadt, J.) ("Representative PAGA actions are distinct from class actions. Representative PAGA actions may, but need not, be brought as class actions.").

- 24 -

preexisting related litigation; (c) the desirability of concentrating the litigation of the claims in the forum; and (d) manageability. Fed. R. Civ. Pro. 23(b)(3).

These factors support certification. Class members have little interest in individually controlling separate actions; multiple actions would be costly, inefficient, and could lead to inconsistent results.  Plaintiffs are un aware of any other litigation alleging similar claims on behalf of California SDAs.  Plaintiffs and class members are California SDAs asserting California wage and hour claims.  Adjudicating these claims in a California federal court familiar with this type of litigation is desirable.

Finally, this case is manageable. As noted in Plaintiffs' Trial Plan,[103] the common factual and legal questions underlying liability may be litigated first, with a bifurcated damages proceeding to follow. At the liability stage, Plaintiffs and Defendant can present their claims using common evidence, including: (1) PFI's Consignment Agreements; (2) PFI's policies, procedures, and other documents; (3) testimony from PFI's employees concerning policies and practices; (4) testimony of Plaintiffs and a representative sample of class member witnesses. These categories consist of common proof that go to the class a whole. If Defendant establishes that SDAs are independent contractors, then judgment will be entered for Defendant and no further liability or damages proceedings would be necessary.  If Plaintiffs prevail on any of their claims at the liability stage, then Stage II would focus on the allocation of monetary relief to class members. Plaintiffs would present expert[104] and/or representative testimony regarding the amount of overtime worked; the amount of necessary expenses owed; the number of missed and uncompensated meal and rest breaks; the value of waiting time penalties; and the value of wage statement penalties.

## IV.   CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' Motion for Class Certification.

---

[103] *Exh. 22*.
[104] *Id.*; *see also* *Exh. 21* (Expert Statement of Professor Michael Belzer).

Plaintiffs' Mem. Of Ps & As ISO of Motion          Case No.: 2:14-cv-7086-JAK-RZx
**REDACTED VERSION**

1

2    Dated:  October 9, 2015                 Respectfully submitted,

3

4                                            RUKIN HYLAND DORIA & TINDALL LLP

5

6                                            By: */s/ Peter Rukin*
                                             Peter S. Rukin
7
                                             Counsel for Plaintiffs
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 26 -