MORGAN, LEWIS & BOCKIUS LLP
CARRIE A. GONELL, SBN 257163
E-mail: cgonell@morganlewis.com
JOHN D. HAYASHI, SBN 211077
E-mail: jhayashi@morganlewis.com
5 Park Plaza, Suite 1750
Irvine, CA  92614
Tel:   949.399.7000
Fax:   949.399.7001

MORGAN, LEWIS & BOCKIUS LLP
PAUL C. EVANS, (admitted *pro hac vice*)
E-mail: pevans@morganlewis.com
1701 Market Street
Philadelphia, PA  19103
Tel:   215.963.5000
Fax:   215.963.5001

Attorneys for Defendant
PEPPERIDGE FARM, INCORPORATED

THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND ALFRED and MARVIN BARRISH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>PEPPERIDGE FARM, INC., a Connecticut Corporation, and DOES 1-100, inclusive,<br><br>Defendants. | Case No. 2:14-cv-7086-JAK-RZx<br><br>Honorable John A. Kronstadt<br><br>**DEFENDANT PEPPERIDGE FARM, INCORPORATED'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: December 14, 2015<br>Time:          8:30 a.m.<br>Courtroom:    750 – 7th Floor |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

Page(s)

I.   INTRODUCTION .......................................................................................... 1

II.  ARGUMENT ................................................................................................ 3

    A.   Standard .............................................................................................. 3

    B.   Plaintiffs Are Inadequate Class Representatives And Their
        Claims Are Not Typical Of The Putative Class................................... 3

        1.   Plaintiffs' Claims Are Irreconcilable With The Financial
            Interests of Absent Class Members ............................................ 4

        2.   Plaintiffs Cannot Adequately Represent Current SDAs
            Because They Are Interested In Different Remedies ................ 9

        3.   Plaintiffs Are Inadequate Representatives Because They
            Are Subject To Claims By Putative Class Members ............... 10

        4.   Plaintiffs Are Inadequate Class Representatives For The
            Expense Reimbursement Claims ............................................. 10

    C.   Plaintiffs' Proposed Class Definition Makes It Impossible To
        Ascertain Who Belongs In The Putative Class................................... 10

    D.   Plaintiffs Cannot Satisfy Rules 23(a)(2) And 23(b)(3) ..................... 12

        1.   Plaintiffs' Misclassification Claim Cannot Be Resolved
            With A Common Answer ......................................................... 13

        2.   Plaintiffs' Labor Code claims present individualized
            inquiries that cannot be answered on a classwide basis .......... 19

        3.   Plaintiffs Cannot Establish Rule 23(b)(3) Superiority ............. 25

III. CONCLUSION .......................................................................................... 25

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aguilar v. Ocwen Fin. Corp.*,
  2015 WL 1345279 (C.D. Cal. Mar. 24, 2015) ...................................................... 3

*Alberghetti v. Corbis Corp.*,
  263 F.R.D. 571 (C.D. Cal. 2010) ........................................................................ 5

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group*,
  247 F.R.D. 156 (C.D. Cal. 2007) .................................................................... 7, 8

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................... 3

*Andrews Farms v. Calcot, Ltd.*,
  2009 WL 1211374 (E.D. Cal. May 1, 2009) ...................................................... 9

*Audio-Video World of Wilmington, Inc., v. MHI Hotels Two, Inc.*, 2011 WL
  1059169, at *4 (E.D.N.C. Mar. 18, 2011) ......................................................... 4

*Ayala v. Antelope Valley Newspapers, Inc.*,
  59 Cal. 4th 522 (Cal. 2014) ............................................................................. 13

*Braun v. Safeco Ins. Co.*,
  2014 WL 9883831 (C.D. Cal. Nov. 7, 2014) ................................................... 21

*Brody v. Astrazeneca Pharm., LP*,
  2008 WL 6953957 (C.D. Cal. Jun. 11, 2008) .................................................. 20

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
  155 F.3d 331 (4th Cir. 1998) ............................................................................. 4

*Campbell v. Best Buy Stores, L.P.*,
  2013 WL 5302217 (C.D. Cal. Sept. 20, 2013) (Kronstadt, J.) .......................... 23

*Colapinto v. Esquire Dep. Servs., LLC*,
  2011 WL 913251 (C.D. Cal. Mar. 8, 2011) ..................................................... 12

*Coleman v. Jenny Craig, Inc.*,
  2013 WL 6500457 (S.D. Cal. Nov. 27, 2013) .................................................. 25

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ...................................................................... 12

*D'Este v. Bayer Corp.*,
  492 F. App'x 721 (9th Cir. 2012).......................................................21

*Dailey v. Sears, Roebuck & Co.*,
  214 Cal. App. 4th 974 (2013)..............................................................23

*Duran v. U.S. Bank Nat'l Assn.*,
  59 Cal. 4th 1 (2014).............................................................................19

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011)............................................................3, 9

*Hanni v. Am. Airlines, Inc.*,
  2010 WL 289297 (N.D. Cal. 2010).............................................11, 12

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992)................................................................3

*Hansberry v. Lee*,
  311 U.S. 32 (1940) ...............................................................................3

*Harrington v. Home Loan Funding, Inc.*,
  CV 06-6763 ..........................................................................................23

*Hughes v. WinCo Foods*,
  2012 WL 34483 (C.D. Cal. Jan. 4, 2012) (Kronstadt, J.) ...................23

*In re Wells Fargo*,
  268 F.R.D. 604 (N.D. Cal. 2010) .............................................19, 20, 21

*Kline v. Coldwell, Banker & Co.*,
  508 F.2d 226 (9th Cir. 1974)................................................................25

*Litty v. Merrill Lynch & Co.*,
  2014 WL 5904907 (C.D. Cal. Aug. 4, 2014) .....................................20

*Mad Rhino, Inc. v. Best Buy Co.*,
  2008 WL 8760854 (C.D. Cal. Jan. 14, 2008).....................................11

*Marlo v. United Parcel Serv., Inc.*,
  639 F.3d 942 (9th Cir. 2011).........................................................19, 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

iii

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

*Martin v. Pac. Parking Sys. Inc.*,
    583 F. App'x 803 (9th Cir. 2014)........................................................................ 12

*Mazur v. eBay Inc.*,
    257 F.R.D. 563 (N.D. Cal. 2009) ....................................................................... 10

*Morris v. Wachovia Secs., Inc.*,
    223 F.R.D. 284 (E.D. Va. 2004)........................................................................... 5

*Mularkey v. Holsum Bakery, Inc.*,
    120 F.R.D. 118 (D. Ariz. 1988)........................................................................... 9

*Narayan v. EGL, Inc.*,
    285 F.R.D. 473 (N.D. Cal. 2012) ....................................................................... 17

*Nguyen v. Baxter Healthcare Corp.*,
    2011 WL 6018284 (C.D. Cal. Nov. 28, 2011) ................................................... 23

*Norris-Wilson v. Delta-T Group, Inc.*,
    270 F.R.D. 596 (S.D. Cal. 2010) ....................................................................... 23

*O'Connor v. Uber Tech., Inc.*,
    2014 WL 5138097 (N.D. Cal. Sep. 1, 2015)................................................ 10, 24

*Pipes v. Life Investors Ins. Co. of Am.*,
    254 F.R.D. 544 (E.D. Ark. 2008) ......................................................................... 9

*Ramirez v. Yosemite Water Co.*,
    20 Cal. 4th 785 (1999)....................................................................................... 20

*S. Snack Foods, Inc., v. J & J Snack Foods Corp.*,
    79 F.R.D. 679 (D.N.J. 1978) ........................................................................... 5, 6

*Sotelo v. MedianNews Group, Inc.*,
    207 Cal. App. 4th 639 (2012).......................................................................17, 22

*Spencer v. Beavex, Inc.*,
    2006 WL 6500597 (S.D. Cal. Dec. 15, 2006)..............................................12, 17

*Vinole v. Countrywide Home Loans, Inc.*,
    571 F.3d 935 (9th Cir. 2009) .........................................................................20, 22

