UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendant: |
|---|---|
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER RE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL (DKT. 54)**

I. **Introduction**

Raymond Alfred and Marvin Barrish (collectively, "Plaintiffs") brought this putative class action in the Los Angeles Superior Court against Pepperidge Farm, Inc. ("PF" or "Defendant"). Complaint, Dkt. 1-1. Plaintiffs contend that PF improperly classified its distributors, or "Sales Development Associates" ("Distributors" or "SDAs") as independent contractors when they were employees. Due to this alleged misclassification, Plaintiffs contend that the Distributors, including Plaintiffs, were not paid required wages, including overtime, were not provided with required meal periods and were not reimbursed for business expenses. PF removed the action. Notice of Removal, Dkt. 1.

On October 31, 2014, the parties stipulated to the filing of a Second Amended Complaint ("SAC" (Dkt. 39)). Plaintiffs filed the SAC on the same day. Dkt. 39. The SAC advances nine causes of action. The following eight causes of action are presented as putative class claims: (1) failure to pay California overtime compensation in violation of Cal. Lab. Code §§ 510 and 1194 and IWC Wage Order No. 9; (2) failure to reimburse for business expenses in violation of Cal. Lab. Code § 2802 and IWC Wage Order No. 9; (3) unlawful withholding of earned wages in violation of Cal. Lab. Code § 221 and IWC Wage Order No. 9; (4) failure to provide meal periods in violation of Cal. Lab. Code §§ 226.7 and 512 and IWC Wage Order No. 9; (5) failure to authorize and permit rest breaks in violation of Cal. Lab. Code § 226.7 and IWC Wage Order No. 9; (6) failure to furnish accurate wage statements in violation of Cal. Lab. Code §§ 226 and IWC Wage Order No. 9; (7) waiting time penalties pursuant to Cal. Lab. Code §§ 201, 202 and 203; and (8) violations of Cal. Bus.& Prof. Code §§ 17200-09 ("UCL"). Plaintiffs' ninth claim, for civil penalties under the Private Attorney General Act, Cal. Lab. Code §§ 2698 *et seq.* ("PAGA"), was brought as a representative action.

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

On October 9, 2015, Plaintiffs filed a Motion for Class Certification and Appointment as Class Counsel ("Motion"), Dkt. 54. Plaintiffs seek to certify a class of "all signatories to SDA Consignment Agreements in the State of California between August 7, 2010 and the present who personally delivered, stocked, and merchandised consigned product in retail stores in California" ("Class Members"). *Id.* at 9.[1] PF opposed the Motion ("Opposition," Dkts. 61, 63, 64), presented evidence in support of its opposition (Dkt. 62) and filed evidentiary objections as to certain matters presented by Plaintiffs (Dkts. 65, 75).[2] Plaintiffs replied ("Reply," Dkt. 72), presented additional evidence, responded to Defendant's evidentiary objections (Dkts. 72-6, 80, 81) and made objections to certain evidence proffered by Defendant. Dkts. 72-8, 74.[3]

A hearing on the Motion was held on December 14, 2015, at the conclusion of which the matter was taken under submission. Dkt. 82. On February 2, 2016, Defendant filed a Supplemental Authority in Support of the Opposition. Dkt. 86. Plaintiffs replied. Dkt. 87.On April 8, 2016, PF filed an additional Supplemental Authority. Dkt. 100. Plaintiffs replied. Dkt. 101.

On August 5, 2016, an Order issued stating that the Motion could be denied on the basis of inadequacy of representation. That Order allowed for additional discovery as to the appropriateness of Ashley Alves as an alternative representative for the class or a subclass. Order re. Motion, Dkt. 105. PF responded on October 7, 2016. Dkt. 112. Plaintiffs replied on October 21, 2016. Supplement to Motion to Certify, Dkt. 113. On January 3, 2017, Plaintiffs filed a supplemental authority. Dkt. 115. Defendant responded. Dkt. 118. Further supplemental authority was filed by Plaintiffs on March 21, 2017. Dkt. 120.

For the reasons stated in this Order, the Motion is **GRANTED IN PART.**

---

[1] In the SAC, Plaintiffs sought to certify a broader class of "all persons or entities who have been employed by Defendant as Distributors under Defendant's Consignment Agreements in the State of California
at any time within four years preceding the filing of this action." SAC ¶ 39, Dkt. 39.

[2] In its Opposition, Defendant states that Plaintiffs' counsel failed to comply with Local Rule 7-3's meet and confer requirement and that the Motion should be denied on that basis. Decl. of Carrie Gonell ¶ 3, Dkt. 61-1 ("Counsel for Plaintiffs did not contact me to discuss the substance of their Motion at any time prior to Plaintiffs' filing it on October 9, 2015."). Plaintiffs are reminded of their obligation to comply with the Local Rules and the Standing Orders. However, because no prejudice has been shown, the Motion is addressed on the merits.

[3] Rulings on the evidentiary objections of the parties are set forth in separate orders.

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

## II. Factual Background

### A. The Allegations of the SAC and Supporting Evidence

Plaintiffs have presented 61 exhibits in support of the Motion. The relevant portions of the allegations of the SAC and the admissible evidence from the exhibits are summarized in the following discussion.

Plaintiffs contend that PF produces grocery products that are sold in retail stores in California. SAC ¶¶ 11, 12, Dkt. 39. Distributors, which have assigned geographic territories, deliver, stock, and remove PF products in retail stores in their respective areas. *Id.* ¶ 12. They also perform certain promotional activities *See, e.g.*, Decl. of Alfred ¶ 8, Dkt. 54-5 ("My job as an SDA involved getting product through Pepperidge Farm, delivering it to stores in my designated area, stocking and merchandising Pepperidge Farm's shelves in those stores according to Pepperidge Farm's priorities, and writing orders for Pepperidge Farm products."); Decl. of Barrish ¶ 7, Dkt. 54-5; Decl. of Taylor ¶ 5, Dkt. 54-5; Decl. of Alves ¶ 6, Dkt. 54-6. Alfred was an SDA from September 1997 until December 23, 2013; Barrish was an SDA from July 1988 to April 4, 2014. SAC ¶¶ 7, 8, Dkt. 39. Alfred declares that starting in August 2010 he worked only for PF, using one vehicle of which he was the primary driver to service the retailers in his assigned territory, and personally stocked and merchandised the PF products at those retailers. Decl. of Alfred ¶ 19, Dkt. 54-5. Barrish makes similar statements. Decl. of Barrish ¶ 19, Dkt. 54-5.

Plaintiffs and each of the Class Members signed a Consignment Agreement ("Agreement") with PF. They have similar language as to the matters at issue, and set forth the terms of the relationship between each of the Class Members and PF. SAC ¶ 15; Dkts. 54-15, 54-19 (copies of Agreement). Alfred states that he did not negotiate the terms of the Agreement before signing it. He understood that those terms were "non-negotiable." Decl. of Alfred ¶ 7, Dkt. 54-5. Barrish makes parallel statements. Decl. of Barrish ¶ 6; *see also* Dkt. 54-5; Decl. of Anthony Taylor ¶ 4, Dkt. 54-5 (stating same); Decl. of Ashely Alves ¶ 4, Dkt. 54-6 (same). Under these Agreements, Plaintiffs and the Class Members are obligated to "purchase" their routes from PF at the outset of their relationships with PF. *Id.*; Decl. of Anthony Taylor ¶ 3, Dkt. 54-5.

The Agreement provides that the Distributors as "independent businessmen." Plaintiffs contend, however, that PF's "unfettered right to control and extensive actual control over Plaintiffs and Class Members is such that the Distributors are actually employees under California law." SAC ¶ 15, Dkt. 39. Plaintiffs provide the following evidence in support of their position that PF had and maintains such control:

- The Agreement states that PF "shall have the right in its discretion to terminate this Agreement at any time without cause upon written notice to the [Distributor]." *Id.* ¶ 16.

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | | Date | April 11, 2017 |
|---|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | | |

- PF has the right to terminate the Agreement for cause, including for "failure of [Distributor] to use his/her best efforts to realize the full sales potential of the Territory for Consigned Products and the continuance of such failure for seven days after written notice thereof from [Defendant]." *Id.* ¶ 17. In this regard, the Agreement required Distributors to do the following:

  "[A]ctively solicit all retail stores in the Territory whose accounts can be profitably handled"

  "[M]aintain at all times an adequate and fresh supply of Consigned Products in all such retail stores;"

  "[P]rovide distribution service to all such retail stores on such days of the week (including weekends), at such intervals and with such frequency as is necessary to realize the full sales potential thereof and to maintain an adequate fresh supply of Consigned Products therein;"

  "[M]ake available to all such retail stores all varieties of authorized Consigned Products unless it is demonstrably unprofitable to do so;"

  "[C]ooperate with [Defendant] in the effective utilization of [Defendant's] advertising, sales promotion, and space merchandising programs and;"

  "Keep fully informed of [Defendant's] recommended policies and method for increasing sales and improving distribution service." *Id. See also* Decl. of Alfred ¶ 9, Dkt. 54-5 (stating that he set his schedule "to comply with Pepperidge Farm's service frequency standards and the stores' delivery windows."); Decl. of Barrish ¶ 8, Dkt. 54-5; Decl. of Alves ¶ 7, Dkt. 54-6.

- PF could also terminate the Agreement for cause on any of the following grounds:

  "[F]ailure of [Distributor] to maintain efficient distribution service throughout the Territory in keeping the established reputation of [Defendant] and the high quality of its products and the continuance of such failure for seven days after written notice thereof from [Defendant];"

  "[F]ailure of [Distributor] to maintain the general appearance and condition of his/her truck or other equipment or his/her own general appearance or deportment or that of his/her helper or helpers, if any, in accordance with standards in keeping with the established reputation of [Defendant] and the high quality of its products and the continuance of such failure for more than five days after written notice thereof from [Defendant];"

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

"[F]ailure of [Distributor] to remain actively and personally involved in the operation and management of the Distributorship";

"[A]ny actions, activities or practices of [Distributor] which either do, or in the reasonable opinion of [Defendant] are likely to, materially damage the reputation of [Defendant] and/or [Defendant's] relations or reputation with consumers, retail stores, or any other purchaser of Consigned Products." SAC ¶ 18, Dkt. 39.

- PF employed district sales managers ("DSMs") who supervised the Distributors. *Id.* ¶ 19. They conducted regular evaluations of Distributors as to their sales and in-store performance. *Id.* PF also monitored Distributors through its billing and ticketing systems. *Id.* ¶ 21. DSMs frequently reviewed "scorecard" assessments of SDA performance, and Distributors were ranked on a scale of best to worst based on these overall scores. Motion, Dkt. 54-1 at 17. DSMs also completed audits of at least ten retail stores each week, and conducted route rides, during which they rode with or followed a SDA as part of the evaluation process. *Id.* If a Distributor's performance was deemed inadequate as to one or more stores, Defendant could send a written notice calling for a remedy within five days, with the alternative that Defendant could terminate the Agreement. SAC ¶ 19, Dkt. 39; Decl. of Alfred ¶ 9, Dkt. 54-5 ("I understood that if I did not satisfy Pepperidge Farm's requirements, I could receive a five-day letter and lose my route."); *id.* ¶ 13 ("My DSM, Will Werther, regularly evaluated my sales and store performance. In addition to evaluating whether I was following the store schematic, Will reviewed whether my stores were down in sales, and he set sales expectations for me. He also evaluated whether I was meeting Pepperidge Farm's service frequency standards and would do 'route rides' where he would follow me on deliveries and evaluate the service to the stores on my route. I understood that if I did not meet or exceed Pepperidge Farm's expectations, they could issue me a five-day letter."); *id.* ¶ 15 ("Pepperidge Farm contacted me multiple times a week through the handheld device, emails, regular mail, or through phone calls. These communications often came from my DSM, who contacted me to tell me about issues with the stores, questions about paperwork, promotions, or any information from John Lucas or account managers."); Decl. of Barrish ¶ ¶ 8, 12, 13, Dkt. 54-5; Decl. of Taylor ¶¶ 6, 10, 12, Dkt. 54-5.

- PF would "from time to time, establish reasonable sales and/or distribution goals for Consignee and this Distributorship" and required that Distributors "meet or exceed any such goals established by [PF]." SAC ¶ 20, Dkt. 39. Under the terms of the Agreement, failure to meet or exceed PF's sales or distribution goals would justify a "for cause" termination of an Agreement. *Id.*

- PF provided Distributors with schematics, or "plan-o-grams," which showed how Distributors should display PF's products that they delivered to stores. *Id.* ¶ 21; Decl. of Alfred ¶ 8, Dkt. 54-5 ("I was required to follow the promotion and display programs and plan-o-grams that Pepperidge Farm provided to me."); Decl. of Barrish ¶ 7, Dkt. 54-5 (stating same); Decl. of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. |

Alfred ¶ 11, Dkt. 54-5 ("Stores had a plan-o-gram, or 'schematic' that Pepperidge Farm expected that I follow. My . . . DSM . . . visited my stores and rearranged the shelves if he found product that was not according to the schematic. He also took photos of the shelves and displays to evaluate whether my shelves were up to Pepperidge Farm's standards and sent these evaluations to me. I did not determine what products went on the schematic of the chain account stores on my route."); *id.* ¶ 12 ("Pepperidge Farm's promotions and the schematics determined the amount of product that I needed to order for a store."); Decl. of Barrish ¶ 9, Dkt. 54-5; Decl. of Taylor ¶¶ 5, 8, 54-5; Decl. of Alves ¶ 6, Dkt. 54-6.

- PF determined the wholesale price of its products. SAC ¶ 21, Dkt. 39; Decl. of Alfred ¶ 12, Dkt. 54-5 ("I did not set the wholesale prices, retail prices, or promotional pricing of the products in chain stores. The pricing was reflected in a specialized handheld computer device, which Pepperidge Farm required me to purchase and maintain, along with a printer."); Decl. of Barrish ¶ 11, Dkt. 54-5; Decl. of Taylor ¶ 9, Dkt. 54-5.