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) .............................................................3, 12, 19, 25

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

iv

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

*Zackaria v. Wal-Mart Stores, Inc.*,
   2015 WL 2412103 (C.D. Cal. May 18, 2015) .................................................... 21

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ........................................................................... 25

**STATUTES**

Cal. Civ. Code § 1567 ............................................................................................ 6

Cal. Civ. Code § 1608 ........................................................................................ 6, 7

Cal. Labor Code § 1171 ....................................................................................... 20

**OTHER AUTHORITIES**

29 C.F.R. § 541.205 .............................................................................................. 21

DLSE Op. Letter 2003.05.23 ................................................................................ 22

Fed. R. Civ. P 23 .......................................................................................... passim

Wage Order 1-2001 § 1 .................................................................................. 20, 21

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

## I.   INTRODUCTION

Plaintiffs are *former* owners of distributorships through which they each distributed Pepperidge Farm ("PFI") products in exclusive territories.  Each earned substantial sales commissions amounting to more than $100,000 annually.  Each was able to delegate tasks to personnel of their own choosing.  And each owned an asset that dramatically increased in value over time, ultimately spurring other distributors to pay top dollar to acquire these exclusive distribution rights.  In fact, before filing this lawsuit, both Plaintiffs sold their distributorships for more than $500,000—tantamount to a "retirement plan," each testified.  Yet, while Plaintiffs face no risk to a business relationship with PFI that no longer exists, they seek to represent for the more than 200 *current* distributors (also known as "SDAs") whose businesses and lives could be uprooted by the mere existence of a classwide claim brought on their behalf.

As set forth below, Plaintiffs cannot meet their class certification burden under Rule 23 for numerous reasons.  First, Plaintiffs treat the adequacy requirement as little more than a box to be checked, limiting their analysis to two short paragraphs in their 25-page Brief.  But adequacy of representation is a constitutional mandate that demands careful scrutiny, and this case underscores why it is so important.  Opting out of the lawsuit cannot sufficiently protect the due process rights of absent class members because this lawsuit calls into serious question the ongoing validity of the distributors' valuable contracts with PFI.  Since Plaintiffs filed this lawsuit, current SDAs in California have had more difficulty selling their distributorships and have made less profit when they did sell.  Numerous SDAs, including one of Plaintiffs' own declarants, have voiced serious concern about the very risks that Plaintiffs themselves were able to avoid by selling their routes before filing suit.

Plaintiffs also fail to meet Rule 23's requirement to offer a class definition that is presently ascertainable.  Specifically, Plaintiffs propose for the first time in

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

1

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION  FOR CLASS CERTIFICATION

this Motion excluding from the class SDAs who did not "personally deliver, stock and merchandise" products on their routes.  Plaintiffs offer no definition of this new criteria, nor do they suggest how this Court could determine which SDAs "personally" serviced their route—or when—without evidence from each SDA.

Nor can Plaintiffs establish commonality and predominance under Rule 23(a)(2) and (b)(3).  The several hundred putative class members each operate their own businesses and interact with PFI in countless different ways.  Given that variation, Plaintiffs cannot show that the threshold question of misclassification can be answered with common evidence.  Plaintiffs similarly neglect to address the overwhelming number of individualized inquires presented by their Labor Code claims.  Most prominently:  (1) Plaintiffs' overtime and meal and break claims are subject to affirmative defenses of exemption that PFI has a due process right to adjudicate and call for individualized inquiries under this Circuit's caselaw; (2) Plaintiffs cannot establish the *prima facie* elements of their claims on a class basis, as many SDAs never worked overtime hours, and were not forced to miss meal and rest periods; and (3) Plaintiffs' expense reimbursement claims present individualized inquiries such as which expenses were incurred and were reasonable.

Finally, Plaintiffs do not meet their burden under Rule 23's superiority requirement.  Plaintiffs proposed a trial "plan" that is nothing more than a laundry list of alleged trial methodologies, none of which account for the many individualized inquiries necessary to adjudicate each putative class members' claims.  The due process rights of *both* absent class members *and* PFI demand more than the "trial by formula" Plaintiffs propose here.  For all the reasons set forth herein, Plaintiff's Motion should be denied.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

2

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

## II.   ARGUMENT[1]

### A.   Standard

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011).  Therefore, Plaintiffs must pass a "rigorous analysis" before being permitted to represent the interests of absent class members, demonstrating that the proposed class meets all four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011).  If these prerequisites are met, Plaintiffs must then establish at least one subpart of Rule 23(b).  Here, Plaintiffs seek class certification under Rule 23(b)(3), which requires a showing of predominance and superiority.  Plaintiffs have not satisfied Rule 23's requirements.

### B.   Plaintiffs Are Inadequate Class Representatives And Their Claims Are Not Typical Of The Putative Class.

Proposed representatives must prove that they "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Supreme Court has unambiguously held that it violates due process when absent parties are represented by plaintiffs whose "substantial interests are not necessarily or even probably the same as those whom they are deemed to represent." *Hansberry v. Lee*, 311 U.S. 32, 39 (1940).  It is constitutionally imperative that proposed class representatives show that they are "part of [a] class and 'possess the same interest and suffer the same injury' as the class members." *Dukes*, 131 S. Ct. at 2550.

Rule 23's adequacy and typicality requirements "tend to merge." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 (1997); *see also* Fed. R. Civ. P 23(a)(3); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

---

[1]  Plaintiffs' counsel failed to comply with Local Rule 7-3's meet and confer requirement (*see* Gonell Decl. ¶¶ 3-10), providing another basis for dismissal. *See Aguilar v. Ocwen Fin. Corp.*, 2015 WL 1345279, at *2 (C.D. Cal. Mar. 24, 2015).

Plaintiffs do not meet the adequacy and typicality requirements because their interests are incompatible with the interests of most putative class members.

### 1. Plaintiffs' Claims Are Irreconcilable With The Financial Interests of Absent Class Members

Plaintiffs cannot adequately represent a class when, as here, both the assertion of their claims and results they seek are fundamentally at odds with the financial interests of putative class members. Courts have recognized that fatal conflicts of interest between the class representatives and class members are present when the latter has incentive to avoid the litigation entirely, especially when that litigation threatens the value of specific investments.

For example, in *Audio-Video World of Wilmington, Inc., v. MHI Hotels Two, Inc.*, owners of individual residential units at a vacation resort filed a putative class action against the property management company on behalf of all unit owners alleging breach of contract. *See* 2011 WL 1059169, at *4 (E.D.N.C. Mar. 18, 2011). The class representatives who formerly contracted with the company to manage their individual units claimed that the company failed to provide them revenue in connection with a breakfast program. *See id*. The district court declined to certify a class because, as in this case, there was "an overriding conflict between the named plaintiffs and more than a few of potential class members, not only as to remedial preferences, but far more significantly, in the decision to take up the sword in the first place" given the putative class members' concern "not only for continued viability of their rental contracts . . . but just as importantly, for protecting the value of their investments in [the] property itself." *See id.*

In particular, the court found that the putative class members' "incentive to avoid the inevitable impact on . . . property values as a result of a class action lawsuit . . . appears to be far greater than their incentive to collect a percentage of [the breakfast charges]." *Id.* The same type of conflict is present here and, as other courts have held, precludes certification on adequacy grounds. *See Broussard v.*

DEFENDANT PEPPERIDGE FARM, INCORPORATED'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 334 (4th Cir. 1998) (adequacy requirement not satisfied where "pursuing any litigation at all was in tension with the evident desire of many [class members] to put the [] dispute behind them"); *Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 578 (C.D. Cal. 2010) (denying class certification because "[f]or obvious reasons, a class representative is not adequate if the representative seeks relief which the class members do not want"); *Morris v. Wachovia Secs., Inc.*, 223 F.R.D. 284, 299 (E.D. Va. 2004); *S. Snack Foods, Inc., v. J & J Snack Foods Corp.*, 79 F.R.D. 679, 680 (D.N.J. 1978).