- PF determined the number of times an SDA should visit stores each week, and the days for such visits. *Id.*; Motion, Dkt. 54-1 at 15.

- PF retained the right to require that Distributors attend quarterly sales meetings where DSMs provided information about upcoming promotions and praised Distributors with the highest sales numbers. SAC ¶ 21, Dkt. 39.

- PF required Distributors to purchase a specialized handheld computer that was used to maintain and communicate to PF detailed information about deliveries, including when they were made to each retail location. *Id.*; Decl. of Alfred ¶ 9, Dkt. 54-5 ("At the end of each day, I completed paperwork and communicated my deliveries to Pepperidge Farm via the handheld."); *id.* ¶ 14 ("Pepperidge Farm required that I purchase a handheld device, which I used to run every aspect of my route. The handheld tracked every ticket I wrote, and the time of day I wrote it. The handheld included preset wholesale prices for the chain stores, my inventory, and any promotional deals that Pepperidge had arranged with the stores. At the end of the day, I transmitted the information in the handheld to Pepperidge Farm. Periodically, Pepperidge Farm sent me notifications that the current version of the handheld would no longer be supported, and they instructed me to purchase a new handheld device."); Decl. of Barrish ¶ 14, Dkt. 54-5; Decl. of Taylor ¶ 11, Dkt. 54-5. Starting in February 2016, the handheld computer was to have a GPS function to provide data to PF regarding a Distributor's location during each day. Motion, Dkt. 54-1 at 16.

- Distributors were not permitted to sell their Distributorships without the prior, written approval by PF. SAC ¶ 22, Dkt. 39. PF requires that any buyer of a Distributorship meet PF's requirements as to "character, ability, financial responsibility, business acumen, and adequate facilities." *Id.* PF retains the right to interview prospective buyers and require them to submit a business plan to PF. Approval of the plan by PF would be required before the

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. |  |  |

sale could proceed. *Id.* PF retains the right of first refusal for any sale of all or any portion of the Distributorship. *Id.* Alfred described these terms as follows

> I could not sell, transfer, or change my route without Pepperidge Farm's approval. When I finally left Pepperidge Farm in 2013, I sold the remainder of my route. I filled out a form that Pepperidge Farm provided to me. My DSM, Will Werther, told me that the first person who was interested in the route was not approved by Pepperidge Farm. There was also a second potential candidate that I understand was also not approved. A third person . . . also expressed interest in the route, and I spoke with him. We came to an agreement about the price of the route; however, we still had to seek Pepperidge Farm's approval for the sale. I had to tell Pepperidge Farm the proposed price of the route and what equipment I was also selling. It took many months to secure Pepperidge Farm's approval. Finally, Will [Werther] called me and told me that it was time to sign the papers for the sale. [The buyer], Will, and I were all at the route transfer. My DSM, Will provided the paperwork that Pepperidge Farm required that we sign in order to transfer the route.

Decl. of Alfred ¶ 20, Dkt. 54-5; *see also* Decl. of Barrish ¶ 18, Dkt. 54-5; Decl. of Taylor ¶ 17, Dkt. 54-5.

- PF negotiated the space where its products would be displayed at the retail stores serviced by Distributors and determined promotional activities for these stores. *Id.* ¶ 23; Decl. of Alfred ¶ 12, Dkt. 54-5 (Alfred "did not determine any promotions for Pepperidge Farm products. Pepperidge Farm instructed me on promotions through sales meetings, emails, and phone calls."). Alfred also declares that

> Pepperidge Farm often sent me product that I had not ordered during the holidays or when Pepperidge Farm was running a promotion or introducing a new item. Often, I did not even know if or when Pepperidge Farm was sending this type of product to me. At one point, I asked my DSM if I could refuse this type of shipment and send it back to Pepperidge Farm, because the product they sent me did not always sell very well in the stores. My DSM informed me that I could not send this product back without it being deducted from commission as stale. Instead, I needed to try to place the product that Pepperidge Farm sent me into my stores. If it did not sell at that point, I had to request that Pepperidge Farm 'forgive' this product and not charge me for it as stale.

*Id.* ¶ 18; *see also* Decl. of Barrish ¶ 17, Dkt. 54-5; Decl. of Taylor ¶ 15, Dkt. 54-5.

| Case No. | LA CV14-07086 JAK (RZx) | | Date | April 11, 2017 |
|---|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | | |

- If any store did not wish to receive deliveries from the SDA assigned to its area, PF retained the right to make other arrangements with the store for the delivery of PF products. SAC ¶ 23, Dkt. 36.

- Distributors routinely worked substantially more than 40 hours per week on certain matters or in servicing retailers, making it difficult for them regularly to service others. *Id.*

- Class Members were paid under a common compensation plan and policy that was based on a sales commission of the items sold. *Id.* ¶ 24; Decl. of Alfred ¶ 16, Dkt. 54-5 ("Pepperidge Farm paid me a commission (20%), once a week, based on the total volume of the wholesale products sold on my route. . . . I never negotiated this commission; it was presented to me when I signed my Consignment Agreement."); Decl. of Barrish ¶ 15, Dkt. 54-5; Decl. of Taylor ¶ 13, Dkt. 54-5.

- Distributors were not permitted to distribute products that competed with those of PF, or if doing so would limit the Distributor's ability to fulfill its obligations to PF. Motion, Dkt. 54-1 at 11.

- PF established relationships with retail chains*, i.e.* entities that own or operate at least three retail stores. More than 99% of the revenue from PF products sold in California was generated by sales to chain accounts. PF negotiated the price at which its products were sold to these accounts, directly billed these accounts and handled all financial matters with them. *Id.* at 13; Decl. of Alfred ¶ 12, Dkt. 54-5 ("Pepperidge Farm handled the billing and collection for chain stores on my route."). PF and chain stores decided which products to have placed on the shelves, the amount of shelf space that PF products would have and how the products would be arranged. Motion, Dkt. 54-1 at 13-14.

- PF retained control over the manner, timing, volume and frequency of the delivery of its products to chain accounts. *Id.* at 14-15. Almost all chain stores had narrow time windows for delivery, some as short as four hours. That is when an SDA was required to deliver PF products to the stores. *Id.* at 15.

- PF retained the right to send Distributors product that they had not ordered. *Id.*

Plaintiffs claim that they and the Class Members sustained the following injuries due to their misclassification as independent contractors:

- PF failed to reimburse the Class Members for expenses, including those related to: vehicles, including fuel, maintenance and repair; handheld computers and printers; warehousing PF products; pallet fees; losses due to stale products and inventory irregularities; and required business liability insurance. SAC ¶ 29, Dkt. 39. As Alfred declares:

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

During my time as an SDA, Pepperidge Farm instituted a 'stale policy.' This policy required that I follow any standards Pepperidge Farm decided to set in order to keep my stale 'privilege.' Every quarter, Pepperidge Farm set 'stale objectives' for me. These objectives were set as a percentage, and if I exceeded the percentage, the cost of the excess stale product was deducted from my commission. I did not negotiate and had no role in setting the stale policy or objectives. If Pepperidge Farm was unhappy with my performance, for example, if I wasn't following plan-o-grams, displays, or delivery frequency, then they could take the stale allowance away from me. Pepperidge Farm sent me a letter explaining this to me. I also called my DSM, Will Werther, almost every other week to seek his approval for the product that I needed to return, which went to charity. I also had to seek Will's approval to return damaged product that arrived at the warehouse. Separately, John Lucas had to approve any stale product for which I was requesting forgiveness. I wrote these letters to explain why I should not be responsible for certain stale products.");

Decl. of Alfred ¶ 17, Dkt. 54-5; *see also id.* ¶ 21; Decl. of Barrish ¶¶ 16, 20, Dkt. 54-5; Decl. of Taylor ¶ 14, Dkt. 54-5; Decl. of Taylor ¶ 18, Dkt. 54-5.

- PF failed to record the actual hours worked by Class Members, to maintain required payroll records reflecting hours worked, or to state the total hours worked on wage statements. SAC ¶¶ 31, 35, 26.

- PF failed to provide a 30-minute meal period to Class Members, and failed to provide a second one to those who worked more than 10 hours on any day. *Id.* ¶¶ 32, 33.

- PF failed to provide to Class Members a 10-minute rest period for each four hours of work. *Id.* ¶ 34.

- Upon termination of employment of Class Members, PF willfully and knowingly failed to pay them all accrued compensation, including reimbursement of all unlawful charges, compensation for missed meal and rest periods, and payment of overtime. *Id.* ¶ 37.

## B. Defendant's Evidence

Defendant presented the following evidence in connection with its opposition to the Motion:

- Some SDAs have expressed concern that this litigation will have an adverse effect on the value of their Distributorships as well as their ability to sell them to others, which are issues that do not affect Plaintiffs. Dkt. 61-3 at 2-3. Defendant cites the following statement in the Declaration of Gomez:

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|----------|-------------------------|------|----------------|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

I am opposed to this lawsuit for a number of reasons. For one, the former SDAs suing Pepperidge Farm have sold their routes and do not have any 'skin in the game' in terms of how this lawsuit affects my business and the business of other current SDAs. I do not want those individuals speaking for me or my business at any time. I also do not want them representing me and my interests in this lawsuit. I am concerned about the effect of this lawsuit on my ability to sell my route, and its price.

Gomez Decl. ¶ 14, Dkt. 62-1 Ex. 7.

Similarly, Erickson declares:

I don't now know what I would do if we were to lose the ability to sell our routes, or if the structure of my relationship with [PFI had to change as a result of this lawsuit. . . . This is my biggest problem with this lawsuit and with the plaintiffs' request to represent me and other current SDAs. . . . I do not see how the two individuals who brought this lawsuit could ever represent my interests.

Ericson Decl. ¶¶ 8, 9, Dkt. 62-1 Ex. 5; *see also* Coody Dep. 24:16-26:14, Dkt. 62-3 Ex. 23 (this litigation will "decrease the value of my route" and affect the "ability to sell [his] route" because potential buyers "wouldn't want to work for Pepperidge Farm"); Ramos Decl. ¶ 10, Dkt. 62-2 Ex. 12 ("My investment in my company is very important to me, and it's a valuable asset that my family and I own. I am opposed to plaintiffs' efforts that could jeopardize the value of the investment in my company."); Buckel Decl. ¶ 3, Dkt. 62-1 Ex. 2 ("It's very important for me to be able to sell my route when I want, because it's one of the most valuable assets I own. I would be very concerned if this lawsuit negatively impacts the value of my route or my ability to sell my route."); Heusner Decl. ¶¶ 12-13, Dkt. 63-1 Ex. 10 ("I was upset when heard about this lawsuit. I am particularly concerned because the lawsuit is being brought by two former SDAs who have already sold their routes and whose interests are not the same as mine since they don't have routes to protect or worry about."); Henning Decl. ¶ 6, Dkt. 62-1 Ex. 9 ("If I couldn't sell my route for some reason because of this lawsuit, I don't know what I'd do. This route represents my investment and my retirement."); Finkelstein Decl. ¶ 19, Dkt. 62-1 Ex. 6 ("If this lawsuit were to affect my ability to sell the route or hurt its value in any way, it would have serious negative consequences on me."); Barrack Decl. ¶ 4, Dkt. 62-1 Ex. 1 ("[If] my route couldn't be sold or lost some of its value, that would cause me a serious financial hardship."); Semien Decl. ¶ 12, Dkt. 61-2 Ex. 14 ("I've built up a lot of value in my route, and it's one of my most valuable assets. If something happened . . . that would prevent me from being able to sell my route or that would reduce its value, that would have a huge impact on me."); Caputo Dep. 164:20-165:4, Dkt. 62-2 Ex. 19 ( prospective buyers will be concerned about SDAs having employee status, which "has a tendency of devaluing your route")).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. |

- SDAs, not PF, decide who services their routes. Dkt. 61-3 at 3-4 (citing Finkelstein Decl. ¶¶ 14, 16, Dkt. 62-1 Ex. 6 ("I use a helper to assist me on my route, and he works about 28-30 hours per week. . . . When I am on vacation my helper runs my entire route."); Alves Dep. 16:9-11; 56:4-8 76:1-9, Dkt. 61-2 Ex. 17 (she "run[s] the routes with [her] husband" even though she owns both routes in her own name); Dangelo Decl. ¶ 6, Dkt. 62-1 Ex. 3 ("[SDA Dale Cox] has team of employees helping him run his distributorship, including managers, a sales team and a delivery team who deliver and merchandise products from his warehouse to his stores."); Barrish Dep. 41:9-42:12, Dkt. 62-2 Ex. 18 (SDAs Ellen and Jay Ward, who are married, own separate distributorships, but primarily service the other spouse's distributorship rather than their own); Chinn Dep. 46:3-9, Dkt. 62-2 Ex. 20 (wife works as helper about 30 hours per week); Dangelo Decl. ¶ 12, Dkt. 62-1 Ex. 3 ("[SDA Ed Gee] has what I would call a 'general manager' who runs the day-to-day operations of his entire distributorship, as well as one other route rep."); Barrack Decl. ¶ 12, Dkt. 62-1 Ex. 1 ("I use a 'helper' if I go on vacation."); Debilzan Decl. ¶¶ 2, 5, Dkt. 62-1 Ex. 4 ("I now own two routes . . . . My wife and I each operate one of these routes, although my wife is not an SDA . . . I use independent contractors as helpers."); Buckel Decl. ¶ 13, Dkt. 62-1 Ex. 2 ("I have the option of hiring 'helpers' to help run the route [but] I don't use any helpers. . . I know that another SDA in my depot, Mike Giganti, employs a full-time helper."); Helton Decl. ¶¶ 4, 7, Dkt. 62-1 Ex. 8 ("My wife and I run the route together" and "[m]y wife and I have one helper who assists us."); Rice Decl. ¶ 7, Dkt. 62-2 Ex. 13 ("[I] have an employee who works 24-30 hours a week servicing my routes."); Henning Decl. ¶ 12, Dkt. 62-1 Ex. 9 ("When I go on vacation, one of the three other SDAs with whom I share a storage depot will cover my route."); Ericson Decl. ¶ 2, Dkt. 62-1 Ex. 5 ("Between my husband, Scott Ericson, and I, we own two Pepperidge Farm distributorships. . . . Although my husband operated the first for a while, today I manage and, other than occasionally using a helper, operate them both myself."); Werther Decl. ¶ 6, Dkt. 62-2 Ex. 15 ("I understand that [SDA] Tom [Ross's] daughter's boyfriend and his wife are running [his] two routes on a day-to-day basis."); Ouye Dep. 43:23-25, Dkt. 62-3 Ex. 24 (hires helper to cover his route when he is on vacation); Semien Decl. ¶ 4, Dkt. 62-2 Ex. 14 ("I ended up hiring another helper and I've been working with him for 8-10 years. He works between approximately 21 and 24 hours per week.")).