Here, as demonstrated next, Plaintiffs' "decision to take up the sword in the first place," has created an irreconcilable conflict between Plaintiffs (former SDAs) and the putative class (most of whom are current SDAs), because the litigation itself imperils the value of the current SDAs' ongoing contractual relationships with PFI—including the devaluation of the current distribution routes.

a.   *This Lawsuit Threatens the Viability of the Consignment Agreement and Current SDAs' Rights Thereunder*

Current SDAs have an ownership interest worth hundreds of thousands of dollars because of rights secured through their contracts with PFI.  *See* **CE 28,** Report of Daniel Slottje ("Slottje Report"), ¶¶ 18-22.  For example, their right to sell their distributorship allows them to profit from the equity appreciation accrued from the time of purchase until the time of sale.  *See id.* ¶ 24.  The SDAs' right to hire and manage employees to assist with their distributorships adds route value by allowing SDAs to service more customers and generate more income.  *See id*. ¶¶ 29-32.  It also makes the routes more desirable to potential purchasers by allowing them to own the routes while still pursuing other endeavors.  *See id.* ¶¶ 36-37.  These rights, however, are contingent on SDAs being classified as independent contractors, as these rights are inherently inconsistent with employment status.  To protect the value of these rights, PFI and the SDAs explicitly agreed that the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

5

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

independent contractor provision of their contracts constitutes an "essential element." Dkt. 54-15 at PgID 1020,[2] Blue 2001 Agreement ¶ 15.[3]

Yet while the enduring validity of the contracts is critical to preserve the value of current SDA distributorships, Plaintiffs here *attack* the contracts as primary evidence that PFI has misclassified SDAs as independent contractors. *See* Pls.' Br. at 16 ("The common proof [of misclassification] begins with the [contracts]."). If Plaintiffs are successful in proving that the terms of the contracts do not permit classification of SDAs as independent contractors, then the existing SDAs will not, as a matter of law, be able to fulfill their agreements to act as independent business owners. In the absence of this essential contract term, the contracts, which do not contain a severability clause, will become void in their entirety. Cal. Civ. Code § 1608 (contract void where any part of consideration is unlawful).[4] Without an enforceable contract, their prized asset will be worthless.

Even if the contracts are not deemed void in their entirety, at minimum, numerous essential provisions of the contracts must be invalidated because they are inherently inconsistent with employee status, as referenced above. Most critically, one does not own a transferrable right to employment and therefore cannot sell or transfer that right to another for profit. The loss of that exceedingly valuable right would have potentially devastating consequences for current SDAs. As set forth in the Slottje Report, potential buyers will account for the possibility that this litigation will result in the loss of that right and others by paying less for distributorships sold while this litigation is pending. *See* **CE 28**, Slottje Report

---

[2] Page number references to previously filed documents are to the Page ID # ("PgID") in the upper right corner of each document.

[3] *See also* **CE 25**, Blue 1992 Agreement, ¶ 15 ("INDEPENDENT BUSINESSMAN. Consignee is a self-employed independent businessman, not an agent or employee of [PF] . . . .").

[4] If the SDAs cannot operate as independent contractors, then both the SDAs and PFI had a mutual mistake about the legitimacy of this material term at the time of contracting, rendering the contract voidable. *See* Cal. Civ. Code § 1567.

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

¶ 44.  Class certification would only signal to the market even more strongly that these valuable rights may be lost, and as a result the amount a willing purchaser will pay for the distributorships will decrease exponentially.  *See id.*  The *moment* Plaintiffs brought this suit, a conflict of interest arose between them and the putative class members, who have a clear interest in protecting their assets' value.[5]

The conflict between Plaintiffs, who already profited from selling their distribution rights, and the current SDA class members, who have every incentive to avoid this litigation entirely, is obvious.  However, even all current SDAs do not have the same interests when it comes to this litigation.  Some current SDAs owe more on loans that are backed by their distribution businesses than the businesses are worth.  They may have no concern about a devaluation of their businesses and may prioritize monetary remedies.  Even for the vast majority of current SDAs who have equity in their distributorships, the amount of equity will vary, as will the damages they may stand to recover in the case.  As a result, the financial interests of different SDAs in retaining their status as independent businesspersons will vary.  These intra-class conflicts are fatal to class certification.  *See Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group*, 247 F.R.D. 156, 176 (C.D. Cal. 2007) (class cannot be certified when members have "opposing interests").  In short, no individual who is willing to jeopardize the distributorship values of current SDAs by pursuing this lawsuit could adequately represent the proposed class.

        b.     *SDA Distributorship Values Have Already Decreased.*

Market data for SDA distributorships in California since the filing of this case shows that the distributorship devaluation expected by Slottje is real and not merely theoretical.  Since this case was filed, the median sales price of distributorships in California has decreased by 3% (after adjusting for differences in retail sales volume on the routes).  *See* **CE 28**, Slottje Report at ¶ 43.  Further, even

---

[5] PFI understands that Plaintiffs may argue that it is obligated to repurchase distributorships if the contracts are voided, but no such obligation exists here.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

though the distributorship listing prices have decreased by 1% *and* more California SDAs are looking to sell distributorships since the filing of this litigation (the average number of distributorships listed per year increased 27% (*id.*)), buyers have purchased distributorships less frequently.  The average number of distributorships purchased per year in California *decreased* by a stunning 31% since the filing of this litigation.  *Id.*  On average, the distributorships that have been sold in California since Plaintiffs filed this litigation were worth *less* at the time of sale than when they were purchased.  The opposite was true before the litigation—i.e., routes (including Plaintiffs' own) were worth *more* when they were sold.  *Id.*

Not surprisingly, many current SDAs have expressed concern that Plaintiffs' pursuit of this litigation may negatively impact the value of—and by extension their ability to sell—their distributorships.  One current SDA, for instance, challenged Plaintiffs' lack of any "skin in the game" and proclaimed: "I also do not want [Plaintiffs] representing me and my interests in this lawsuit.  I am concerned about the effect of this lawsuit on my ability to sell my route, and its price."[6]  Indeed, two of *Plaintiffs' own declarants* admitted as much.  One testified that this lawsuit will "decrease the value of [his] route" and affect his "ability to sell [his] route" because potential buyers "wouldn't want to work for Pepperidge Farm."  **CE 23**, Coody Dep. 24:16-26:14; *see also* **CE 19,** Caputo Dep. 164:20-165:4.

SDAs who are unhappy with this lawsuit cannot protect their interests by simply opting out of any class certified in this matter.  The ongoing risk of devaluation is based on the continued existence of the lawsuit and its potential

---

[6] *See* **CE 7**, Gomez Decl. ¶ 14; **CE 12**, Ramos Decl. ¶ 10 ("I am opposed to plaintiffs' efforts that could jeopardize the value of my investment in my company"); **CE 5**, Ericson Decl. ¶¶ 8, 9 ("I do not see how the two individuals who brought this lawsuit could ever represent my interests."); **CE 2**, Buckel Decl. ¶ 3 ("I would be very concerned if this lawsuit negatively impacts the value of my route or my ability to sell my route"); **CE 14**, Semien Decl. ¶ 12; **CE 9**, Henning Decl. ¶ 6; **CE 6**, Finkelstein Decl. ¶ 19; PFI Summ. of Evid. ("SE") at ¶ 1.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

8

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

impact on the contracts under which each California SDA operates.  As a result, opting out is not a solution to the constitutional problems raised by Plaintiffs' suit.

### 2.    Plaintiffs Cannot Adequately Represent Current SDAs Because They Are Interested In Different Remedies.

Plaintiffs do not appear to know what they want out of this litigation.  They each state in their declarations that "[m]y interest in this lawsuit is to recover wages, unpaid expenses, and other damages resulting from PFI's treatment of me as an employee while classifying me as an independent contractor."  *See* Dkt. 54-5 at PgID 650, Alfred Decl. ¶ 4; *id.* at PgId 659, Barrish Decl. ¶ 4.  Both then contradicted those sworn statements in their depositions, where they stated that the *only* relief they want is changes to alleged PFI practices in dealing with SDAs (**CE 16**, Alfred Dep. 40:13-17; **CE 18**, Barrish Dep. 19:6-20:5)—a remedy that is not even sought in the operative Complaint.  Plaintiffs' failure to even understand what their lawyers have sought in this lawsuit or to direct them to seek what they now claim to want is yet another ground for finding them inadequate to represent the class.