- SDAs set their own hours and have adopted different schedules. Dkt. 61-3 at 4-5 (citing Barrack Decl. ¶¶ 2, 8, 11, Dkt. 62-1 Ex. 1 ("I control my schedule. . . . At Laura Scudders [as a company-owned route drive], the company told me when I had to make deliveries, where I had to be and when. . . . At Pepperidge Farm, on the other hand, I get to run the route how I want. . . . [N]o one can tell me what days to work, how many hours I need to be working, or whether I can take the rest of the week off for that matter."); Gomez Decl. ¶¶ 5, 8, Dkt. 62-1 Ex. 7 ("As an SDA, I set my own delivery schedule based on my customers' needs and individual receiving hours and my own schedule and preferences. . . . It's up to me how long I am on the road each day. . . . As a driver for company-owned routes [such as Bell Brands and Mother's Cookies], the company dictated my hours."); Henning Decl. ¶ 12, Dkt. 62-1 Ex. 9 ("I set my own schedule."); Buckel Decl. ¶¶ 4, 9, Dkt. 62-1 Ex. 2 ("I don't have a boss to answer to and I don't have a set schedule" [and] "Pepperidge Farm does not tell me when to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

arrive, when to leave, or how many hours in a week I should or should not work. I do not believe they could do so under the terms of my contract even if they tried."); Debilzan Decl. ¶ 9, Dkt. 62-1 Ex. 4 ("I am in charge of my own schedule."); Caputo Dep. 76:1-17, Dkt. 62-2 Ex. 19 (could adjust his route on his own to account for changes in store receiving hours); Ericson Decl. ¶ 10, Dkt. 62-1 Ex. 5 ("I set my own schedule, and nobody from Pepperidge Farm checks in on me or the hours I am working. Pepperidge Farm does not require me to work any particular hours or any particular number of hours."); Finkelstein Decl. ¶¶ 10-11, Dkt. 62-1 Ex. 6 ("I use my own judgment to determine the optimal schedule for servicing my customers" [and] "[t]he number of hours I work is my choice."); Helton Decl. ¶¶ 13, Dkt. 62-1 Ex. 8 ("My wife and I set our own schedules. We don't tell Pepperidge Farm our schedules, and Pepperidge Farm doesn't ask."); Heusner Decl. ¶ 6, Dkt. 62-1 Ex. 10 ("I have complete control over my own schedule. Pepperidge Farm does not tell me when I need to begin working, when I need to be at certain stores, or by when I need to be finished working."); Rice Decl. ¶ 7, Dkt. 62-2 Ex. 13 ("Pepperidge Farm does not set my schedule."); Barrish Decl. ¶ 8, Dkt. 54-5 at 14-15 ("Pepperidge Farm expected me to deliver product within the predetermined receiving hours of the stores on my route," but did not set the precise schedule for deliveries); *See* Decl. ¶ 5, Dkt. 54-8 at 11 (works 6.5 hours per day, 35 hours per week but says he "work[s] this schedule to meet Pepperidge Farm's standards," although specific delivery schedules are not set by PF); Dufault Decl. ¶ 5, Dkt. 54-6 at 23 (works 30 hours per week, but claims "schedule is set by the work demands Pepperidge Farm places on [her]," but not expressly as to hours or locations)).

- Many SDAs do not feel obligated to follow PF's frequency of service guidelines. Dkt. 61-3 at 5-6 (citing Ramos Decl. ¶ 4, Dkt. 62-2 Ex. 12 ("Although Pepperidge Farm recommends that I visit stores on certain days, I don't follow those recommendations because of the nature of my stores."); Rice Decl. ¶ 11, Dkt. 61-3 Ex. 13 ("I am familiar with a card from Pepperidge Farm providing recommendations for how often a route owner might want to service a particular store based on its volume of sales. This card is a recommendation only and I definitely have never followed it."); Debilzan Decl. ¶ 9, Dkt. 61-3 Ex. 4 ("Sometimes Pepperidge Farm will pass along a store's requests related to the store's delivery windows or desired frequency of service, but that information comes from the customer, not Pepperidge Farm. I do not see it as a mandate or requirement from Pepperidge Farm."); Gomez Decl. ¶ 9, Dkt. 61-3 Ex. 7 ("[A]ny expectations to provide a certain level of service comes from the demands of my customers, not from Pepperidge Farm.")).

- Many SDAs did not work overtime. Dkt. 61-3 at 6 (citing Buckel Decl. ¶ 7, Dkt. 62-1 Ex. 2 ("I always work less than 40 hours per week."); Ramos Decl. ¶ 4, Dkt. 62-2 Ex. 12 ("[I]n a typical week I work Monday, Thursday and Friday from around 4 a.m. to 1 p.m. – no more than about 27 hours per week."); Henning Decl. ¶ 3, Dkt. 62-1 Ex. 9 ("[Since 1997 I] have been working about 25 hours per week running my Pepperidge Farm route."); Barrack Decl. ¶ 2, Dkt. 62-1 Ex. 1 ("I work about 25 hours a week."); Helton Decl. ¶ 13, Dkt. 62-1 Ex. 8 ("[I work] a total of about 35-40 hours per week."); Dufault Decl. ¶ 5, Dkt. 54-6, at 22 ("I am currently working approximately 30 hours a week.")).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. |

- SDAs make different decisions as to the products, and quantity of those products, to order. Dkt. 61-3 at 6 (citing Gomez Decl. ¶ 6, Dkt. 62-1 Ex. 7 ("I use my own judgment to determine how much product to order for a particular account" whereas as an employee for company owned routes "I had absolutely no say in the volume of product that I delivered to a particular account"); Ericson Decl. ¶ 12, Dkt. 62-1 Ex. 5 ("I also control my orders . . . . I use the information regarding promotions, along with my experience and knowledge about my stores, to determine my orders."); Helton Decl. ¶ 9, Dkt. 62-1 Ex. 8 ("[M]y wife and I discuss what to order, drawing on our grocery experience and what promotions are going on."); Ramos Decl. ¶ 5, Dkt. 62-2 Ex. 12 ("It is important to use good judgment in running my business, especially when it comes to ordering inventory."); Ouye Dep. 44:11-13, Dkt. 62-3 Ex. 24 (orders product using "pre-ordering" method so that he can drive a smaller vehicle and only deliver the product the stores actually need); Buckel Decl. ¶ 14, Dkt. 62-1 Ex. 2 ("I take [promotions] information into account when deciding how much of what product to order for my stores each week."); Dangelo Decl. ¶ 16, Dkt. 62-1 Ex. 3 ("I have discussed product allocations with the SDAs in my district before the allocations were made to provide the opportunity to make changes to the allocations."); Debilzan Decl. ¶¶ 4, 10, Dkt. 62-1 Ex. 4 ("[B]ecause my stores are high volume, I can better predict the ordering needs for each store in advance without physically checking the shelves. In other words, I can 'pre-order' inventory for my stores. . . . I decide how much product to order each week."); Motion, Dkt. 54-1 at 6 n.38 (citing declarations to show that "[s]chematics and Pepperidge Farm promotions largely determine the amount of products that SDAs order").

- Although some SDAs believed that a "suggestion" by a DSM was actually a directive, many SDAs have rejected those suggestions. Dkt. 61-3 at 7-8 (citing Gomez Decl. ¶ 3, Dkt. 62-1 Ex. 7 ("In fact, when the DSM makes suggestions about how I run my business, I feel quite comfortable disagreeing with him. I have never felt like I am 'required' to follow any of his suggestions and I've never been punished in any way for not following them."); Debilzan Decl. ¶ 13, Dkt. 62-1 Ex. 4 ("I do not have a manager or supervisor. I do not view the interim [DSM] assigned to my district (Al LaRocca) or the prior DSM (Don Richins) as my manager or supervisor."); Rice Decl. ¶¶ 10, 20, Dkt. 62-2 Ex. 13 ("[My DSM] and I have a very good relationship. He doesn't give me any pressure at all on how often I should be servicing my stores or my sales volume."); Dangelo Decl. ¶ 11, 17, Dkt. 62-1 Ex. 3 ("I can't require an SDA to take any of my suggestions, and SDAs can reject, modify, or accept my suggestions. . . . As a DSM, I do not have the authority, and have never claimed to have the authority, to tell an SDA how to run his distributorship."); Helton Decl. ¶ 12, Dkt. 62-1 Ex. 8 ("Pepperidge Farm's DSM has been an outstanding resource for my business. . . . He periodically offers suggestions and advising on some best practices employed by other SDAs. Sometimes I incorporate these practices into how I manage my route, and sometimes I do not."); Heusner Decl. ¶ 5, Dkt. 62-1 Dkt. 10 ("Pepperidge Farm's District Sales Manager is really a tremendous resource for my business who helps me to increase sales opportunities and make more money. He doesn't act like a boss or a supervisor and I don't think he has the right to do that under my Consignment Agreement."); Ramos Decl. ¶¶ 6, 8, Dkt. 62-2 Ex. 12

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. |

("[My DSM] he does not have control over me or how I run my company. I have never felt like I am 'required' to follow any of his suggestions and I've never been punished in any way for not following them."); Semien Decl. ¶¶ 9-10, Dkt. 62-2 Ex. 14 ("I have a good relationship with the Pepperidge Farm [DSM] for my district. The name is not really accurate; he's not my 'manager' and he doesn't manage me or my business. He's just a company representative for Pepperidge Farm."); Taylor Decl ¶¶ 10, 12, Dkt. 54-5 at 25; Alves Decl. ¶¶ 9, 11, 12, Dkt. 54-6 at 6-7; Epilone Decl. ¶¶ 10, 12, Dkt. 54-7 at 12; Seeto Decl. ¶¶ 8, 9, Dkt. 54-8 at 12-13 (alleging DSMs contact them daily and exercise control over them)).

- There are variations in the manner in which SDAs pursue and manage chain accounts and smaller "cash accounts." SDAs pursue cash accounts and negotiate prices with them. Dkt. 61-3 at 8-9 (citing Rice Decl. ¶ 3, Dkt. 62-2 Ex. 13 ("I service about 10-12 cash accounts, which are generally smaller stores, that together account for about 20% of my sales."); Dangelo Decl. ¶¶ 13, 14, Dkt. 62-1 Ex. 3 ("I understand that more than 10% of the business of both SDAs Lee Brandenburg and Don Langell is from cash accounts. The SDAs in my district have very different route layouts . . . . in terms of the types of stores (i.e., chain vs. cash accounts)."); Barrack Decl. ¶ 14, Dkt. 62-1 Ex. 1 ("I had a couple cash accounts when I bought the route, and I've added a few since then. . . . I negotiate with the cash account stores to determine the price of these products, and I can cut them a deal if it makes sense financially . . . ."); Caputo Dep. 112:22-113:23, Dkt. 62-2 Ex. 19 (had up to seven cash accounts, but decided to stop servicing all but two because they were unprofitable); Debilzan Decl. ¶ 14, Dkt. 62-1 Ex. 4 ("I choose whether and how diligently to pursue cash accounts on my routes."); Chinn Dep. 69:12-70:8, Dkt. 62-1 Ex. 20 (elected to discontinue servicing cash accounts because they were not profitable and did not warrant the time needed to do so); Gomez Decl. ¶ 11, Dkt. 62-1 Ex. 7 ("With cash accounts, I have complete discretion to set my own prices and payment methods. For example, I can 'float' my cash account customers credit if they do not have the money to pay me on a certain week, and have done this."); Henning Decl. ¶ 13, Dkt. 62-1 Ex. 9 ("Today, my route includes three chain accounts and a number of cash accounts. . . . I set my own prices for anything I sell to the cash accounts, and sometimes I'll even run my own promotions."); Ramos Decl. ¶ 2, Dkt. 62-2 Ex. 12 ("JR Distribution could service cash stores . . . if I wanted to, but I choose not to because I would rather spend my time doing other things."); Coody Dep. 103:7-10, 104:25-105:17, Dkt. 62-3 Ex. 23 (sets the prices for his 10 cash accounts); Semien Decl. ¶ 8, Dkt. 62-2 Ex. 14 ("10% [of my sales] are from cash accounts" and "with cash accounts I can set my own prices."); Ouye Dep. 66:20-67:20, Dkt. 62-3 Ex. 24 (had six cash accounts when he started working his route, but dropped all of them but one because they were not profitable. Maintained one only because he liked the operators of the store); Alfred Decl. ¶ 10, Dkt. 54-5 at 5 (no cash accounts since August 2010); Barrish Decl. ¶ 10, Dkt. 54-5 at 15 (serviced "only a few cash accounts" since August 2010); Alves Decl. ¶ 8, Dkt. 54-6 at 6 (only has one cash account amounting to "less than 1% of total sales volume"); Motion, Dkt. 54-1 at 13 ("[N]early all SDA commission earnings are from chain accounts.")).