Regardless of their inconsistent statements, as former SDAs, Plaintiffs have severed their economic ties with PFI and therefore would benefit only by "backward looking relief" (i.e., monetary awards).  They have no interest, let alone standing, to pursue remedies such as injunctive relief because they would not benefit from such relief.  *See e.g.*, *Ellis*, 657 F.3d at 988.  Similarly, as former SDAs, Plaintiffs will not suffer from any adverse impact that a judgment against PFI may have on the company and its operations.  By contrast, current SDAs have a strong interest in their ongoing business relationship with PFI and the continued vitality of their distributorships in California and of PFI.  *See e.g.*, *Andrews Farms v. Calcot, Ltd.*, 2009 WL 1211374, at *9 (E.D. Cal. May 1, 2009); *Pipes v. Life Investors Ins. Co. of Am.*, 254 F.R.D. 544, 550 (E.D. Ark. 2008); *Mularkey v. Holsum Bakery, Inc.*, 120 F.R.D. 118, 120 (D. Ariz. 1988).

DEFENDANT PEPPERIDGE FARM, INCORPORATED'S OPPOSITION TO PLAINTIFFS' MOTION  FOR CLASS CERTIFICATION

### 3.   Plaintiffs Are Inadequate Representatives Because They Are Subject To Claims By Putative Class Members.

In addition to the sweeping conflict between Plaintiffs and the vast majority of SDAs they seek to represent, Plaintiffs have an additional layer of conflict with the putative class members to whom they sold their distributorships.  Plaintiffs each testified that they had contemplated filing this lawsuit before they sold their distributorships.  **CE 16**, Alfred Dep. 218:22-24; **CE 18**, Barrish Dep. 178:1-4.  By waiting until after they sold, Plaintiffs were able to shift the risk of suffering devaluation from themselves to the SDAs who purchased from them.  These absent class members may well have unjust enrichment or similar claims *against* Plaintiffs that will only increase as further route devaluation occurs.  Other putative class members who sold all or part of their routes could also face intra-class claims.

### 4.   Plaintiffs Are Inadequate Class Representatives For The Expense Reimbursement Claims.

Plaintiffs have indicated that they may seek to use the IRS mileage reimbursement rate to determine damages on a class-wide basis for their Section 2802 claims.  *See* Dkt. 54-15 at PgID 943, Report of Michael Belzer ("Belzer Report"), ¶ 9.  Plaintiffs have failed to demonstrate that it is in the best interests of the class to waive their claims for actual expenses that are not captured by the IRS mileage rate formula.  In fact, Plaintiffs' own expert testified that that use of the federal mileage rate would be unfair to at least some of the putative class members, because it would not fairly compensate them for their vehicle operation expenses.  **CE 27**, Belzer Dep. 34:7-35:11, 38:8-22.  For this reason alone, Plaintiffs are inadequate representatives for asserting mileage reimbursement claims. *See O'Connor v. Uber Tech., Inc.,* 2014 WL 5138097, at *14 (N.D. Cal. Sep. 1, 2015).

### C.   Plaintiffs' Proposed Class Definition Makes It Impossible To Ascertain Who Belongs In The Putative Class.

Plaintiffs have the burden to offer a class definition that is adequately defined, precise, and *presently ascertainable*—and their failure to do so is an independent basis for denying certification.  *Mazur v. eBay Inc.*, 257 F.R.D. 563,

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW

DEFENDANT PEPPERIDGE FARM, INCORPORATED'S OPPOSITION TO PLAINTIFFS' MOTION  FOR CLASS CERTIFICATION

567 (N.D. Cal. 2009); *Hanni v. Am. Airlines, Inc.*, 2010 WL 289297, at *9 (N.D. Cal. 2010).  Here, Plaintiffs define the putative class as "all signatories to SDA Consignment Agreements in the State of California between August 7, 2010 and the present *who personally delivered, stocked, and merchandised consigned product in retail stores in California*."  Pls.' Br. at 1 (emphasis added).  The italicized criteria renders the class definition unascertainable.

First, Plaintiffs offer no explanation as to what would qualify as having "personally delivered, stocked, and merchandised consigned product."  Such ill-defined language in a class definition precludes certification.  *Mad Rhino, Inc. v. Best Buy Co.*, 2008 WL 8760854, at *3-4 (C.D. Cal. Jan. 14, 2008) (refusing to certify class definition using term like "smaller independent retailers" because it was impermissibly vague).  For instance, it is unclear whether any of the following SDAs would be in the putative class:  an SDA who personally services his distributorship only two days per week because he also works as a full-time grocery store manager (*see* **CE 15**, Werther Decl. ¶¶ 5, 6); an SDA who almost always uses a full-time general manager and a helper, but may rarely personally deliver, stock and merchandise product (*see* **CE 3**, Dangelo Decl. ¶ 12); spouses who each own a distributorship but who generally service the other spouse's distributorship for which they are not the owning SDA (*see* **CE 18**, Barrish Dep. 41:9-42:12).

Second, even if there were a way to define what it means to have "personally delivered, stocked, and merchandised Consigned Product," there is no way to *identify* which SDAs did so and when without obtaining testimony from each SDA.  Plaintiffs' proposed definition does not address how the parties—and the Court— are to ascertain *when* an SDA was (and was not) part of the class.  For example, an SDA may have "personally delivered" merchandise to stores in his territory for some portion of the class period, but had an employee who then performed the deliveries during another portion – would the SDA be a class member and, if so, during what period of time?  That Plaintiffs' proposed class definition would create

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW

such issues of "fluid class membership" by timeframe further demonstrates its unascertainability. *See Colapinto v. Esquire Dep. Servs., LLC*, 2011 WL 913251, at *9 (C.D. Cal. Mar. 8, 2011). Indeed, when Plaintiff Barrish was asked how he would determine whether and how frequently a particular SDA personally serviced the stores in his territory, Barrish testified that he would have to "call him, I guess." **CE 18,** Barrish Dep. 26:23-27:17. This is exactly the type of individualized inquiry that precludes certification. *See Spencer v. Beavex, Inc.*, 2006 WL 6500597, at *9 (S.D. Cal. Dec. 15, 2006) (class definition that sought to exclude "drivers who provided more than 51% of their services to [defendant] by using their own employees or subcontractors" not ascertainable); *see also Hanni*, 2010 WL 289297, at *9; *Martin v. Pac. Parking Sys. Inc.*, 583 F. App'x 803, 804 (9th Cir. 2014).

### D.   Plaintiffs Cannot Satisfy Rules 23(a)(2) And 23(b)(3).

Plaintiffs also fail to meet Rule 23's commonality and predominance requirements, which independently precludes certification. To show commonality under Rule 23(a)(2), Plaintiffs must do more than allege that all class members "have all suffered a violation of the same provision of law." *Dukes*, 131 S. Ct. at 2551. Instead, Rule 23(a)(2) requires Plaintiffs to show that there will be "common *answers* apt to drive the resolution of the litigation. Here, Plaintiffs have posited the precise type of allegedly common *question*—i.e., "whether PFI misclassified its California SDAs as independent contractors" (Pls.' Br. at 1)—that *Dukes* rejected as insufficient. Moreover, a showing of commonality under Rule 23(a)(2) does not end the analysis. Plaintiffs must also establish that "questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that class treatment would be superior to individual litigation." Fed. R. Civ. P. 23(b)(3). This standard is "even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Plaintiffs cannot meet this standard because their claims present a quagmire of individual questions to sort through. Class certification, therefore, is inappropriate.