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|----------|-------------------------|------|----------------|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

- Many SDAs have concluded that warning letters from PF, which are called "five-day cure letters," do not reflect meaningful control of their businesses. Dkt. 61-3 at 9-10 (citing Buckel Decl. ¶15, Dkt. 62-1 Ex. 2 ("I have received 5-day warning letters from my DSM before. I've probably received on average one of these per year. I view these as a slap on the wrist and not a threat to my continued ownership of my route."); Barrack Decl. ¶ 17, Dkt. 620-1 Ex. 1 ("I've gotten 5-Day Letters for certain issues with my stores, but I don't consider them to be a big deal."); Rice Decl. ¶ 9, Dkt. 62-2 Ex. 13 ("There were no consequences to me for having received [a 5-day letter] and I felt free to tell the Pepperidge Farm DSM for my district, Al LaRocca, that I disagreed with what was in the letter. I didn't see it as a big deal then and still do not today."); Ericson Decl. ¶ 16, Dkt. 62-1 Ex. 5 ("[I]n my experience, [5-day letters] are not used to tell SDAs what to do or how to do their jobs. . . . There is no real consequence to receiving a five day letter."); Chinn Dep. 111:25-112:3, 162:15-18, Dkt. 62-2 Ex. 20 (received "20-40" 5-day letters, but did not lose route; considered the 5-day letters to be "unnecessary")).

- Some SDAs engage in other businesses along with the distributorships. Dkt. 61-3 at 10-11 (citing Werther Decl. ¶ 5, Dkt. 62-2 Ex. 15 (SDA Ross works full-time as Ralph's Store Director); Finkelstein Decl. ¶ 12, Dkt. 62-1 Ex. 6 ("In addition to running my distributorship, I am a Certified Public Accountant, and perform occasional accounting work for friends and relatives, particularly during tax season. I've never asked or felt the need to ask Pepperidge Farm for permission to do this accounting work."); Ericson Decl. ¶ 20, Dkt. 62-1 Ex. 5 ("I have known other Pepperidge Farm route owners who have taken on other work. For example, I know of another SDA whose route is relatively close to mine that delivered products for Pez candy for several years, in addition to running her Pepperidge Farm distributorship."); Dangelo Decl. ¶ 7, Dkt. 62-1 Ex. 3 ("[SDA Dale Cox's] company doesn't just deliver Pepperidge Farm products. I know that he also distributes or has distributed a number of other types of product, such as Kettle Chips, olive oil, and non-food products."); Chinn Dep. 27:19- 25; 98:7-25, Dkt. 62-3 Ex. 20 (worked about 30 hours per week as a bellman for a hotel from 2012 to the present);  Ramos Decl. ¶ 1, Dkt. 62-2 Ex. 12 ("I also own a bread distributorship for Bimbo Bakeries."); Buckel Decl. ¶ 6, Dkt. 62-1 Ex. 2 ("I continue to do some 'odd jobs' in addition to my work as an SDA."); Coody Dep. 127:10-18:19, Dkt. 62-3 Ex. 23 (owns and manages five rental properties in Atlanta; Henning Decl. ¶¶ 3-4, Dkt. 62-1 Ex. 9 ("[E]ven after buying my own route (until 1997) I also held another job in the grocery business, at Safeway. Working at a grocery store and delivering Pepperidge Farm products to grocery stores was never a problem for me or with Pepperidge Farm . . . .")).

- Some SDAs use a PF-leased depot to store inventory, while others use their own facilities. Dkt. 61-3 at 11 (citing Buckel Decl. ¶ 8, Dkt. 62-1 Ex. 2 ("[A] few other SDAs and I pitch in for the monthly rent at our own depot. Pepperidge Farm reimburses us for a percentage of the cost."); Ramos Decl. ¶ 3, Dkt. 62-2 Ex. 12 ("Since I cannot store products in a storage unit [due to a local ordinance], I have worked with Pepperidge Farm to allow JR Distribution

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

to store product on the company vehicle."); Heusner Decl. ¶ 7, Dkt. 62-1 Ex. 10 ("I do not use a Pepperidge Farm depot. Instead, I share a storage unit with five other SDAs."); Alves Decl. ¶ 6, Dkt. 54-6 at 5; Moses Decl. ¶ 5, Dkt. 54-8 at 27-28; Seeto Decl. ¶ 4, Dkt. 54-8 at 11 (used Pepperidge Farm depot and thus incurred no warehouse expenses)).

- There are variations among SDAs in selecting the type and number of vehicles to use in their businesses. Dkt. 61-3 at 11-12 (citing Barrack Decl. ¶ 15, Dkt. 62-1 Ex. 1 (2000 "box truck"); Ericson Decl. ¶18, Dkt. 62 Ex. 5 (uses three trucks); Buckel Decl. ¶ 11, Dkt. 62-1 Ex. 2 (Chevy Silverado pickup truck and 16-foot trailer); Debilzan Decl. ¶ 2, Dkt. 62-1 Ex. 4 ("I now own two routes and two trucks (at one point, I owned and used four trucks in the operation of my distributorship)."); Caputo Dep. 107:14-108:18, Dkt. 62-2 Ex. 19 (since 2013 has used a truck and trailer because he does not want to pay for a new box truck until he has completed the payment for his route); Henning Decl. ¶ 10, Dkt. 62-1 Ex. 9 (has used 16-foot truck, now uses a larger one); Ramos Decl. ¶ 3, Ex. 62-2 Ex. 12 (uses truck that "resembles a food truck" as well as a van that "contains shelves on the walls for storing product in an organized fashion"); Rice Decl. ¶ 3, Dkt. 62-2 Ex. 13 ("Generally, I use the box truck and my employee uses the step van.")).

- There are also differences in what SDAs and/or their personnel wear while working on PF routes and whether their vehicles have a PF logo. Dkt. 61-3 at 12-13 (citing Finkelstein Decl. ¶ 8, Dkt. 62-1 Ex. 6 ("I wear a Pepperidge Farm-branded shirt when operating my route . . ., but I know many SDAs who choose not to wear Pepperidge Farm-branded clothes. I do not have a Pepperidge Farm decal or any Pepperidge Farm logo on my truck, but again, this isn't a requirement . . . .") Buckel Decl. ¶ 11, Dkt. 62-1 Ex. 2 ("I bought Pepperidge Farm apparel, but I don't wear them anymore and Pepperidge Farm has never required me to do so. I do not use a Pepperidge Farm logo on my truck, and no one from Pepperidge Farm has ever said I needed to do so."); Barrack Decl. ¶ 15, Dkt. 62-1 Ex. 1 ("[N]o one at Pepperidge Farm has ever told me that I need to put a Pepperidge Farm logo on my truck or wear Pepperidge Farm clothing, and they don't have the right to tell me to do so."); Caputo Dep. 109:8-11; 110:14-15; 111:19-112:18, Dkt. 62-2 Ex. 19 (vehicles have not had any insignia on them; has logo placed on his own shirts by a "logo person" because he thinks it looks professional); Helton Decl. ¶¶ 10-11, Dkt. 62-1 Ex. 8 ("No one from Pepperidge Farm has ever told me I had to wear Pepperidge Farm clothes, and I have never felt that it was required."); Ouye Dep. 65:24-66:19, Dkt. 62-3 Ex. 24 (used to wear Pepperidge Farm logo when the company provided it for free, but now that it no longer does, he wears a collared shirt and shorts); Chinn Dep. 66:14-22; 68:16-18, Dkt. 62-2 Ex. 20 (trucks do not have Pepperidge Farm logo because he does not want people to know what is inside his truck; wears regular street clothes to run his distributorship most of the time)).

- Many SDAs describe their duties in a way that suggests their qualification for the outside sales exemption. Dkt. 61-3 at 13-14 (citing Kenny Dep. 121:20-24, Dkt. 62-3 Ex. 22 (he spent "almost all" of his working hours at his stores); Kenny Resume, Dkt. 62-4 Ex. 26

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|----------|-------------------------|------|----------------|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. |

(during time as SDA "developed mutually beneficial relationships to maximize existing accounts and to grow customer base" and "increas[ed] sales by at least 9% in less than 12 months"); Debilzan Decl. ¶¶ 12, 16, Dkt. 62-1 Ex. 4 ("I believe the best way to increase sales is to form relationships with and gain the trust of key decision makers at the stores on my routes. My goal is to get them to understand the value of my service and the Pepperidge Farm brand."); Buckel Decl. ¶ 5, 7, Dkt. 62-1 Ex. 2 ("Each day, I generally spend about 15% of my time driving, [and] 70% inside stores" and "I try to make contact with store managers as often as I can to improve my sales."); Ouye Dep. 60:2-14, Dkt. 62-3 Ex. 24 (spends at least 75% of his work hours with store contacts as part of an effort to increase sales); Ericson Decl. ¶ 10, 11, Dkt. 62-1 Ex. 5 ("I am free to use my time as I see fit and in the manner I believe will help me make the most sales. For me, that means spending more time in my stores building relationships with my store owners and managers."); Barrack Decl. ¶ 13, Dkt. 62-1 Ex. 1 ("I try to spend time every week speaking with my stores' managers to help improve my business in their stores."); Finkelstein Decl. ¶ 9, Dkt. 62-1 Ex. 6 (ma a priority to speak with store managers at least once per week about displays and promotions); Coody Dep. 93:3-11, Dkt. 62-3 Ex. 23 (develops relationships with store contacts so that he can have more in-store displays); Helton Decl. ¶ 9, Dkt. 62-1 Ex. 8 ("By frequently being in my stores and developing relationships with my customers, I often get prime real estate in terms of shelf and display space. Gaining that space is critical to growing sales."); Henning Decl. ¶ 13, Dkt. 62-1 Ex. 9 ("I've grown my sales considerably. In fact, they've more than doubled."); Heusner Decl. ¶ 3, Dkt. 62-1 Ex. 10 ("[Part of my success] is the result of my efforts to grow sales by developing great relationships with the store managers on my route (which leads to increased display and sales opportunities."); Semien Decl. ¶ 6, Dkt. 62-2 Ex. 14 ("[T]he main reasons why I sell so many products are because I've earned the trust of the store managers in my territory and I understand the merchandise.")).

- The SDAs vary in allocating time to administrative matters. Dkt. 61-3 at 14 (citing Kenny Dep. 150:8-152:8, Dkt. 62-3 Ex. 22 (spent "two to three hours every day" planning for the next day and additional time on placing orders and reporting sales); Kenny Resume, Dkt. 62-4 Ex. 26 (while SDA "planned and implemented sales and marketing objectives, "prepared and presented reports one expenses, budgets, and growth" and "promoted company products"); Buckel Decl. ¶ 7, Dkt. 62-1 Ex. 2 (spends 15% of his time "filling orders and stocking product"); Dufault Dep. 106:6-25, Dkt. 62-3 Ex. 21 (spends at least 2 ½ hours every week on "paperwork"); Chinn Dep. 96:12-20, Dkt. 62-2 Ex. 20 (does "administrative" work on his own)).

- There is a variation among SDAs with respect to time spent on managerial activities. Dkt. 61-3 at 14-15 (citing Dangelo Decl. ¶ 6, Dkt. 62-1 Ex. 3 (SDA Dale Cox manages team of sales and delivery personnel who service his many routes); *id.* at 12 (SDA Ed Gee hires a manager to run his route); Debilzan Decl. ¶ 6, Dkt. 62-1 Ex. 4 ("I decide who I use as helpers, set their compensation (both how much to pay them and how often), and evaluate their performance. Pepperidge Farm has no say in the management of my helpers, and it

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
| --- | --- | --- | --- |
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

has never tried to involve itself."); Ericson Decl. ¶ 22, Dkt. 62-1 Ex. 5 ("[S]election of my helper, when my helper works, [and] what my helper does . . . is entirely up to me"); Rice Decl. ¶ 8, Dkt. 62-2 Ex. 13 ("Pepperidge Farm has no say in my use of employees or other helpers to run my route."); Semien Decl. ¶¶ 3, 4, Dkt. 62-1 Ex. 14 ("I sold one of my routes to another distributor, Don Lanzel, because I was dissatisfied with my helpers at the time . . . . Since then, I ended up hiring another helper and I've been working with him for 8-10 years. . . . He does a good job and I've been satisfied with my employee's work.")).

- Many SDAs could or did take rest and meal breaks. Dkt. 61-3 at 15 (citing Barrack Decl. ¶¶ 2, 11, Dkt. 62-1 Ex. 1 ("I get to decide when I take a break, or don't take a break, depending on what else I want to do that day. . . . I take breaks whenever I want to."); Chinn Dep. 65:5-7, Dkt. 62-2 Ex. 20 (he could take meal breaks); Gomez Decl. ¶ 8, Dkt. 62-1 Ex. 7 ("It's up to me how long I am on the road each day and when I choose to take breaks."); Barrish Dep. 67:12-23, Dkt. 62-2 Ex. 18 (would eat lunch at warehouse on slow days); Ramos Decl. ¶ 9, Dkt. 62-2 Ex. 12 ("As the owner of the company, I can take a 30 minute lunch break if I wanted to, but I prefer to eat in the truck and end my day earlier. I can also take 10 minute breaks throughout the day if [I] want.")).

- Some SDAs operate their business through entities. Dkt. 61-3 at 15 (citing Gomez Decl. ¶ 12, Dkt. 62-1 Ex. 7 (incorporated distributorship under the name "Tons of Crumbs, Inc."); Helton Decl. ¶ 6, Dkt. 62-1 Ex. 8 (incorporated distributorship under name, "WHEH Enterprises"); Ramos Decl. ¶ 1, Dkt. 62-2 Ex. 12 (incorporated business as "JR Distribution"); Dangelo Decl. ¶ 4, Dkt. 62-1 Ex. 3 (SDA Dale Cox incorporated distributorship as "Dale Cox Distributing, Inc."); Chinn Dep. 49:11-17, Dkt. 62-2 Ex. 20 (did not incorporate because he did "not [have] enough knowledge about the process"); Caputo Dep. 88:3-5, Dkt. 62-2 Ex. 19 (did not incorporate)).