1.      **Plaintiffs' Misclassification Claim Cannot Be Resolved With A Common Answer.**

Plaintiffs have not—and cannot—show that a classwide answer exists with respect to *Borello*'s principal inquiry:  whether the defendant has "the right to control the manner and means of accomplishing the result desired."  48 Cal. 3d at 350.  And, *Borello*'s "secondary" factors present additional individualized questions that preclude certification of Plaintiffs' misclassification claims.

Initially, the contracts cannot alone be relied upon to answer the misclassification question.  *See Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 535 (Cal. 2014) (parties' "course of conduct" is relevant where there has been "a practical allocation of rights at odds with the written terms").  The contracts do not confer to PFI a *de facto* common right to control by giving PFI the ability to terminate the contract without any consequence.  To the contrary, PFI must pay a 25% penalty above fair market value if it terminates a contract without cause, which could well amount to a six-figure sum.  Dkt. 54-15 at PgID 1019 ¶ 20.[7]

Indeed, Plaintiffs spend much of their Brief discussing alleged evidence outside of the contract.  Thus, the parties agree that this Court must look beyond the contracts to answer the misclassification question.  And doing so reveals substantial, material differences in the relationships between PFI and SDAs that preclude a finding of commonality or predominance.  For example, there are stark differences in how SDAs (*inter alia*): use helpers or employees;[8] set their helpers'

---

[7] Plaintiffs argue (Br. at 16) that PFI can "remove stores from all SDA routes" and "terminate SDAs for cause without remuneration for their routes."  But PFI cannot exercise either right simply because an SDA does not use a particular manner or means to accomplish those results.  Dkt. 54-15 at PgID 1019, 1021, Blue 2001 Agreement ¶¶ 7, 19.  Indeed, for cause terminations are not without remuneration as the Agreements provide for "Consignee's right to receive compensation therefor."  PFI has, in fact, paid individuals in either circumstance for the fair market value of either their stores or their distributorships.

[8] *See* **CE 2**, Buckel Decl. ¶ 13; **CE 6**, Finkelstein Decl. ¶¶ 14, 16; **CE 14**, Semien Decl. ¶ 4; **CE 4**, Deblizan Decl. ¶¶ 2, 5; **CE 1**, Barrack Decl. ¶ 12; **CE 8**, Helton Decl. ¶¶ 4, 7 (showing variation in helper use); *see also* SE at 2.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

13

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION  FOR CLASS CERTIFICATION

hours and schedule;[9] set their own hours and schedule;[10] choose to incorporate their businesses;[11] decide which and what volume of products to order;[12] pursue "cash accounts" (accounts that are not billed by PFI) and negotiate prices with those cash accounts;[13] determine which and how many vehicles to use to operate their businesses;[14] choose what they (or their helpers) wore while delivering consigned product, and whether their trucks bear a PFI logo;[15] and decide when and how to divest some or all of their distributorship or acquire additional territory.[16] Plaintiffs ignore all of this, and instead point to practices that fail to show commonality.

      a.    *The circumstances identified by Plaintiffs do not evidence a common right of control.*

    Plaintiffs point to various facets of SDAs' relationships with PFI that, they say, show uniform control over the manner and means by which each SDA operated his distributorship. The undisputed evidence, however, shows that different SDAs had very different experiences that preclude certification.

---

[9] *See* **CE 8**, Helton Decl. ¶ 7; **CE 4**, Debilzan Decl. ¶ 6; **CE 5**, Ericson Decl. ¶ 22.

[10] *Compare* **CE 2**, Buckel Decl. ¶ 4; **CE 1**, Barrack Decl. ¶¶ 2, 11; **CE 9**, Henning Decl. ¶ 12; **CE 8**, Helton Decl. ¶¶ 7, 13; **CE 7**, Gomez Decl. ¶¶ 5, 8; **CE 10**, Heusner Decl. ¶ 6 (all attesting they control own schedules) *with* Pls.' Br. at 7 n.44; *see also* SE at 3.

[11] *See* **CE 7**, Gomez Decl. ¶ 12; **CE 8**, Helton Decl. ¶ 6; **CE 12**, Ramos Decl. ¶ 1.

[12] *Compare* **CE 4**, Debilzan Decl. ¶¶ 4, 10; **CE 8**, Helton Decl. ¶ 9; **CE 2**, Buckel Decl. ¶ 14; **CE 5**, Ericson Decl. ¶ 12 (they decide what to order); *with* Pls.' Br. at 7 n.52; *see also* SE at 6.

[13] *Compare* **CE 1**, Barrack Decl. ¶ 14; **CE 14**, Semien Decl. ¶ 8; **CE 9**, Henning Decl. ¶ 13; **CE 4**, Debilzan Decl. ¶ 14; **CE 7**, Gomez Decl. ¶ 11 (describing cash account activity on their distributorships) *with* Pls.' Br. at 5 n.33; *see also* SE at 8.

[14] *See* **CE 1**, Barrack Decl. ¶ 15 (one box truck); **CE 4**, Debilzan Decl. ¶ 2 (four trucks); **CE 9**, Henning Decl. ¶ 10 (changed vehicles ); **CE 8**, Helton Decl. ¶ 11 (step van and box truck);  **CE 12**, Ramos Decl. ¶ 3 (van); *see also* SE at 12.

[15] *See* **CE 2**, Buckel Decl. ¶ 11; **CE 6**, Finkelstein Decl. ¶ 8; **CE 1**, Barrack Decl. ¶ 15; **CE 9**, Henning Decl. ¶¶ 8, 9; *see also* SE at 13.

[16] *See* **CE 6**, Finkelstein Decl. ¶¶ 3, 5; **CE 14**, Semien Decl. ¶ 3; **CE 4**, Debilzan Decl. ¶ 17; *with* Pls.' Br. at 4; *see also* SE at 20.

14

For instance, Plaintiffs allege that "PFI expected these SDAs to personally deliver, stock, and merchandise PFI product. . . ." *See* Pls.' Br. at 12.  However, several SDAs—including Plaintiff Alfred himself—say that they, and they alone, decide who services or serviced their distributorships.  *See* n.8, *supra*; **CE 16**, Alfred Dep. 62:10-64:12.  Indeed, Plaintiffs' own proposed class definition recognizes as much.  *See* Section II.C., *supra*.

Plaintiffs also point to various aspects of SDAs' relationships with their chain accounts (i.e., SDAs' own customers) and argue PFI somehow controls the SDAs through those relationships.  For example, they point to store receiving hours and planograms.  *See* Pls.' Br. at 6-7.  Each SDA's territory, however, includes a different configuration of retail and cash stores,[17] different types of retail stores with different practices, as well as a different geographic layout.[18]  If some unidentified customer requirements of SDAs were relevant to the misclassification analysis, individualized inquiries into which SDAs service those stores and how many would be necessary, precluding a finding of commonality.

Moreover, in contrast to Plaintiffs' allegations, other SDAs attest that, in their individual experiences, they determine when and how to best service their customers,[19] how many hours they spend working on their distributorship, and how best to display products at their chain accounts.  These SDAs explain that if they

---

[17] *Compare* **CE 13**, Rice Decl. ¶ 3 (sales from his cash accounts make up 20% of his total sales; **CE 1**, Barrack Decl. ¶ 14 (territory came with cash accounts and has added more); **CE 3**, Dangelo Decl. ¶ 13 (describing SDAs with over 10% cash account business) *with* Pls.' Br. at  5 (suggesting cash accounts comprise less than 1% of SDA business); *see also* SE at 8.

[18] *See, e.g,* **CE 2**, Buckel Decl. ¶ 7 (explaining that his small geographic route allows him to service his stores in less time, and he only works about 35 hours per week); **CE 8** Helton Decl. ¶ 5 (describing challenges of having larger geographic territory); **CE 4** Debilzan Decl. ¶ 3 (describing differences between configuration of his wife's territory and his own).