- SDAs vary in determining and applying business expenses for income tax purposes. Dkt. 61-3 at 15-16 (citing Alfred Dep. 65:8-13, Dkt. 62-2 Ex. 16 ("do[es]n't know" whether he took business-related deductions in connection with preparation of tax returns); Barrack Decl. ¶ 15, Dkt. 62-1 Ex. 1 ("I depreciate [my truck's] value every year on my taxes."); Buckel Decl. ¶12, Dkt. 62-1 Ex. 2 ("Besides depot/warehouse expenses, I also claim home office expenses on my taxes. I also expense my cell phone charges, gas, and mileage on my truck."); Ericson Decl. ¶ 21, Dkt. 62-1 Ex. 5 (uses tax deductions for trucks and equipment); Finkelstein Decl. ¶ 13, Dkt. 62-1 Ex. 6 (uses tax write-offs on most of his business expenses, including labor costs, gas, handheld computer maintenance fees, the handheld computer itself, truck costs, phone bills and insurance); Ramos Decl. ¶ 10, Dkt. 62 Ex. 12 ("The company [that I own] owns all the equipment and the van, and depreciates these assets for tax purposes.")).

- There are differences among SDAs in deciding whether to sell or transfer portions of their territories or to acquire additional ones. Dkt. 61-3 at 16 (citing Debilzan Decl. ¶ 17, Dkt. 62-1

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV14-07086 JAK (RZx) | | Date | April 11, 2017 |
|---|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | | |

Ex. 4 ("I have engaged in four route splits since I purchased my first route. Each of those splits have been my own decision using my own business judgment, with no influence or control by Pepperidge Farm."); Finkelstein Decl. ¶¶ 3, 5, Dkt. 62-1 Ex. 6 (Pepperidge Farm not involved in research conducted before buying route or in decision-making process to buy route); Semien Decl. ¶ 3, Dkt. 62-2 Ex. 14 (Pepperidge Farm "wasn't involved in my decision" to sell off a route)).

- Defendant has also submitted the expert report of Daniel J. Slottje, Senior Managing Director at FTI Consulting and a Professor Emeritus of Economics at Southern Methodist University in Dallas, Texas. Ex. 28, Dkt. 62-4. Slottje opines that the business model for Distributors, which includes efforts to maximize profits, relies on their status as independent contractors and "[t]he data show that the California market for distribution rights to Pepperidge Farm routes has softened considerably after Plaintiffs filed this action on August 7, 2014." *Id.* at 18-19. A supplemental report by Slottje, which was completed in October 2016, states that the statistical trend of a "softening market" has continued. Dkt. 112-3 at 50.

## III. <u>Analysis</u>

### A. **Legal Standard for Class Certification**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks omitted). Under Fed. R. Civ. P. 23, a class "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). That "rigorous analysis" will "frequently" include "some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 131 S. Ct. at 2551. "Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160.

The first step in establishing the propriety of class certification requires a showing that the proposed class meets each of the prerequisites of Rule 23(a). *Wal-Mart*, 131 S. Ct. at 2551; *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). These are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a)(1)-(4). Further, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 131 S. Ct. at 2551 (emphasis in original).

If these four elements of Rule 23(a) are satisfied, the next step in the analysis is a determination whether the proposed class meets at least one set of standards under Rule 23(b). *See, e.g.*, *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Plaintiffs rely on Rule

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

23(b)(3), which provides, in relevant part, that a class proceeding "may be maintained . . . if . . . questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### B. Legal Standards for Classifying Workers

Under California law, when determining whether a person is an "employee" or an "independent contractor," a central test is "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 988 (9th Cir. 2014) (citation omitted). Under California law, other secondary factors are also considered as part of this determination. They include:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 769 P.2d 399, 404 (Cal. 1989). "The individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." *Id.* at 404 (citation omitted).

### C. Application

#### 1. Whether the Requirements of Fed. R. Civ. P. 23(a) Have Been Met

##### a) Numerosity

###### (1) Legal Standard

Fed. R. Civ. P. 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." "Impracticability does not mean impossibility, but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir.1964). No specific number of class members is required to satisfy this requirement. *Cypress v. Newport News Gen. & Nonsectarian Hospital Ass'n,* 375 F.2d 648, 653 (4th Cir.1967).

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|----------|-------------------------|------|----------------|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

(2)     Application

The SAC alleges that the class size is likely within the range of 500-700 current and former California Distributors. SAC, Dkt. 39 at ¶ 40(a). In support of this claim, Plaintiffs have offered evidence that, according to PF, at least 291 Distributors operated in California during the relevant time period. Motion, Dkt. 54-1 at 20. Plaintiffs note that many DSMs have been deposed, most of whom testified that they personally deliver products and stock shelves. *Id.* Defendant has not disputed these figures. This evidence is sufficient to show that the numerosity requirement has been satisfied.

b)     Commonality

(1)     Legal Standard

Fed. R. Civ. P. 23(a)(2) provides that a class may be certified only if "there are questions of law or fact common to the class." Commonality requires a showing that "the class members have suffered the same injury" and "does not mean merely that they have all suffered a violation of the same provision of law." *Wal-Mart*, 131 S. Ct. at 2551 (internal quotation marks removed). The class claims must "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* In determining commonality, "even a single common question will do." *Id.* at 2556 (internal markings omitted).

(2)     Application

*(a)     Plaintiff's Position*

Plaintiffs claim that "the overarching question" in the case is whether under California law PF misclassified its California Distributors as independent contractors. Motion, Dkt. 54-1 at 9. Plaintiffs argue that "[r]esolution of this common question using common proof (including common agreements and policies) will resolve an issue central to [PF's] liability in this case." *Id.* at 21 (citing *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) ("commonality only requires a single significant question of law or fact."); *Bowerman v. Field Asset Servs., Inc.*, No. 13-CV-00057-WHO, 2015 WL 1321883, at *14 (N.D. Cal. Mar. 24, 2015) ("whether putative class members were misclassified under California law as independent contractors" is common question capable of common resolution)).

Plaintiffs next identify the following questions of fact and law that are common to the putative Class Members:

- Whether PF employed Class Members in a position that is subject to, and not exempt from, California's overtime pay and other wage and hour requirements;

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

- Whether PF knew or should have known that Class Members regularly worked more than 40 hours per week and/or eight hours per day;
- Whether PF failed to pay Class Members overtime wages for time worked in excess of 40 hours per week or eight hours per day;
- Whether PF failed to provide Class Members with adequate off-duty meal periods and compensation for missed meal periods in violation of Cal. Lab. Code §§ 226.7 and 512 and IWC Wage Order No. 9;
- Whether PF failed to provide Class Members with adequate rest periods and compensation for missed rest periods in violation of Cal. Lab. Code § 226.7 and IWC Wage Order No. 9;
- Whether PF had a policy or practice of not paying meal and rest period premiums to Class Members when they had not been provided with them;
- Whether Class Members incurred employment-related expenses and/or losses in carrying out their duties to PF;
- Whether PF failed to indemnify Class Members for their necessary employment-related expenses and/or losses in violation of Cal. Lab. Code § 2802 and IWC Wage Order 9;
- Whether Defendant's collection and deduction of fees, including those for pallets, fees for stale products and substandard inventory, and fees related to handheld computers, violated Cal. Lab. Code § 221 and IWC Wage Order 9;
- Whether in violation of Cal. Lab. Code § 226.8(a)(2), Defendant unlawfully charged fees to Class Members arising from their employment with Defendant;
- Whether Defendant knowingly and intentionally failed to provide Class Members with accurate and itemized wage statements as required by Cal. Lab. Code § 226 and IWC Wage Order No.9;
- Whether Defendant violated Cal. Lab. Code § 1174 and IWC Wage Order No. 9 by failing to maintain records of the actual hours that Class Members worked each day;
- Whether Defendant violated Cal. Lab. Code §§ 201-203 by failing, upon the termination of any Class Member, timely to pay that person all wages then due for overtime and missed meal periods;
- Whether Defendant's misclassification of Class Members was willful and in violation of Cal. Lab. Code § 226.8;
- Whether the foregoing violations also constitute unlawful, unfair, and/or fraudulent business practices under Cal. Bus. & Prof. Code §§17200, *et seq.*

SAC, Dkt. 39 ¶ 40(b).

### (b)    Defendant's Position

Defendant argues that "[t]he several hundred putative class members each operate their own businesses and interact with PF[] in countless different ways. Given that variation, Plaintiffs cannot show that the threshold question of misclassification can be answered with common evidence." Opposition, Dkt. 61 at 8. Defendant then argues that

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

(1) Plaintiffs' overtime and meal and break claims are subject to affirmative defenses of exemption that PF[] has a due process right to adjudicate and call for individualized inquiries under this Circuit's case law; (2) Plaintiffs cannot establish the *prima facie* elements of their claims on a class basis, as many SDAs never worked overtime hours, and were not forced to miss meal and rest periods; and (3) Plaintiffs' expense reimbursement claims present individualized inquiries such as which expenses were incurred and were reasonable.

*Id.*

### (c)    Analysis

There is a common question presented in this action. It is whether the SDAs are independent contractors or employees of Defendant. The relevant legal standard is whether Defendant had the right to exercise control in a manner comparable to what an employer does. *Alexander*, 765 F.3d at 988. Defendant has interacted with all putative Class Members under the common Agreements. Therefore, the issues relevant to control are common as to all putative Class Members. This conclusion is consistent with those reached by other district courts under similar circumstances. *See Martinez*, CV 15-5112 RGK (Ex), Dkt. 86-1 at 10 ("Plaintiffs have presented evidence showing that putative class members' claims stem from a common source in that they all worked for Defendant and they were all subject to the same company policies during the relevant class period. Therefore, Plaintiffs have met their burden to demonstrate commonality among class members."); *O'Connor v. Uber Techs., Inc.*, No. C-13-3826 EMC, 2015 WL 5138097, at *8–9 (N.D. Cal. Sept. 1, 2015) ("[T]he common legal issue of whether all class members should be classified as employees or independent contractors is one whose answer would not only be apt to drive the resolution of the litigation, but could in fact be outcome determinative") (internal citations removed); *Guifu Li v. A Perfect Franchise, Inc.*, No. 5:10-CV-01189-LHK, 2011 WL 4635198, at *7 (N.D. Cal. Oct. 5, 2011) ("District Courts throughout this circuit have found that commonality is met when the proposed class of plaintiffs asserts that class members were improperly classified as independent contractors instead of employees.").

The resolution of this issue will also largely, if not entirely, determine whether there is liability for the claims for PAGA penalties due to misclassification as independent contractors (Cal. Lab. Code § 226.8), failure to provide accurate wage statements (Cal. Lab. Code § 226), failure to reimburse business expenses, failure to pay for overtime or waiting time, and the corresponding claims under Cal. Bus. & Prof. Code § 17200.

### c)    Adequacy of Representation and Typicality

#### (1)    Legal Standards

"[T]he typicality and adequacy inquiries tend to significantly overlap." *O'Connor*, 2015 WL 5138097, at *9 (citing Newberg on Class Actions § 3:32 (5th ed. 2015) ("Due to the related

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | | Date | April 11, 2017 |
|---|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | | |

nature of the two requirements and the frequency with which they are challenged on the same grounds, many courts address the typicality and adequacy requirements in a single inquiry.")).

Fed. R. Civ. P. 23(a)(3) requires that the "claims or defense of the representative parties" be "typical of the claims or defenses of the class." This requirement is met if the "representative claims are 'typical,'" *i.e.,* "if they are reasonably co-extensive with those of absent class members[.]" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Representative claims "need not be substantially identical." *Id.* "Typicality refers only to the nature of the claim, as mentioned above, not to the quantity of violations or the specific facts surrounding each violation." *Hughes v. WinCo Foods*, No. ED CV11-00644 JAK, 2012 WL 34483, at *7 (C.D. Cal. Jan. 4, 2012).

Fed. R. Civ. P. 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. "Class representatives fail to meet the adequacy standard when the conflicts between the class members are serious and irreconcilable." *Guifu Li*, 2011 WL 4635198, at *9 (internal citations removed).

        (2)      Application

        *(a)*      *Adequacy of Named Plaintiffs*

Plaintiffs argue that their claims are typical because like the putative Class Members, they sustained damages when, under the Agreements, PF misclassified them as independent contractors rather than as employees. SAC, Dkt. 39 at ¶ 40(c); Motion, Dkt. 54-1 at 21 (citing *Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-2104 SC, 2008 WL 4156364, at *5 (N.D. Cal. Sept. 5, 2008) (typicality shown when movants "presented evidence that [Defendant] had a corporate practice of classifying delivery drivers as independent contractors and that this practice was common to the overwhelming majority of [Defendant's] delivery drivers.")).

Plaintiffs argue that they are adequate representatives. In support of this position, they state that collectively they

> do not have any conflicts of interest with other class members; they share common injuries with the class and seek monetary relief that will benefit the entire class. Plaintiffs have actively participated in this case through responding to Defendant's discovery requests and attending depositions. Plaintiffs' counsel is experienced in complex class action wage and hour litigation and has prosecuted this case vigorously.

Dkt. 54-1 at 22.

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|----------|-------------------------|------|----------------|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

Defendant argues that the financial interests of the Plaintiffs and the Class Members are in conflict because Plaintiffs are former Distributors. Defendant points out that the Plaintiffs sold their distributorships prior to initiating this action. In contrast, more than 200 of the putative Class Members are currently Distributors. Opposition, Dkt. 61 at 7. Defendant argues that the conflict arises because this litigation will have an adverse effect on the value of the distributorships owned by the Class Members who are active, and that this will be reflected in the sales prices that are received if they are sold in the future. In contrast, the Plaintiffs do not have this risk because all of them previously sold their respective Distributorships. *Id.* at 15. Defendant adds that certain Class Members who are currently Distributors may even have claims against those Plaintiffs from whom they purchased them because this litigation may cause a reduction in their values, something that could have been known prior to when the sales were completed. *Id.* at 16.