[19] Although Plaintiffs point to service frequency standards as alleged common evidence many SDAs do not feel controlled by—or follow—them.  *See* SE at 4.

want to work less hours per week, they can either (1) hire more help[20] or (2) split off a piece of their distributorships.[21]  Many SDAs acknowledge that that they control and decide how much product to order. *See* n. 12, *supra*.[22]  The wide variation in these SDAs' experiences precludes a commonality finding.

b.   *PFI's efforts to monitor and encourage SDAs' compliance with their contracts are irrelevant.*

Plaintiffs focus extensively in their brief on evidence that does not answer the question of whether or not PFI has a right to control the manner and means by which they perform.  Plaintiffs cite to a Stale Policy, 5-day cure letters,[23] and the BDS process, which simply measure each SDA's compliance with his contract. These do not mandate the manner and means by which an SDA performs services.[24] They have no bearing on the classification of SDAs.[25]  Similarly, the fact that PFI employs District Sales Managers ("DSM") who, in part, determine through store evaluations if SDAs are complying with their contractual obligations has no bearing on the misclassification test and does not support certification.  Those DSMs also communicate promotions and sales opportunities and make non-mandatory suggestions to SDAs. Although some SDAs may have subjectively felt that a DSM's suggestion was a mandate,[26] many SDAs acknowledge that they are free to—and do—reject their DSMs' suggestions.[27]

---

[20] *See, e.g.*, **CE 4**, Debilzan Decl. ¶ 8 (uses helper so he can work less hours); **CE 6**, Finkelstein Decl. ¶ 16 (increases helpers hours when he wants to take vacation).

[21] *See* **CE 4**, Debilzan Decl. ¶ 17; **CE 18**, Barrish Dep. 41:2-8 (describing splits).

[22] PFI employees confer individually about product allocations with SDAs to see how much product the SDA would like allocated. *See* **CE 3**, Dangelo Decl. ¶ 16.

[23] Several SDAs say 5-day cure letters were not a means of controlling the way they ran their business.  *See* SE at 9.

[24] Plaintiffs also overlook that an SDA could choose not to participate in the Stale Policy and its terms would not apply to him.  *See* **CE 20**, Chinn Dep. 148:12-21.

[25] The unremarkable fact that Pepperidge Farm must approve a purchasing SDA with whom it will enter into a contract, as it would approve any third party vendor before executing an agreement with it, is likewise irrelevant to the *Borello* inquiry.

[26] *See, e.g.*, Dkt. 54-5 at PgID 671, Taylor Decl. ¶ 10; Dkt. 54-6 at PgID 679-80,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

c.   *The Court's application of* Borello*'s secondary factors will likewise require individualized inquiries.*

Courts routinely deny class certification in similar misclassification cases where the *Borello* secondary factors cannot be addressed by common evidence. *See, e.g., Narayan v. EGL, Inc.*, 285 F.R.D. 473, 480 (N.D. Cal. 2012) (denying certification of class of delivery drivers); *Sotelo v. MedianNews Group, Inc.*, 207 Cal. App. 4th 639, 659 (2012).  Plaintiffs fail to make this required showing here.

First, whether each SDA is engaged in a distinct occupation or business under *Borello* cannot be determined without inquiring into the circumstances of every single SDA.  *See Spencer*, 2006 WL 6500597, at *16 (denying class certification due to the distinct business factor); *Narayan*, 285 F.R.D. at 478 (N.D. Cal. 2012) (same).  PFI does not track or monitor whether SDAs work for other companies or own other businesses, or the amount of time each spends on such work.  Some SDAs engage in a wide range of distinct business activities—such as distributing non-food products, and working at a hotel, as a CPA, as a director of a grocery store, and doing "odd jobs."[28]  This Court could only find such information through a "highly individualized" endeavor.  *Spencer*, 2006 WL 6500597 at *16 (individualized nature of this factor alone was enough to preclude certification)

Second, *Borello*'s level of skill and opportunity for profit or loss factors cannot be resolved by common evidence in this case.  *See Sotelo,* 207 Cal. App. 4th at 658-59 (finding "opportunity for profit" factor requires individualized inquires where some individuals possess "entrepreneurial and management skills" that allow them to increase earnings).  207 Cal. App. 4th at 658-59.  Here, the skills

---

Alves Decl. ¶¶ 9, 11, 12.

[27] *See* **CE 13**, Rice Decl. ¶ 10; **CE 8**, Helton Decl. ¶ 12; **CE 14**, Semien Decl. ¶¶ 9-10; **CE 3**, Dangelo Decl. ¶¶ 11, 17; *see also* SE at 7.

[28] *See* Dangelo Decl. ¶ 7 (describing SDA Cox's sophisticated distribution company which distributes a number of product lines, including non-food products); **CE 20**, Chinn Dep. 27:19-25; 98:7-25 (works at hotel 30 hours a week); **CE 15**, Werther Decl. ¶ 5(SDA Ross works full-time at grocery store); **CE 6**, Finkelstein Decl. ¶ 12 (works as CPA); **CE 2**, Buckel Decl. ¶ 6 (odd jobs).

needed to run a distributorship are highly individualized and depend on factors such as: whether the SDA uses helpers/employees, and how many; whether the SDA chooses to focus on selling as opposed to just delivering; the degree to which the SDA pursues cash accounts; the geographic size of the distributorship; and the number of stores and sales volume of the distributorship.  An SDA's opportunity for profit or loss depends in large part of the degree to which he possesses these skills.  Some SDAs are sophisticated businesspersons[29] while others describe themselves as mere delivery persons.[30]

Third, individual inquiries will be necessary under the "method of payment" factor.  While SDAs are paid a commission by PFI for the products they distribute to *chain* accounts, the SDAs are paid by their cash customers, not by PFI, based on whatever method and terms of payment are agreed to by the SDA and the customer.  SDAs can decide how frequently to invoice cash accounts and even whether to extend credit to some or all of their cash accounts.  *See* n.13, *supra*. Some territories have few cash opportunities, while others (particularly in urban areas) have substantial opportunities to develop cash accounts.  *See* **CE 3**, Dangelo Decl. ¶14.  This Court could only find out such facts by making individualized inquiries.

Fourth, there is wide variation in the evidence of the SDAs' "investment in equipment or materials required for the task" under *Borello*.  The amount of each SDA's initial investment (i.e., purchase price) in his distributorship varies significantly.[31]  Furthermore, other investments that some, but not all, SDAs make in their distributorships include:  paying a helper, employee or manager (*see* n.8, *supra*); buying additional trucks and handheld devices to be able to service more

---

[29] *See* **CE 3,** Dangelo Decl. ¶¶ 4-10 (describing SDA Cox).

[30] *See* Dkt. 54-6 at PgID 678, Alves Decl. ¶ 6; Dkt. 54-5 at PgID 660, Barrish Decl. ¶ 7; Dkt. 54-8 at PgID 746, Moses Decl. ¶ 4.

[31] *Compare* Dkt. 54-5 at PgId 669, Taylor Decl. ¶ 3 (paid about $200,000 for distributorship) *with* Dkt. 54-6 at PgId 677, Alves Decl. ¶ 4 (almost $900,000).

DEFENDANT PEPPERIDGE FARM, INCORPORATED'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

stores more frequently;[32] buying additional hand trucks and dollies;[33] and investing in the legal costs to incorporate.[34]

Fifth, whether PFI or the SDA supplies the instrumentalities, tools, and place of work under *Borello* presents individualized inquiries, such as whether an SDA used a company-leased depot or obtained his own facility.[35]

Sixth, Plaintiffs essentially admit (Pls.' Br. at 20-21) that whether each SDA and PFI believed they were creating an employer-employee relationship requires individualized inquiries. Nothing short of a sworn statement from each individual SDA would provide a common answer on this factor.

### 2. Plaintiffs' Labor Code claims present individualized inquiries that cannot be answered on a classwide basis.

#### a. *PFI's exemption defenses create individualized issues.*

PFI is constitutionally "entitled to litigate its statutory defenses to individual claims." *Dukes*, 131 S. Ct. at 2561; *see also Duran v. U.S. Bank Nat'l Assn.*, 59 Cal. 4th 1, 34 (2014). The Plaintiffs and putative class members each may be exempt under the outside sales, administrative, executive, or commission exemptions, or a combination of exemptions, under California law. While PFI bears the burden on the merits to prove these defenses, Plaintiffs bear the burden of showing that these exemption defenses can be adjudicated on a class basis. *See, e.g.*, *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947-48 (9th Cir. 2011). "[I]ndividualized inquiries [are] necessitated by the[se] various exemptions" when determining whether issues common to the class predominate over individualized issues. *In re Wells Fargo*, 268 F.R.D. 604, 610 (N.D. Cal. 2010).