Plaintiffs respond that the report prepared by Slottje may show that the price for relevant Distributorships has declined, but the causes were not properly studied or identified. Reply, Dkt. 72 at 3. They also contend that an adjudication of the claims here would not require that Distributors become employees, which would, of course, adversely affect the value of the Distributorships, including the ability of Class Members to sell them to others. Instead, the parties could negotiate and implement reasonable terms for independent contractor relationships. *Id.* at 4 (citing *Smith v. Cardinal Logistics*, 2008 WL 4156364 at *7 (N.D. Cal. Sept. 5, 2008) (there is "nothing to stop" the parties from implementing a true independent contractor relationship); *O'Connor*, 2015 WL 5138097 at *13 ("even if Uber loses this case, it will be free to restructure its relationship [to make drivers] bona fide independent contractors.")). Plaintiffs also claim that a termination of the distributorship agreements could require large payouts by PF to the current Distributors. *Id.* at 5.

The named Plaintiffs are inadequate class representatives because they are no longer Distributors. If the proposed class were certified, and the Class prevailed on its claims, this would not require the current Distributors to become PF employees. Instead, how those relationships would be defined could be determined by future negotiations. However, Plaintiffs have no stake in how such negotiations might proceed. They are no longer involved in business dealings with PF. The putative Class Members who are current Distributors have a stake in the outcome as well as on the future value of the Distributorships that they purchased. Indeed, Class Members have a far greater interest in both areas. For all of the foregoing reasons, Plaintiffs are not adequate to represent all of the putative Class Members.

*(b)     Adequacy of Proposed Subclasses*

In their Reply, Plaintiffs proposed a subclass solution. Thus, they argued, for the first time, that if it is determined that the named Plaintiffs are not adequate representatives for those members of the proposed Class who are current SDAs, Ashley Alves ("Alves"), who is a current Distributor, could be substituted as the representative for that subclass. *Id.* at 6; Decl. of Alves ¶ 2, Dkt. 54-

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

6 ("I am a current Sales Development Associate (SDA) for Pepperidge Farm in Orange County. I have worked for Pepperidge Farm as an SDA since August 2013.").

Subsequently, PF deposed Alves and her husband and then submitted a supplemental brief. Dkt. 112. It argues that Alves is not an adequate representative for the proposed subclass, and that its certification would be inappropriate because the claims advanced in the SAC are contrary to the best interests of current Distributors. In support of this position, PF relies on the opinion of Slottje that this litigation will cause a diminution in the value of Distributorships. PF also submitted declarations from certain current Distributors who oppose this litigation for that reason. PF argues that a statement by Alves confirms this conflict because she is not concerned about such a potential decline in value. Alves testified about this issue during her deposition. She stated that she does not believe it is "a realistic possibility" that PF will cease to maintain an independent contractor relationship with the current Distributors if Plaintiffs prevail on their claims.[4]

PF has also identified the following reasons that support the claimed conflict for Alves as the representative of the class:

- Alves has less equity in her Distributorship than other Distributors. She has a current outstanding loan that reflects approximately 56% of the estimated fair market value of her Distributorship. Dkt. 112-3 at 59-69.
- Alves seeks to recover on behalf of both herself and her husband. He is not a Distributor, but assists her in operating it. If successful on both claims, the combined recovery would be disproportionate to the recoveries by other Distributors who cannot assert such parallel claims (Dkt. 112 at 10); and
- Unlike many Distributors, Alves never sold or attempted to sell any portion of her route. As a result, she "need not be concerned about a potential claim against her by a purchasing Distributor, nor troubled by any current devaluation of or loss of ability to sell the distributorships as a result of the existence of this litigation." Dkt. 112 at 10.

---

[4] *See, e.g.*, Second Alves Deposition, Dkt. 1-4, at 215:9-22:

They've had this business model for multiple, multiple years. Why would they want to change that now? . . . I personally don't believe that they're going to do that.

\*\*\*
Q: So Pepperidge Farm potentially reclassifying distributors on an ongoing basis as employees, that's not a realistic risk of this litigation because you don't think it's going to happen?
A: I don't believe – I don't believe that.
Q: You don't believe that's a realistic possibility?
A: No, I don't."

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

In Plaintiffs' supplemental reply (Dkt. 113), they argue that Alves' assessment of the risks of litigation does not affect her adequacy to serve as a representative of the proposed subclass. They argue that, independent of her subjective understanding of the financial risks of litigation, her interests are aligned with those of the other putative Class Members who are current Distributors. Dkt. 113 at 11. For example, she states that she has the following common interests with other current Distributors:

- Being free from unjustified control by PF of their operations as independent contractors;
- Increasing the value of Distributorships; and
- Obtaining compensation for any unjustified control over their operations previously imposed by PF.

It is neither necessary nor always possible that a class representative and all members of the class will have identical interests on all matters. *Hughes v. WinCo Foods*, No. ED CV11-00644 JAK, 2012 WL 34483, at *7 (C.D. Cal. Jan. 4, 2012). Instead, the proposed class representative must have claims that are typical of those of the putative class members and can adequately represent them as to such claims. These standards are met here. By creating two subclasses -- one of current Distributors represented by Alves, and the other of former Distributors, represented by Plaintiffs -- the claimed inadequacy of representation is addressed.

That some Distributors do not wish to pursue this action does not defeat the Motion.

> As a general rule, disapproval of the action by some class members will not preclude a class action on the ground of inadequate representation. Those courts that have found inadequate representation on these grounds have generally done so only when a very large proportion of the class disagrees with the suit. Courts have also been hesitant to warrant expressions of disapproval by class members where these might be the product of solicitation or pressure by the defendant. Even when they exist and are substantial, conflicts concerning the propriety of a suit are less troubling in Rule 23(b)(3) cases, as the disgruntled class members in a (b)(3) suit can opt out.

Newberg on Class Actions § 3:65 (5th ed.); *see also In re Yahoo Mail Litigation*, 2015 WL 3523908, *15 (N.D. Cal. 2015) (quoting *id.*); *Martinez*, CV 15-5112 RGK (Ex), Dkt. 86-1 at 10-11; *O'Connor*, 2015 WL 5138097, at *12–13; *Norris-Wilson v. Delta-T Grp., Inc.*, 270 F.R.D. 596, 606 (S.D. Cal. 2010); *Guifu Li*, 2011 WL 4635198, at *9 (N.D. Cal. Oct. 5, 2011) ("The fact that . . . some potential class members may prefer their current employment situation, is not sufficient to defeat adequacy."). Further, these putative Class Members could elect to opt out.

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|----------|-------------------------|------|----------------|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

*(c)*     *Conflicts Among Class Counsel*

Plaintiffs are represented by three law firms. If the class members are divided into the two subclasses, Plaintiffs propose that that two of these firms -- Shapiro Haber & Urmy and Rudolph Friedmann -- represent the subclass of current Distributors, and the other -- Rukin Hyland -- represent the subclass of former Distributors. Dkt. 113 at 18 n. 7. Plaintiffs have made this proposal because the putative subclass of current Distributors has more members than the one comprised of former Distributors. *Id.*

In its Supplemental Brief, PF argues that these three law firms cannot adequately represent the proposed subclasses simply by "divvying up representation among each other." Dkt. 112 at 5. Defendant argues that this will not address the following ethical issues: (1) each of the three firms has been representing all of the members of both proposed subclasses, without their informed consent to the waiver of any conflicts as to the representation; (2) each firm has confidential information from what would be its former clients -- the members of the subclass that it would no longer represent; and (3) these conflicts will become more obvious as Distributors are placed in different subclasses where their interests could diverge.

In support of its position, PF cites *Radcliffe v. Hernandez*, 818 F.3d 537, 541 (9th Cir. 2016). There, two formerly-independent subclasses had been represented by separate counsel. The two subclasses were consolidated for settlement proceedings, with the counsel for one of them appointed lead counsel for both. Counsel for the other subclass sought to disqualify lead counsel. In support of this position, it argued that that class counsel had "created a conflict of interest" between class representatives and absent class members "by conditioning incentive awards for the class representatives on their approval of the proposed settlement agreement." *Id.* at 539. From this it argued that lead counsel necessarily had a conflict of interest, which "generally leads to automatic disqualification." *Id.*

*Radcliffe* concluded that "California does not apply a rule of automatic disqualification for conflicts of simultaneous representation in the class action context." *Id.* at 539, 543-47. The court observed that in class actions, class counsel often simultaneously represents different members of a class whose interests may diverge somewhat as to the pursuit and disposition of their shared claims, including as to a potential settlement of them. *Id.* at 544-45. Further, a disqualification of counsel would require the engagement of new counsel and the loss of the case-specific information held by existing counsel. *Id.* Therefore, rather than imposing a *per se* disqualification rule in the context of a class action proceeding, *Radcliffe* affirmed the application of the balancing of the interests test that the district court applied in rejecting disqualification. Under this test, the

> court must weigh the combined effects of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that fair resolution of disputes

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|----------|-------------------------|------|----------------|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest.

*Id.* at 547 (quoting *William H. Raley Co. v. Superior Court*, 149 Cal.App.3d 1042 (1983)).

The Second Circuit reached a similar conclusion when it determined that a

> motion to disqualify an attorney who has represented the entire class and who has thereafter been retained by a faction of the class to represent its interests in opposition to a proposed settlement of the action cannot be automatically granted. Rather, there must be a balancing of the interests of the various groups of class members and of the interest of the public and the court in achieving a just and expeditious resolution of the dispute.

*In re Agent Orange Prod. Liab. Litig.*, 800 F.2d 14, 19 (2d Cir. 1986) (addressing motion to disqualify counsel on appeal for subclass challenging classwide settlement).

In the present action, an application of the *Radcliffe* factors supports the reassignment of current counsel between the two subclasses. Counsel have invested substantial time and effort in the representation of the Class. To require new counsel would impose substantial cost burdens because those attorneys -- at least one for each subclass -- would have to spend substantial time reviewing pleadings, discovery and decisions, interviewing class members and evaluating available evidence. Although new counsel may not have to redo all of the work that current counsel has performed, the necessary efforts would be quite substantial.

The potential conflict here concerns subclasses whose members may seek different forms of relief, and whose financial interests could diverge. Those who are current Distributors may have an interest in preserving the ability to sell their businesses, while those who already sold them would no longer have that concern. However, whether such issues will arise as this matter proceeds, and if so, whether the information that current counsel has would impose any prejudice, is uncertain. Furthermore, no class member has objected to the continued representation of the subclasses as proposed.

\*    \*    \*

For the foregoing reasons the adequacy of representation and typicality requirements are satisfied as to both subclasses.

2.    <u>Whether the Requirements of Fed. R. Civ. P. 23(b)(3) Have Been Met</u>

a)    Legal Standard

If the Rule 23(a) prerequisites are satisfied, the next issue is whether those of Rule 23(b) have been met. *See, e.g., Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|----------|--------------------------|------|----------------|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

Plaintiffs seek certification under Fed. R. Civ. P. 23(b)(3), which has two requirements: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The following factors are considered in making this determination: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

"The fact that the plaintiffs may meet the commonality requirement when the employer has a blanket policy of classifying class members as independent contractors does not establish that common questions of fact or law predominate." *Guifu Li*, 2011 WL 4635198, at *13 n. 4 (citing *In re Wells Fargo Home Mortg.,* 571 F.3d 953, 955 (9th Cir.2009) (abuse of discretion in certifying a wage and hour class pursuant to FRCP 23(b)(3) based on a blanket exemption policy)).

        b)      Application

           (1)      Predominance

                *(a)*     *Misclassification*

Plaintiffs argue that the question whether the Distributors are employees or independent contractors predominates over all other issues. Plaintiffs cite *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 988 (9th Cir. 2014), as to this issue. *Alexander* held that "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Id.* (*citing Borello &*, 48 Cal. 3d at 350). The plaintiffs in *Alexander* worked full time as drivers for a package delivery service. It was determined that they were employees as a matter of law because the package delivery service had the right to control their work under a uniform operating agreement. *Id.* at 989, 997. *Alexander* confirmed the principle that the determinative issue is the right to control and not whether it was exercised in a particular manner. *Accord Ambrose v. Avis Rent a Car Sys. Inc.*, 2014 WL 6976114, at *10 (C.D. Cal. Dec. 8, 2014) (the proper test is "right to control" and not the "actual exercise of control").

Plaintiffs argue that the question of control is subject to common proof. Thus, they contend that PF has "formalized, routinized and standardized" its systems for dealing with Distributers. Motion, Dkt. 54-1 at 23. This includes the Consignment Agreements, which are substantially the same as to all Distributers, and PF's uniform policies for onboarding, evaluation and discipline. *Id.* at 23-24. Courts have certified classes where similar issues were presented as to whether the class members were employees or independent contractors. *Id.* at 24 (citing *Bowerman*, 2015 WL 1321883, at *1 (certifying California wage and hour claims where plaintiffs, who had been designated as independent contractors by defendant, performed property preservation

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|----------|-------------------------|------|----------------|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

work for defendant, operated under defendant's common system and claimed that they were misclassified); *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 610 (N.D. Cal. 2014), (certifying class of drivers who alleged they were misclassified as independent contractors); *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, No. 3:12-CV-00596-MOC, 2015 WL 1346125, at *1 (W.D.N.C. Mar. 24, 2015) (certifying a wage and hour class where plaintiffs alleged that a commercial bakery misclassified its distributors as independent contractors and where the distributors were required to sign Distributor Agreements and deliver, stock, and merchandise the defendant's product); *In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 273 F.R.D. 424, 458-59 (N.D. Ind. 2008) (certifying California wage and hour claims of those who had been designated as independent contractors and were subject to the defendant's standard operating agreement)).