---

[32] *See* **CE 8,** Helton Decl. ¶ 5; **CE 4,** Debilzan Decl. ¶ 2.

[33] *See* **CE 6** Finkelstein Decl. ¶ 4; **CE 2** Buckel Decl. ¶ 11.

[34] *See* **CE 8,** Helton Decl. ¶ 6; **CE 7**, Gomez Decl. ¶ 12; **CE 12**, Ramos Decl. ¶ 1.

[35] *Compare* Dkt. 54-6 at PgID 678, Alves Decl. ¶ 6; Dkt. 54-8 at PgID 730, Seeto Decl. ¶ 4; Dkt. 54-8 at PgID 746, Moses Decl. ¶ 5 (stating they used a Pepperidge Farm depot or warehouse); *with* **CE 10**, Heusner Decl. ¶ 7; **CE 2**, Buckel Decl. ¶ 8 (stating they leased their own facility).

1

(i)     Individualized inquiries are necessary to determine whether the outside sales exemption applies.

2     California Labor Code § 1171 expressly excludes from the overtime

3 requirements "any individual employed as an outside salesman." *Brody v.*

4 *Astrazeneca Pharm., LP*, 2008 WL 6953957, at *5 (C.D. Cal. Jun. 11, 2008); Wage

5 Order 1-2001 § 1(C).  An outside salesperson is an individual who "customarily

6 and regularly works more than half the working time away from the employer's

7 place of business selling tangible or intangible items or obtaining orders or

8 contracts for products, services or use of facilities." *Id*; Wage Order 1-2001 § 1(J).

9 The exemption also applies to activities that are reasonably related to outside sales

10 activity, such as preparation time, travel time, and paperwork. *Ramirez v. Yosemite*

11 *Water Co.*, 20 Cal. 4th 785, 801 (1999).

12     Many putative class members describe their daily tasks in a way that would

13 fall into this exemption.  For example, SDA Kenny (one of Plaintiffs' own

14 declarants) testified that he spent "almost all" of his working hours at his stores

15 (**CE 22**, Kenny Dep. 121:20-24) and SDA Buckel attests that he spends "about

16 70%" of his days in stores to build relationships with store personnel. **CE 2**, Buckel

17 Decl. ¶ 7.[36]  Other SDAs, however, suggest that being a distributor does not involve

18 "selling," but merely delivering PFI product.[37]  Consequently, whether the

19 California outside sales exemption applies "poses the greatest problem from a

20 predominance perspective." *Wells Fargo*, 268 F.R.D. at 613.  Other than analyzing

21 individualized evidence from each SDA, there is no way to know which do (and do

22 not) qualify for the exemption.  *See, e.g. Vinole v. Countrywide Home Loans, Inc.*,

23 571 F.3d 935, 947 (9th Cir. 2009); *Litty v. Merrill Lynch & Co.,* 2014 WL 5904907,

24

---

25 [36] *See also* **CE 6**, Finkelstein Decl. ¶ 9 (spending time with store managers drives

26 sales); **CE 4**, Debilzan Decl. ¶¶ 12, 16 (selling store managers on service and Pepperidge Farm brand is key to increasing sales); **CE 8**, Helton Decl. ¶ 9 (often

27 able to sell his way into "prime time real estate" in stores); *see also* SE at 14.

28 [37] *See e.g.*, Dkt. 54-5 at PgID 660, Barrish Decl. ¶ 7; Dkt. 54-5 at PgID 678, Alves Decl. ¶ 6; Dkt. 54-8 at PgID 746, Moses Decl. ¶ 4.

at *6 (C.D. Cal. Aug. 4, 2014). Plaintiffs offer no way to adjudicate the outside sales exemption absent a painstaking fact inquiry into SDAs' actual daily work activities.

(ii) Individualized inquiries are necessary to determine whether the administrative exemption applies.

To determine whether any given SDA is exempt under the California administrative exemption, the Court must review whether he spent more than half of his time on exempt administrative duties. Wage Order 1-2001 § 1(A)(2); *Wells Fargo*, 268 F.R.D. at 611. Exempt administrative duties include those under the federal regulations, such as "planning, negotiating, representing the company, purchasing, *promoting sales*, and business research and control." *See* 29 C.F.R. § 541.205; *see also D'Este v. Bayer Corp.*, 492 F. App'x 721, 722 (9th Cir. 2012) (work that is "qualitatively" administrative includes "representing their respective companies and promoting sales"). Plaintiffs offer no common proof that could determine whether any SDA meets or does not meet this exemption.

As this inquiry turns on individualized inquiries into the amount of time each SDA spent on exempt administrative duties, courts routinely deny certification of overtime misclassification claims. *See Zackaria v. Wal-Mart Stores, Inc.*, 2015 WL 2412103, at *14 (C.D. Cal. May 18, 2015) (finding that "the requirements unique to the administrative exemption . . . do not lend themselves to common proof"); *Braun v. Safeco Ins. Co.*, 2014 WL 9883831, at *12 (C.D. Cal. Nov. 7, 2014) (same).

The evidence shows that SDAs spend their time in vastly different ways, but many indeed spend at least some time on administrative activities. For example, SDA Kenny spends "two to three hours every day" planning for the next day and additional time on placing orders and reporting sales (**CE 22**, Kenny Dep. 150:8-152:8); SDA Dufault estimates she spends about 2 ½ hours per week on "writing orders" and "paperwork" (**CE 21**, Dufault Dep. 106:6-25); and SDA Gordon Chinn notes that he handles all of the "administrative" work for his distributorship (**CE 20**, Chinn Dep. 96:12-20); *see also* SE at 15. All could be subject to the

administrative exemption (or a combination of the administrative and executive exemption),[38] depending on how much time they actually spent on these tasks.  The only way to know whether any SDA is subject to this exemption would be through individualized inquiries into the percentage of time they spend on exempt tasks.

        b.     *Individualized inquiries are needed to determine whether each SDA can establish a prima facie case for overtime.*

Individual issues also predominate as to whether each SDA is even eligible for overtime.  Plaintiffs bear the burden of showing common evidence that each and every SDA is entitled to overtime pay.  *See, e.g.*, *Marlo*, 639 F.3d 942, 947-48 (9th Cir. 2011); *Sotelo*, 207 Cal. App. 4th at 652.  Where, as here, a defendant does not have a uniform policy governing how putative employees spend their time, a court must make individualized inquiries of each class member to find out as much.  *Vinole*, 246 F.R.D. at 641.

The evidence in this case shows great variance in the hours worked by SDAs, thus demonstrating the lack of any classwide policy requiring overtime.  The evidence shows great variance in SDA work schedules: some work three days a week, others six days;[39] some hold other jobs and, thus, only work certain days of the week;[40] some take frequent vacation, others hardly ever do.[41]  The days of the week and the number of hours worked is left entirely to the discretion of the individual SDA.  Tellingly, even some of Plaintiffs' own declarants admit that they

---

[38] Time spent on managerial and administrative duties can be combined for purposes of applicability of exemption.  DLSE Op. Letter 2003.05.23, at 5.  The executive exemption applies to individuals whose duties include or are closely related to, inter alia, managing the enterprise (or a subdivision thereof) and directing the work of two or more other employees.  Wage Order 1-2001§ 1(A)(1).  Individualized issues will also be required to determine which SDAs employ helpers/employees and whether they are covered by this exemption.

[39] *Compare* **CE 12**, Ramos Decl. ¶ 4 *with* **CE 6**, Finkelstein Decl. ¶ 11.

[40] *See* **CE 15**, Werther Decl. ¶¶ 5-6 (describing SDA Ross).