Defendant argues that, under the Agreements, it does not have a *de facto* right to control the Distributors, notwithstanding that it may terminate the Agreements. Among other consequences of a termination without cause is the requirement that PF pay the SDA a 25% penalty above the fair market value of the Distributorship. This would often require a payment of a very significant amount to the Distributor. Opposition, Dkt. 61 at 19. Defendant adds that, notwithstanding the terms of the Agreements, its business relationships with Distributors vary. In support of this position, Defendant relies on *Martinez et al. v. Flower Foods, Inc. et al.*, No. 2:15-CV-05112-RGK (C.D. Cal. Feb. 1, 2016). Dkt. 86-1, Ex. 1. There, the written agreements between plaintiffs, who were drivers, and defendants required conformance to "Good Industry Practice." Opposition, Dkt. 61 at 12. However, *Martinez* found that this standard was so broad and unspecific that there were many "variations" about the regulation of the behavior and performance of the drivers. *Id.* These variations "manifest[ed] a difference in the actual scope of [d]efendants' right to control" plaintiff drivers. *Id.*

PF argues that there are "stark differences" in how different members of the Class

> use helpers or employees; set their helpers' hours and schedules; set their own hours and schedule; choose to incorporate their businesses; decide which and what volume of products to order; pursue "cash accounts," which are not billed by PF, and negotiate prices with those cash accounts; determine which and how many vehicles to use to operate their businesses; choose what they (or their helpers) wore while delivering consigned product, and whether their trucks bear a PF logo; and decide when and how to divest some or all of their distributorship or acquire additional territory.

Opposition, Dkt. 61 at 19-20.

Defendant also contends there are variations among the territories served by different Distributors. These include the type of retail stores located in the territory, the practices of the retail stores with respect to the sale of products and the geographic size of the territory. *Id.* at 21. In support of its position as to the variations among Distributors, Defendant cites the testimony of certain Distributors about how they determine when and how best to service their

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

customers. This includes hours worked, display of products at chain accounts and the amount of products to order. *Id.* at 21-22.

As to the secondary factors, which are discussed above,[5] Defendant argues that issues of control require an assessment of the operations of each Distributor. Thus, whether there is an employer-employee relationship with PF is an issue that is subject to an individualized analysis. For example, some Distributors work for other businesses. *Id.* at 23 (citing 2006 WL 6500597, at *16 (denying class certification due to the distinct business factor); *Narayan*, 285 F.R.D. at 478 (N.D. Cal. 2012) (same)); *Martinez*, No. 2:15-CV-05112-RGK, slip op. at 13 ("individualized questions" are raised with respect to the variance among drivers that reflects the absence of a right to control by defendant).

Defendant also argues that the skills required for a position as an SDA vary. Some of the Distributors employ helpers, with the number varying among Distributors who use them. Some Distributors focus on increasing sales to customers, while others focus only on delivery of the PF products. Some Distributors focus on obtaining cash accounts. As noted, there are also variations in the sizes of the areas served by Distributors, the number of retail stores within the areas, and the resulting sales volumes. Defendant also argues that individual inquiries will be necessary as to the method of payment to Distributors. Some are paid a commission by PF for chain accounts, but are paid directly by cash account customers pursuant to agreements entered directly with such parties. Those agreements may include credit terms. Defendant argues that there is a substantial variation among Distributors in the investment in equipment. As noted, some hire helpers, and acquire additional delivery trucks, handheld devices, hand trucks and dollies. Some incur legal costs in forming and maintaining the entity through which they operate.

The distinctions among Distributors identified by PF do not arise from the Agreements between those Distributors and PF. These Agreements are uniform on all matters material to the present issues. Instead, PF argues the actual degree of control exercised by PF may vary among Distributors. Although such variations may reflect the right to control, this evidence is more relevant to the exercise of control. It is the former that is material. "[W]hat matters under the common law is not how much control a hirer *exercises,* but how much control the hirer retains the *right* to exercise." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 533 (2014)

---

[5] As discussed earlier, these secondary factors include: (a) whether the putative employer has the right to terminate at will, without cause; (b) "whether the one performing services is engaged in a distinct occupation or business;" (c) "the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision;" (d) "the skill required in the particular occupation;" (e) "whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work;" (f) "the length of time for which the services are to be performed;" (g) "the method of payment, whether by the time or by the job;" (h) "whether or not the work is part of the regular business of the principal;" and (i) whether the parties "believe they are creating the relationship of employer-employee." *Alexander*, 765 F.3d at 988-89.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

(emphasis in original); *see also Villalpando*, 303 F.R.D. at 608 ("the Court must ask, 'is [Defendant's] right of control over its [drivers], whether great or small, sufficiently uniform to permit classwide assessment?") (quoting *Ayala*, 59 Cal. 4th at 533); *Air Couriers Int'l v. Emp't Dev. Dep't*, 150 Cal. App. 4th 923, 934 (2007) (that an employer has the right to control is not barred by a showing that workers have latitude in how the work is performed).

Because the scope of the right to control is governed by the Agreements, which are common, and evidence of actual operational control or independence can be presented at a trial, this factor weighs in favor of finding predominance as to this claim.

> (b)    Unpaid Overtime Wages and Wage Time Penalties Claim

Cal. Lab. Code § 510 and IWC Wage Order 9–2001, § 3, require the payment of overtime compensation to non-exempt employees. Plaintiffs argue these claims are subject to common proof because PF failed to maintain an overtime policy or pay overtime compensation. Motion, Dkt. 54-1 at 31 (citing *Villalpando*, 303 F.R.D. at 609 (minimum wage and overtime claims could be resolved classwide where class members were subject to common payment practices); *Bowerman*, 2015 WL 1321883, at *15 (certifying misclassification case including overtime claims)).

Defendant argues that Plaintiffs have not shown that there is common evidence as to the determination whether every putative Class Member is entitled to overtime pay. Opposition, Dkt. 61 at 28 (citing *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947-48 (9th Cir. 2011); *Sotelo*, 207 Cal. App. 4th at 652). It argues that where, as here, a defendant does not have a uniform policy governing how putative employees spend time in performing their work, individualized inquiries will arise as to each class member on this issue. *Id.* (citing *Vinole*, 246 F.R.D. at 641). In support of this position, Defendant argues that Distributors kept very different hours and that some never worked overtime. *Id.*

Defendant also relies on IWC Wage Order No. 9, which regulates wages, hours, and working conditions with respect to the transportation business in California. It exempts from overtime-pay requirements "persons employed in administrative, executive, or professional capacities." Cal. Code Regs. tit. 8, § 11090(1)(A); *see also* Cal. Lab. Code § 515(a). PF argues that if it is determined that Class Members were employees, many may be exempt under these standards. PF has presented evidence showing that certain distributors spend significant amounts of time in stores, or developing and maintaining relationships with store personnel. Dkt. 61 at 26. From this, PF argues that any such SDA may be properly classified as an "outside salesman," *i.e.*, one who "customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities." *Brody v. Astrazeneca Pharm.*, LP, 2008 WL 6953957, at *5 (C.D. Cal. 2008). PF also argues that some Class Members may be exempt from overtime under the "administrative exemption," because they spend more than half of their time on duties

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

such as "planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." See 29 C.F.R. § 541.205.

PF argues that it is "entitled to litigate [its] statutory defenses to individual claims." Opposition, Dkt. 61 at 25 (quoting *Dukes*, 131 S. Ct. at 2561). PF concedes that it has the burden on these defenses, but notes that Plaintiffs must show that a class proceeding is warranted in light of Defendant's plan to present them. *Id.* at 26 (citing *Marlo*, 639 F.3d 947-48). *See also In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268 F.R.D. 604, 611 (N.D. Cal. 2010) ("[W]hen an employer asserts an exemption as a defense, such as the outside sales exemption, the resolution of which depends upon how employees spend their time at work, unless plaintiff proposes some form of common proof . . . common issues of law or fact are unlikely to predominate."). Because these defenses apply to both liability and damages, PF argues that liability is not subject to common proof.

To support its position, PF relies on *Marlo v. United Parcel Serv., Inc.*, *supra.* That case concerned a proposed class action brought by certain supervisory employees of a parcel delivery company. They claimed that the company had misclassified its full-time supervisors as exempt from overtime pay requirements. 639 F.3d at 944. The district court certified the class, based in part on a showing that the employer applied a uniform overtime exemption policy to the proposed class on the basis of their job titles. *Id.* However, the district court later decertified the class because much of the evidence presented was in the form of testimony by individuals about the actual duties performed by class members. *Id.* The Ninth Circuit affirmed the decertification because determining the application of the overtime exemption would depend on the employment activities of individual class members. *Id. Marlo* noted that "[t]he existence of a policy classifying [plaintiffs] as exempt from overtime-pay requirements does not necessarily establish that [plaintiffs] were misclassified, because the policy may have accurately classified some employees and misclassified others." *Id.* at 948.

Plaintiffs have proposed a trial plan in which any affirmative defenses as to individual Class Members may be bifurcated, and tried together with damages should liability be found in the trial on that issue. *See* Proposed Trial Plan, Dkt. 54-14 at 62. Under this approach, Plaintiffs propose that they would introduce "evidence of independent contractor misclassification coupled with corporate testimony that all class members are considered ineligible for overtime, and that Defendant made no overtime payments to class members." *Id.* at 64. They add that, during the same proceeding, Defendant would be "free to assert affirmative defenses related to its uniform classification of class members as independent contractors. Any affirmative defenses relating to the particular circumstances of individual class members can be addressed in individual hearings or prove-ups during the damages phase." *Id.*

Plaintiffs argue that, under this trial plan, the central question presented will be whether Defendant had a common policy or practice of denying overtime. Plaintiffs contend that there is common evidence regarding work demands "prevalent on every route," because PF controls the "manner, timing, volume, and frequency of product delivery" to retailers, many of whom have

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

narrow time windows when deliveries must be made. Dkt. 54-1 at 14-15. Other questions, including both individual affirmative defenses and damages, could be adjudicated as to individual Class Members in more narrow proceedings that could be conducted in an efficient manner. For example, the number of hours that constituted overtime could be determined in this fashion. *See Norris-Wilson v. Delta-T Grp., Inc.*, 270 F.R.D. 596, 609 (S.D. Cal. 2010) ("once the matter of liability has been resolved, the question of damages almost answers itself. That means it's possible to conceive of the liability question as a straightforward damages question, anyway, in which case . . . individual analysis is to be expected but doesn't defeat class action treatment"); *cf. Johns v. Bayer Corp.*, 280 F.R.D. 551, 560 (S.D. Cal. 2012) (individualized defenses may be adjudicated separately from common, predominant issues, and do not preclude certification).

Given the circumstances here, *Marlo* is distinguishable. There, and in other cases cited by Defendant, it was conceded that the putative class members were employees. The central issue presented was the nature of their job duties. That, in turn, was the basis for an assessment of the applicability of the overtime exemption. In contrast, here the core issue is whether Distributors were employees. Unless Plaintiffs prevail on that issue, the exemption question is not presented. Further, unlike in *Marlo*, Defendant has not submitted any affirmative evidence that any of the Distributors spent a material amount of time on exempt activities. Instead, Defendant has identified two Class Members who has testified that they spend significant amounts of time on sales activity, and others who state that sales activities are an important component of their work. Dkt. 61 at 26. Defendant also has presented declarations from Class Members who state that they engage in certain administrative activities. This evidence does not show that these activities collectively require more than half of the time that they work

It is also noteworthy that the proposed class includes individuals who "personally delivered, stocked, and merchandised consigned product in retail stores." These activities do not require sales or administrative actions. This adds further support for the necessary showing of both commonality and predominance. Thus, the issue may not arise as to many class members. However, the fact that it may arise supports a trial plan in which this affirmative defense as to individual claims would be bifurcated. Such separate proceedings would be necessary only if Plaintiff prevails on liability. *See* Proposed Trial Plan, Dkt. 54-14 at 62. That plan is adopted.

>    (c)    Claim for Failure to Reimburse for Business
>    Expenses under California Labor Code § 2802 and IWC
>    Wage Order No. 9

Cal. Lab. Code § 2802 requires an employer to "indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties," Plaintiffs argue that common questions predominate on this cause of action. Thus, they contend that PF had a common policy not to reimburse Distributors for the following costs: trucks, fuel, maintenance and registration; handheld devices; printers; insurance or warehousing fees. *See Villalpando*, 303 F.R.D. at 609 (Section 2802 claim "len[t] itself to class

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. |

treatment to the extent that [defendant] ha[d] a uniform policy as what is reimbursed and what is not"); *Hopkins v. Stryker Sales Corp.*, 2012 WL 1715091, at *9 (N.D. Cal. May 14, 2012) (common questions predominated "in the inquiry as to whether [Defendant's] business expense reimbursement policy violated Cal. Lab. Code § 2802" and where Plaintiffs had identified common categories of expenses that were not reimbursed); *Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 639 (S.D. Cal. 2010) (where "putative class members were engaged in a common type of job and performed common tasks," common issues predominated on Section 2802 claim."). Plaintiff argues that individualized questions related to the amount of damages do not preclude class certification.

Plaintiffs' expense reimbursement claims will arise if it is determined that they are employees. Whether such expenses were incurred can also be determined on a classwide basis with common proof. However, if both of those issues were resolved favorably to the members of the Class, individual determinations would be required as to the amounts claimed. That process would parallel the bifurcated proceeding described earlier as to the overtime issue, and could be a part of the same individual proceedings described there.

### (d)     Meal and Rest Break Claim

The SAC advances causes of action for failure to provide meal periods and to authorize and permit rest breaks, in violation of Cal. Lab. Code § 226.7 and IWC Wage Order No. 9. Plaintiffs contend this claim is subject to common proof. IWC Wage Order 9–2001 provides that "no employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes." Plaintiffs argue that where an employer fails to maintain records of meal periods, there is a rebuttable presumption that the meal periods were not provided. Motion, Dkt. 54-1 at 30 (citing *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1053 (2012) (Werdeger, J., concurring); *Medlock v. Host Int'l, Inc.*, No. 1:12-CV-02024-JLT, 2013 WL 2278095, at *3 (E.D. Cal. May 22, 2013)). IWC Wage Order No. 9, § 12 states that employers "shall authorize and permit all employees to take rest periods."