[41] *Compare* **CE 6**, Finkelstein Decl. ¶ 16 (3-4 weeks of vacation per year); *with* **CE 18**, Barrish Dep. 42:24-43:4 (only one vacation during entire time as SDA).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

are not entitled to overtime compensation,[42] and Plaintiffs admit they do not know which putative class members are (and are not) so entitled. *See* Alfred Dep. 157:6-9. Indeed, many SDAs attest that they never worked more than eight hours per day or forty hours per week on their distributorships.[43] *See Harrington v. Home Loan Funding, Inc.*, CV 06-6763 SVM (MANx), slip op. at 26 (C.D. Cal. Mar. 21, 2007). Individualized inquiries into how many hours each SDA chose to work will be necessary to determine overtime eligibility, precluding class certification.

c.   *Individualized inquiries are needed to adjudicate Plaintiffs' meal and rest breaks.*

Plaintiffs' claims for meal and rest break violations cannot be certified unless Plaintiffs can also establish a uniform policy to *force* putative class members to forego meal and rest periods. *Norris-Wilson v. Delta-T Group, Inc.*, 270 F.R.D. 596, 609 (S.D. Cal. 2010) (certification of independent contractor claims by itself does not warrant certification of meal and rest period claims); *Nguyen v. Baxter Healthcare Corp.*, 2011 WL 6018284, at *5 (C.D. Cal. Nov. 28, 2011); *Hughes v. WinCo Foods*, 2012 WL 34483, at *8 (C.D. Cal. Jan. 4, 2012) (Kronstadt, J.) (declining to certify missed meal period claims where "a wide range of factors affect when meal breaks are taken"); *see also Campbell v. Best Buy Stores, L.P.*, 2013 WL 5302217, at *13 (C.D. Cal. Sept. 20, 2013) (Kronstadt, J.). Furthermore, "the absence of a formal written policy . . . does not necessarily imply the existence of a uniform policy or widespread practice." *Dailey v. Sears, Roebuck & Co.*, 214 Cal. App. 4th 974, 1002 (2013).

Here, Plaintiffs provide only anecdotal statements from a handful of declarants who claim to have missed meal or rest periods (notably, however, not all

---

[42] *See* Dkt. 54-8 at PgID 730, Seeto Decl. ¶ 5 (6 ½ hours per day and 35 hours per week); Dkt. 54-6 at PgID 696, Dufault Decl. ¶ 5 (30 hours per week).

[43] *See* **CE 2**, Buckel Decl. ¶ 7; **CE 12**, Ramos Decl. ¶ 4; *see also* **CE 9**, Henning Decl. ¶ 3; **CE 1**, Barrack Decl. ¶ 2; **CE 8**, Helton Decl. ¶ 13; *see also* SE at 5.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

23

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

of Plaintiffs' declarants alleged this).[44]  Neither Plaintiffs nor their declarants claim that PFI denied them meal and rest breaks.  In fact, numerous other SDAs—including Plaintiff Barrish—attest that they could take meal and rest periods, and many did so.[45]  This evidence falls far short of showing that an entire class was *forced* to miss meal and rest periods.  Under these facts, there is no uniform policy or widespread practice to deny SDAs meal and rest breaks.

> d.     *Individualized inquiries are required to adjudicate Plaintiffs' reimbursement of business expenses claim.*

Courts have held that expense reimbursement claims can be "problematic to certify as class actions because 'there may be substantial variance as to what kind of expenses were even incurred by [the putative employees] in the first place.'" *O'Connor*, 2015 WL 5138097, at *14 (citing *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1022 (N.D. Cal. 2010)).

Individual inquiries will be required to determine whether the expenses sought by Plaintiffs were reasonable and necessary—or were ever even incurred. Second Am. Comp. ¶ 47.  Some SDAs, for example, did not incur "warehousing expenses" at all, as they used a PFI-leased "depot" at no cost.  *See* n.35, *supra*. Other SDAs used their own facility, but PFI's depot allowance covered some or all of the cost of doing so.  *Id.*.  Likewise, some SDAs obtained their handheld computers and/or vehicles as part of the purchase price for their distributorship (*see* **CE 6**, Finkelstein Decl. ¶ 4), or did not acquire either during the relevant period (*see* **CE 16**, Alfred Dep. 92:8-93:4.). Moreover, whether the IRS mileage rate is favorable or unfavorable as to each SDA's vehicle-related expenses will depend upon the number of miles driven and the number and type of vehicles that each SDA used.  *See* Section II.B.4, *supra*.  Finally, whether and to what extent each

---

[44] *See e.g.*, Dkt. 54-8 at PgID 751, Johnson Decl.
[45] *See* **CE 18**, Barrish Dep. 67:12-23 (would eat lunch at warehouse on slow days); **CE 20**, Chinn Dep. 65:5-7 (noting he could take meal break); **CE 1**, Barrack Decl. ¶¶ 2, 11; **CE 12**, Ramos Decl. ¶ 9; **CE 7**, Gomez Decl. ¶ 8 ; *see also* SE at 17.

DEFENDANT PEPPERIDGE FARM, INCORPORATED'S OPPOSITION TO PLAINTIFFS' MOTION  FOR CLASS CERTIFICATION

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW

putative class member took tax write-offs for these alleged expenses is a necessary individualized inquiry,[46] as it will impact what damages they can recover.

### 3.      Plaintiffs Cannot Establish Rule 23(b)(3) Superiority.

Under Rule 23(b)(3), Plaintiffs must show "a suitable and realistic plan for trial of the class claims." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001).  That plan cannot involve procedural tools that deprive a defendant of its right to assert its affirmative defenses as to each class member. *See, e.g., Dukes*, 131 S. Ct. at 2546; *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 236 n.8 (9th Cir. 1974).  Here, as set forth in PFI's concurrently-filed Opposition to Plaintiffs' Trial Plan, Plaintiffs fail to present a manageable trial plan. Instead, Plaintiffs' purported expert, Dr. Michael Belzer, simply points to a variety of procedural devices that he *could* use, without identifying any specifics.

Moreover, Belzer now admits that he cannot even conduct the studies he suggested in his declaration he might undertake.  He testified that he could not devise a sampling plan unless he knew how many drivers (including helpers) there were and what types of vehicles they drive.  Neither PFI nor Plaintiffs, however, know either of those things.  Without this information, Belzer stated:  "Then I don't know where we'd begin.  I have no idea."  (**CE 27,** Belzer Dep. 86:15-24).  Belzer even admitted, "I'm not sure what I would do with respect to someone that didn't respond to the survey. . . .  whatever; no way to know."  (*Id.* 103:15-104:13).

### III.    CONCLUSION

For all of the foregoing reasons, PFI respectfully requests that this Court deny Plaintiffs' Motion for Class Certification.[47]

---

[46] *See* **CE 6**, Finkelstein Decl. ¶ 13; **CE 1**, Barrack Decl. ¶ 15; *see also* **CE 26**, Alfred Dep. 65:8-13 (stating he "do[es]n't know" if he took deductions); SE at 20.
[47] Where, as here, Plaintiffs fail to establish Rule 23 requirements with respect to overtime and meal and rest break claims, class certification of derivative California claims for waiting time penalties, inaccurate wage statements, unfair competition, and civil penalties under PAGA should be denied as well.  *See, e.g. Coleman v. Jenny Craig, Inc.*, 2013 WL 6500457, *12 (S.D. Cal. Nov. 27, 2013).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

25

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION  FOR CLASS CERTIFICATION

1

2   Dated:   November 9, 2015                MORGAN, LEWIS & BOCKIUS LLP

3

4                                            By____/s/ Carrie A. Gonell_____
                                                Carrie A. Gonell
5                                               Attorneys for Defendant
                                                PEPPERIDGE FARM,
6                                               INCORPORATED

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW

26

DEFENDANT PEPPERIDGE FARM,
INCORPORATED'S OPPOSITION TO PLAINTIFFS'
MOTION  FOR CLASS CERTIFICATION