Plaintiffs also argue that this claim is subject to common proof because, throughout the relevant time period, PF neither had a policy regarding meal or rest breaks nor made premium payments as to those that were missed or taken late. They also claim that there is common evidence as to the number of hours Distributors were required to work. Dkt. 54-1 at 30-31 (citing *Villalpando*, 303 F.R.D. at 609 (lack of a meal/rest break policy and the uniform failure to authorize such breaks are matters of common proof.); *Bradley v. Networkers Int'l, LLC*, 211 Cal. App. 4th 1129, 1151 (2012), *as modified on denial of reh'g* (Jan. 8, 2013) ("[W]hen an employer has not authorized and not provided legally-required meal and/or rest breaks, the employer has violated the law and the fact that an employee *may* have actually taken a break or was able to eat food during the work day does not show that individual issues will predominate in the litigation."); *Faulkinbury v. Boyd & Associates, Inc.*, 216 Cal. App. 4th 220, 235 (2013), *review denied* (July 24, 2013) (same)).

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

Defendant responds that certification of this claim is unwarranted unless Plaintiffs can establish that there was a uniform policy to require putative class members to forgo meal and rest breaks. Dkt. 61 at 29 (citing *Norris-Wilson v. Delta-T Group, Inc.*, 270 F.R.D. 596, 609 (S.D. Cal. 2010) (certification of independent contractor claims by itself does not warrant certification of meal and rest period claims); *Hughes v. WinCo Foods*, 2012 WL 34483, at *8 (C.D. Cal. Jan. 4, 2012) (declining to certify missed meal period claims of those whose status as employees was not disputed where "a wide range of factors affect when meal breaks are taken"); *accord Campbell v. Best Buy Stores, L.P.*, 2013 WL 5302217, at *13 (C.D. Cal. Sept. 20, 2013) (declining to certify class of employee delivery drivers, when employer had a formal policy allowing meal breaks, and plaintiffs did not sufficiently show a uniform or consistent contrary policy). Defendant also argues that "the absence of a formal written policy . . . does not necessarily imply the existence of a uniform policy or widespread practice." *Dailey v. Sears, Roebuck & Co.*, 214 Cal. App. 4th 974, 1002 (2013). Defendant argues that Distributors could take rest and meal breaks, and that many did so. Dkt. 61 at 30.

Plaintiffs reply that a policy of denying breaks to all Class Members may be established with common evidence. In support of this position they cite *Villalpando*, 303 F.R.D. 588. There, a class composed of delivery drivers was certified with respect to their claims that meal and rest breaks had not been provided to them. As in the present action, those class members had been classified as independent contractors. *Id.* at 609. The court determined that the claims were based on the defendant's "lack of a policy to permit meal and rest breaks, which itself is an issue susceptible to common proof." *Id.* (citing *Bradley v. Networkers International, LLC*, 211 Cal.App.4th 1129, 1150 (2012), *as modified on denial of reh'g* (Jan. 8, 2013) (meal and rest break claims based on the absence of a policy to provide them were suitable for certification)). The plaintiffs also identified various "companywide practices with respect to scheduling of deliveries that they contend make it difficult or impossible for drivers to take breaks." *Id.*

A similar analysis was applied in *Bradley*, 211 Cal. App. 4th 1129. Applying California law on class certification, the court found that common issues predominated as to meal and rest break claims brought by telecommunications technicians who were designated as independent contractors, and then converted to employees. In reversing the denial of certification of the class *Bradley* explained that

> an employer has an obligation to relieve its employee of all duty, permit the employee to take an uninterrupted 30-minute break, and to not impede or discourage the employee from doing so. . . . Similarly, an employer has an obligation to provide a rest break, and if the employer fails to do so, the employer cannot claim the employee waived the break. . . . Under the logic of these holdings, when an employer has not authorized and not provided legally-required meal and/or rest breaks, the employer has violated the law and the fact that an employee may have actually taken a break or was able to eat food during the work day does not show that individual issues will predominate in the litigation.

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

*Id.* at 1151 (*citing Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004 (2012)).

Because the class claims were based on alleged uniform policies that made it difficult to take meal and rest breaks, they were deemed suitable for certification. *Id.* If liability were established, the court concluded that individual questions as to damages could be adjudicated in separate proceedings.

No evidence has been presented as to individualized determinations on whether rest breaks were taken. Instead, Plaintiffs' theory calls for evidence to be presented as to whether Defendant had a policy or practice of generally denying meal and rest breaks to Class Members because the nature of their work was such that they could not both take such breaks and complete their work within the claimed time restrictions imposed by Defendant. Plaintiffs argue that this determination can be made on the basis of common evidence, including as to routes worked, hours of deliveries, and work demands, as well as evidence that Defendant never made any premium payment for a missed rest period or meal break.

A consideration of these competing positions shows that, based on the present evidence, it is uncertain whether this issue can be resolved through common evidence. The underlying issue is whether Defendant improperly classified Class Members as independent contractors. As noted above, no records were maintained by Defendant as to hours worked by Distributors. Nor did Defendant adopt a policy about meal or rest breaks because it classified the putative Class Members as independent contractors. Although Plaintiffs propose to present common evidence as to the amount of time that Distributors had to work to complete their daily tasks, this or responsive evidence may show that some putative Class Members had the opportunity to take breaks. Consequently, as to the meal and rest period claims, Plaintiffs have not satisfied the predominance requirements of Rule 23(b). However, this determination is without prejudice to a reconsideration of this issue once discovery has been completed.

### (e)     Wage Statement Penalties Claim

Cal. Lab. Code § 226(a) and IWC Wage Order No. 9 require that, at the time of each payment of wages or at least twice a month, an employer must provide its employees with accurate, itemized written statements containing certain required information. That information is described in § 226 and Wage Order No. 9, § 7. Plaintiffs argue that this is another issue that is subject to common proof because such statements were not provided. Motion, Dkt. 54-1 at 32 (citing *Norris-Wilson*, 270 F.R.D. at 610 (certifying wage statement claim where overtime pay was uniformly not recorded)).

For the reasons stated earlier, these claims may be adjudicated on a class-wide basis. They are based on a claimed practice that affected all Class Members.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | | Date | April 11, 2017 |
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | | |

(f)    *Waiting Time Penalties Pursuant to Cal. Lab. Code.*
*§§ 226 and IWC Wage Order 9*

Plaintiffs also claim that PF violated Cal. Lab. Code § 202, which requires employers to pay all unpaid wages within a specific time period following the termination of employment, and Cal. Lab. Code § 203, which provides that an employer who willfully does not timely pay such compensation is subject to a penalty. Plaintiff argues that this claim is also one in which predominance has been established. Motion, Dkt. 54-1 at 32 (citing *Norris-Wilson*, 270 F.R.D. at 611; *Dilts*, 267 F.R.D. at 640 (certifying waiting time penalty claims as derivative claims when other unpaid wage claims were certified)). This claim is also subject to a classwide determination because it is derivative of the general issue as to whether the putative Class Members were misclassified. If Plaintiffs prevail on that issue, individual determinations would be required as to the specific instances in which owed wages were not timely paid following the termination of a Distributor.

(g)    *Cal. Bus. & Prof. Code §17200 Claim*

The claim under Cal. Bus. & Prof. Code §17200 is derivative of the alleged wage and hour violations. Therefore, certification that parallels that provided as to those claims is appropriate. *See, e.g., Guifu Li v. A Perfect Franchise, Inc.,* No. 5:10-CV-01189-LHK, 2011 WL 4635198, at *15 (N.D. Cal. Oct. 5, 2011) (certifying UCL claim for wage and hour violations certified under Rule 23)).

(h)    *Conclusion*

For the foregoing reasons, common questions predominate as to whether Distributors were employees or independent contractors. The central question to be resolved -- whether PF has the right to control Distributors -- will be determined based on classwide evidence. The resolution of that issue will, as noted above, determine whether there is liability as to most, if not all, of the remaining claims. Issues as to damages and the application of particular defenses to Class Members will be reserved for a second phase process, whose design can be finalized should liability as to the Class be established.

(2)    Superiority

Class treatment is deemed superior "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon*, 150 F.3d at 1022 (quotation omitted). In evaluating this issue, the following factors are considered: (1) the interest of class members in individually controlling prosecution of separate actions; (2) the extent and nature of any pending litigation concerning the controversy; (3) the desirability of litigating the claims in the particular forum where the class action is filed; and (4) difficulties likely to arise in managing the class action. Fed. R. Civ. P. 23(b)(3). A class action is superior "[w]here classwide litigation

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-07086 JAK (RZx) | | Date | April 11, 2017 |
|---|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | | |

of common issues will reduce litigation costs and promote greater efficiency." *Valentino*, 97 F.3d at 1234.

Plaintiffs argue that they are not aware of any similar litigation, that class members have little interest in individually controlling separate actions, and that multiple actions would be costly, inefficient, and could lead to conflicting results. Motion, Dkt. 54-1 at 33. Plaintiffs argue that this case is manageable as class action because the common factual and legal questions underlying liability would be bifurcated. Thereafter, appropriate proceedings on damages could go forward. *Id.* Defendant restates its position that individualized inquiries will be at the center of any trial of these claims. Opposition, Dkt. 61 at 8, 31.

A class action is warranted by the costs to the parties and the courts that would arise from individual actions. For these reasons, a class proceeding in this action is superior.

        3.    <u>Ascertainability</u>

        a)    The Issue Presented

Defendant argues that, in connection with this Motion, Plaintiffs for the first time proposed excluding from the putative Class those Distributors who did not "personally deliver, stock and merchandise" products on their routes, and that this makes the Class unascertainable. Opposition, Dkt. 61 at 7-8. The SAC proposed a class of "all persons or entities who have been employed by Defendant as Distributors under Defendant's Consignment Agreements in the State of California at any time within four years preceding the filing of this action." Dkt. 39 at 11. Defendant argues that it is unclear both what "personally deliver, stock and merchandise" products means and how this group would be identified. *Id.* at 17-18 (citing *Spencer v. Beavex, Inc.*, 2006 WL 6500597, at *9 (S.D. Cal. Dec. 15, 2006) (class definition that sought to exclude "drivers who provided more than 51% of their services to [defendant] by using their own employees or subcontractors" not ascertainable); *Hanni*, 2010 WL 289297, at *9; *Martin v. Pac. Parking Sys. Inc.*, 583 F. App'x 803, 804 (9th Cir. 2014)).

        b)    Legal Standards

"Although there is no explicit requirement concerning the class definition in [Fed. R. Civ. P.] 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed.'" *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679-80 (S.D. Cal. 1999). To meet this requirement, a class must be defined "by reference to objective criteria." *Algarin v. Maybelline*, 300 F.R.D. 444, 454 (S.D. Cal. 2014). Moreover, it must be "administratively feasible for the court to ascertain whether an individual is a member." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998). Similarly, *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012), concluded that a class "must be currently and readily ascertainable based on objective criteria." Thus, "[i]f class members are

| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
|---|---|---|---|
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id.* at 593.

          c)     Application

The definition of the subgroup to be excluded from the putative Class is straightforward. It is reasonable to conclude that Class Members would know the manner in which they operated their Distributorships. They would also know whether they had employees, and if so, what they did in connection with the delivery and stocking of products on the routes. Plaintiffs have identified similar classes that were certified. *See Bowerman,* 2015 WL 1321883, at *6 (persons who "personally performed property preservation work in California"); *Villalpando*, 303 F.R.D. at 610 (persons who "personally provided delivery services for [Defendant]"); *In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 283 F.R.D. 427, 458 (N.D. Ind. 2012) (persons who "drove or will drive a vehicle on a full-time basis"). Defendant can also test these assertions by examining the business records of the Distributors, which likely reflect whether an SDA had other persons perform the delivery function. A claim by an SDA that he or she personally delivered merchandise, can also be tested by evidence from the retailers who were served.

This case is different from those nationwide consumer class actions in which ascertainability could not be shown. *See, e.g.*, *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009) (class of "all persons in the United States who won auctions managed by Seller Defendants and operated by eBay, or who would have won such auctions by virtue of being the highest bidder who was not a shill bidder . . . .") . *Mad Rhino, Inc. v. Best Buy Co.*, 2008 WL 8760854, at *3-4 (C.D. Cal. 2008) (denying certification to nationwide class of independent retailers). The definition of the class is sufficiently precise that all Class Members should be able to identify themselves as having a right to recover based on the description provided. This is all that ascertainability requires. *See Bowerman,* 2015 WL 1321883, at *6.

## IV.   <u>Conclusion</u>

For the reasons stated in this Order, the Motion is **GRANTED IN PART**. Two subclasses are certified. The first is composed of those Class Members who are current SDAs. Alves is designated as the representative of that subclass. The second subclass is composed of those Class Members who are former Distributors. Alfred and Barrish are designated as the representative of that subclass. The issue of liability is bifurcated and will be the subject of the initial trial. If either or both subclasses prevail as to liability on one or more issues, a further process will be designed to address any remaining issues that are unique to members of either subclass.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV14-07086 JAK (RZx) | Date | April 11, 2017 |
| Title | Raymond Alfred, et al. v. Pepperidge Farm, Inc., et al. | | |

A scheduling conference in this matter is set for May 8, 2017, at 1:30 p.m. On April 28, 2017, the parties shall submit a joint report setting forth their respective or collective views as to the appropriate dates for the completion of any additional discovery, further motions, the Final Pretrial Conference and Trial.

**IT IS SO ORDERED.**

_____  :  _____

Initials of Preparer    ak